DEBORAH CLARK-WEINTRAUB
MAX R. SCHWARTZ
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174
Telephone:  (212) 223-6444
Facsimile:   (212) 223-6334
Email:  dweintraub@scott-scott.com
            mschwartz@scott-scott.com

JOHN T. JASNOCH (Bar No. 281605)
SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone:  (619) 233-4565
Facsimile:   (619) 233-0508
Email:  jjasnoch@scott-scott.com

*Attorneys for Lead Plaintiffs*

*[Additional counsel on signature page]*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| UNION ASSET MANAGEMENT HOLDING AG, *et al.*, <br><br> Plaintiffs, <br><br> v. <br><br> SANDISK CORPORATION, *et al.*, <br><br> Defendants. | Case No. 3:15-cv-01455-VC <br><br> Hon. Vince Chhabria <br><br> **SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** <br><br> <u>DEMAND FOR JURY TRIAL</u> |

# TABLE OF CONTENTS

I.     SUMMARY OF CLAIMS ........................................................................ 1

II.    JURISDICTION AND VENUE .............................................................. 5

III.   PARTIES ................................................................................................ 5

IV.    SUBSTANTIVE ALLEGATIONS ......................................................... 7

       A.   SanDisk's Business: Flash Memory ........................................... 7

       B.   SanDisk's Growth Stalls ............................................................. 8

       C.   SanDisk's Plan to Mask Its Decline ........................................ 10

       D.   As Recounted by Confidential Witnesses, Unbeknownst to
            the Market, but Known to Defendants, SanDisk's Enterprise
            SSD Business Actually Faced Massive Difficulties During
            the Class Period and Was Performing Poorly ........................... 11

V.     DEFENDANTS'  MATERIAL  MISREPRESENTATIONS  AND
       MISLEADING OMISSIONS DURING THE CLASS PERIOD ............... 21

VI.    THE   TRUTH   EMERGES:   CORRECTIVE   DISCLOSURES
       AND POST-CLASS PERIOD EVENTS ........................................... 34

VII.   ADDITIONAL SCIENTER ALLEGATIONS ....................................... 41

       A.   Defendants' Imputed Knowledge of Facts Critical to Core
            Operations ................................................................................. 42

       B.   SanDisk's Potential Sale Provided Motivation to Inflate
            SanDisk's Stock ......................................................................... 45

VIII.  LOSS CAUSATION .............................................................................. 45

IX.    CLASS ACTION ALLEGATIONS ....................................................... 47

X.     APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND
       *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE .......................... 49

XI.    NO SAFE HARBOR .............................................................................. 51

XII.   COUNTS ............................................................................................... 52

       FIRST COUNT .................................................................................... 52

       SECOND COUNT ............................................................................... 55

XIII.  PRAYER FOR RELIEF ........................................................................ 56

XIV.   JURY TRIAL DEMANDED ................................................................. 56

i

Lead Plaintiffs City of Bristol Pension Fund, City of Milford, Connecticut Pension & Retirement Board, Pavers and Road Builders Pension, Annuity and Welfare Funds, the Newport News Employees' Retirement Fund, and Massachusetts Laborers' Pension Fund (collectively, the "Institutional Investor Group" or "Plaintiffs"), by and through their attorneys, and on behalf of all others similarly situated, allege the following upon information and belief, except as to those allegations concerning Plaintiffs, which are alleged upon personal knowledge. Plaintiffs' information and belief are based on, among other things, their counsel's investigation, which includes without limitation: (a) a review and analysis of regulatory filings made by Defendant SanDisk Corporation ("SanDisk" or the "Company") with the U.S. Securities and Exchange Commission ("SEC"); (b) a review and analysis of press releases and media reports issued and disseminated by the Company; (c) a review of other publicly available information concerning the Company; and (d) investigative interviews with persons having first-hand knowledge of the Company's operations.

# I.   SUMMARY OF CLAIMS

1.     This is a securities fraud class action brought to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act") on behalf of all persons or entities that purchased or otherwise acquired SanDisk common stock between October 16, 2014 and April 15, 2015, inclusive (the "Class Period"), and who were damaged thereby.  More specifically, Defendants (as defined below) made false and misleading statements regarding SanDisk's supposed success integrating a key corporate acquisition for its all-important enterprise solid-state drive ("SSD") business, the breadth and quality of SanDisk's enterprise SSDs, and the strength of SanDisk's enterprise sales team and strategy, even as a host of undisclosed problems with the integration and the enterprise business caused SanDisk's enterprise revenue to fall, including revenue derived from the acquisition, and to badly miss internal sales forecasts.

2.     SanDisk was a leading supplier of NAND flash memory, the primary data storage medium in most of today's consumer electronics.  The Company historically supplied

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:15-cv-01455-VC

chips to electronics (*e.g.*, computer) manufacturers to embed in their products, and sold its own branded memory cards and USB drives via retail sales channels.

3.      Prior to and during the Class Period, growth in the flash memory industry was shifting from the foregoing markets, in which SanDisk had experienced success, to the markets for SSDs, especially the market for enterprise SSDs, in which customers must store very large amounts of data.

4.      SanDisk began to build its enterprise SSD business[1] leading up to the Class Period, as that market grew rapidly, through acquisitions of several companies with products and technology that would allow it to compete in that market.  This included the acquisition of Pliant in 2011, SMART Storage in 2013, and Fusion-io in 2014.  Prior to and during the Class Period, the Company touted, and analysts accordingly discussed and fawned over, the high-margin (*i.e.*, high-profit) nature of the enterprise SSD business.   As a result of these acquisitions, the growing market for enterprise SSDs, and the high-profit potential of enterprise SSDs, the enterprise SSD business became one of the Company's most important and highest margin segments.

5.      Throughout the Class Period, Defendants claimed that they had made "excellent progress in integrating Fusion-io into SanDisk" such that they had "largely completed [their] overall Fusion-io integration."  They also touted the breadth and quality of SanDisk's product portfolio and the strength of SanDisk's sales force and customer relationships as unique competitive advantages in the enterprise market.  For example, Defendants stated: "[w]ith the acquisition of Fusion-io, SanDisk now has the most comprehensive enterprise portfolio in the industry;" "SanDisk has an industry-leading solutions portfolio and roadmap, and our deep

---

[1]      SanDisk has two revenue channels: commercial and retail.  The commercial channel is further segmented into client (which are products sold to manufacturers of laptops, tablets, mobile phones and other electronics for incorporation into the end product) and enterprise. The enterprise products are sold to customers with large-scale (so-called "hyperscale") data storage needs, such as data centers, cloud storage vendors, and social networking and other high-traffic websites.   The retail channel encompasses direct-to-consumer products like camera SD cards and USB thumb drives.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:15-cv-01455-VC

ecosystem and customer engagement are second to none;" and SanDisk has "tremendous sales and customer support reach."

6.     Moreover, SanDisk touted growth in its enterprise SSD segment as offsetting its loss of significant sales to Apple, which stopped purchasing client SSDs from SanDisk in favor of another supplier.  Those Apple purchases accounted for 19% of SanDisk's total revenue.

7.     As Defendants were aware, from attending regular meetings that addressed the Company's enterprise business and receiving regular reports on enterprise sales, notwithstanding robust demand in the enterprise SSD market, SanDisk was actually experiencing significant, undisclosed headwinds in its integration of Fusion-io, production and qualification of enterprise products, and also with its sales force that had very little experience selling enterprise products, which resulted in declining enterprise revenue, including for Fusion-io derived PCIe SSDs and missed internal sales forecasts.  More specifically:

(a) SanDisk did not possess the most comprehensive or broad set of products in the enterprise market.  To the contrary, each category of SanDisk's enterprise products suffered from a host of engineering and qualification problems, performed worse than products offered by SanDisk's competitors, and, in fact, did not provide the solutions that customers required at any level of the enterprise market;

(b) SanDisk's enterprise business was not well positioned to secure sales, take advantage of the growing demand for enterprise products, or for growth; in truth, SanDisk was experiencing significant difficulties integrating the various product lines and technologies that it acquired from Pliant, SMART Storage, and Fusion-io with its own technology, causing SanDisk to delay its next-generation enterprise products and fall ever further behind its competitors; in the face of these problems, SanDisk's senior executives were unable to agree on, or identify, a winning strategy for the Company's enterprise business;

(c) SanDisk was not executing its enterprise business strategy well; rather, SanDisk's enterprise products were consistently behind schedule and plagued by

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:15-cv-01455-VC

design problems and bugs, which also led to substantial difficulty and delay qualifying those products with customers; on top of that, much of SanDisk's sales force had little experience with, or success selling, enterprise products and the sales force could not execute a coherent strategy because it was broken into factions that derived from the various companies SanDisk had acquired; and

(d) Far from proceeding excellently, let alone being completed, SanDisk's integration of Fusion-io had been a disaster; SanDisk had been unable to incorporate its technology with Fusion-io's products, to reduce the cost of Fusion-io's products to a competitive level, to make progress with Fusion-io's next-generation products, to meld Fusion-io's sales force and other personnel into SanDisk's enterprise teams, or to create a strategy for Fusion-io's products that was consistent with SanDisk's goals.

8.      Also, in an effort to mask the significant challenges that the Company faced, SanDisk significantly depleted inventories in 3Q2014 in order to keep meeting its gross margin numbers, which Defendants touted as the best in the industry.  But this would backfire, leaving the Company unable to respond to increased customer demand during the Class Period.

9.      Notwithstanding Defendants' efforts to keep the truth from investors, as alleged in §VI, *infra*, these material facts were partially revealed to investors for the first time on March 26, 2015, and fully revealed for the first time on April 15, 2015.  For example, on March 26, Defendants disclosed that SanDisk had "lower than expected sales of enterprise products."  As a further example, on April 15, 2015, Defendants disclosed that SanDisk suffered from "product issues including qualification delays impacting embedded and enterprise sales," that it had a "reduced 2015 opportunity in the enterprise market," and that its products derived from Fusion-io had suffered a sales decline.

10.     The market reacted swiftly and negatively to these disclosures.  On March 26, 2015, the same day that SanDisk made its partial disclosure, the price of the Company's common stock plummeted from its previous day's close of $81.18 to a closing price of $66.20, a drop of 18.45% on unusually heavy trading volume.  Similarly, the day after the Company's

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:15-cv-01455-VC

April 15, 2015 disclosure, SanDisk's common stock dropped approximately 5% from $71.12 to $67.91, once again on unusually heavy trading volume.

## II.    JURISDICTION AND VENUE

11.    The claims asserted herein arise under §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and 78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

12.    This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §1331 and §27 of the Exchange Act (15 U.S.C. §78aa).

13.    Venue is proper in this Judicial District pursuant to 28 U.S.C. §1391(b) and §27 of the Exchange Act (15 U.S.C. §78aa(a)).  Substantial acts in furtherance of the alleged fraud or the effects of the fraud have occurred in this Judicial District.  Many of the acts charged herein, including the preparation and dissemination of materially false and/or misleading information, occurred in substantial part in this Judicial District.  Additionally, Defendant SanDisk is located within this Judicial District.

14.    In connection with the acts, transactions, and conduct alleged herein, Defendants directly and indirectly used the means and instrumentalities of interstate commerce, including the United States mail, interstate telephone communications, and the facilities of a national securities exchange.

## III.    PARTIES

15.    Lead Plaintiff City of Bristol Pension Fund, as set forth in its certification (ECF No. 22-2), purchased SanDisk common stock during the Class Period and suffered damages, as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

16.    Lead Plaintiff City of Milford, Connecticut Pension & Retirement Board, as set forth in its certification (ECF No. 22-3), purchased SanDisk common stock during the Class Period and suffered damages, as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

17.     Lead Plaintiff The Newport News Employees' Retirement Fund, as set forth in its certification (ECF No. 22-5), purchased SanDisk common stock during the Class Period and suffered damages, as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

18.     Lead Plaintiff Massachusetts Laborers' Pension Fund, as set forth in its certification (ECF No. 22-6), purchased SanDisk common stock during the Class Period and suffered damages, as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

19.     Lead Plaintiff Pavers and Road Builders Pension, Annuity and Welfare Funds, as set forth in their certification (ECF No. 22-4), purchased SanDisk common stock during the Class Period and suffered damages, as a result of the federal securities law violations and false and/or misleading statements and/or material omissions alleged herein.

20.     Defendant SanDisk was a Delaware corporation with its principal executive offices located at 951 SanDisk Drive, Milpitas, California 95035.   During the Class Period, SanDisk, through its officers and directors, published periodic filings with the SEC and made public statements that, as alleged herein, contained material misrepresentations and omissions that artificially inflated the price of the Company's common stock.  On October 21, 2015, it was announced that SanDisk would be acquired by Western Digital Technologies, Inc. ("Western Digital") and that acquisition was completed on May 12, 2016.

21.     Defendant Sanjay Mehrotra ("Mehrotra") was at all relevant times SanDisk's President and Chief Executive Officer ("CEO").  Throughout the Class Period, Mehrotra made statements in the Company's press releases and earnings conference calls, which, as alleged herein, contained material misrepresentations and omissions when made.  For all relevant times, Mehrotra made the false and misleading statements and omissions recklessly or with actual knowledge that they were false and misleading.  During the Class Period, Defendant Mehrotra sold 24,844 shares of SanDisk stock for proceeds of nearly $2.6 million.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:15-cv-01455-VC

22.     Defendant Judy Bruner ("Bruner") was at all relevant times Chief Financial Officer ("CFO") and Executive Vice President of Administration of the Company.  Throughout the Class Period, Bruner made statements in the Company's press releases and earnings conference calls, which, as alleged herein, contained material misrepresentations and omissions when made.  For all relevant times, Bruner made the false and misleading statements and omissions recklessly or with actual knowledge that they were false and misleading.  During the Class Period, Defendant Bruner sold 13,613 shares of SanDisk stock for proceeds of more than $1 million.

23.     Hereinafter, Defendants Mehrotra and Bruner will be collectively referred to as the "Individual Defendants."   Defendant SanDisk and the Individual Defendants will be collectively referred to as "Defendants."

## IV.     SUBSTANTIVE ALLEGATIONS

### A.     SanDisk's Business: Flash Memory

24.     SanDisk designs, develops and manufactures flash memory semiconductors along with related components and products.  Flash is a type of "non-volatile" memory used to store electronic data, which means that a flash product retains the data it is storing even if it is turned off.  The type of architecture that SanDisk uses for its flash is referred to as NAND.

25.     Flash was first developed about thirty years ago.  Its early commercial use was often in "removable" products, such as USB thumb drives or memory cards, that connect to and are then detached from a host device, such as a digital camera.

26.     As flash technology advanced over the last decade or so – becoming cheaper, higher-performing and smaller – it has taken on new commercial applications.  This means, for example, that flash technology may be "embedded" directly into, and play a permanent role in, the functioning of larger consumer products, like computers.

27.     More importantly, flash technology can now form the basis of SSDs, which are used for secondary electronic data storage.  Secondary storage holds larger-scale data that does not have to be accessed to run a device or group of devices, and is more akin to the information

stored in a library that users may want to access from time to time.  For that reason, secondary storage is sometimes referred to as holding "cool data," whereas data that is more fundamental to the moment-by-moment operation of a device is referred to as "hot data," and customers will typically pay less for cool data storage solutions than for hot data storage solutions.

28.     An older technology, known as hard-disk drives ("HDDs"), had long dominated secondary storage.  HDDs may cost less for the same amount of storage than SSDs, but SSDs are faster, more durable, and smaller then HDDs.  Significantly, the price differential between HDDs and SSDs has decreased as a tectonic shift in the amount and use of data has occurred. With the advent and ever increasing ubiquity of the internet, enterprise customers – which, as noted above, operate cloud computing, social networks, e-commerce and related technologies – need exponentially more data to be held in secondary storage, and that data needs to be accessed more quickly than in the past.  These shifting needs have allowed SSDs to increasingly displace HDDs.

**B.      SanDisk's Growth Stalls**

29.     Prior to the Class Period, which begins in 4Q2014, on October 16, 2014, SanDisk experienced consistent growth driven by its sale of removable products (like USB drives) to retail customers.  But SanDisk was experiencing significant headwinds that Defendants knew impaired the Company's prospects.

30.     First, prior to the Class Period, the market for removable flash products was decelerating and threatening to shrink, as technological advances allowed flash storage to be embedded directly into consumer devices.  This was particularly harmful to SanDisk, which led the removable flash products market and generated its highest margins from those products.

31.     Second, SanDisk's NAND architecture, the backbone for all of its products, was falling critically behind that of competing NAND manufacturers.

32.     At its most basic level, NAND architecture is based on nodes that hold data, where the smallest unit of data is referred to as a "bit" and 8 bits are commonly referred to as a "byte."  The driving force for SanDisk and its competitors is to create storage solutions that hold

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:15-cv-01455-VC

as much data as possible in as small a space as possible, while maintaining or improving performance in terms of the speed, accuracy and energy efficiency with which users can access data.

33.     For NAND architecture, this imperative had traditionally meant making nodes ever smaller so that an expanding number of them could be packed into a two-dimensional plane, and also increasing the number of bits that a single node could hold.  Over the last several years, the technological limit for how small a manufacturer can scale a node while still maintaining performance at a cost-effective level has begun to be reached, such that the ability to improve the capacity and performance of two-dimensional NAND ("2D NAND") will soon cease.  As SanDisk and its competitors recognized, in order to keep improving NAND, it would be necessary to develop a three-dimensional version of NAND ("3D NAND"), where nodes would not just be spread out across two dimensions, but would also be stacked vertically, allowing exponentially more nodes to be packed into even smaller spaces.

34.     While acknowledging that some of its competitors had announced the development or volume production of 3D NAND technologies, SanDisk's 3Q2014 Form 10-Q stated that the Company's 2D NAND technologies were "expected to be used for the majority of [the Company's] revenue for the next few years."  In fact, SanDisk was over a year behind Samsung in development of the next-generation 3D NAND architecture.  Prior to the Class Period, Samsung had released 3D NAND products, with which SanDisk's 2D NAND products could not compete, and SanDisk still had not released products containing 3D NAND even after the Class Period ended.

35.     Third, as SanDisk would announce during the 4Q2014 earnings conference call, in a devastating blow, SanDisk lost the largest single customer in its SSD business, Apple.  That business accounted for about 19% of SanDisk's overall revenue in 2014, or about $441 million, according to the Company's 2014 Form 10-K, and SanDisk had no other equipment manufacturer lined up to replace those lost sales.  Notably, as Wedbush reported in its March 27, 2015 analyst report, SanDisk had been selling client SSDs to Apple, which Apple installed

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:15-cv-01455-VC

in its products, but Apple switched to Samsung's 3D NAND SSDs.  Likewise, early in 2015, the *Korean Times* reported that Samsung had also won enterprise SSD business at Google with its 3D NAND SSDs.  SanDisk has yet to make up this revenue loss.  As SanDisk revealed in its January 27, 2016 investor conference call, the Company's 2015 yearly revenue was approximately 16% lower than its 2014 yearly revenue, which mirrored the amount of revenue that it lost from Apple.

> **C.     SanDisk's Plan to Mask Its Decline**

36.     Facing a diminishing market for its highest-margin removable products business line, more advanced 3D NAND from other flash suppliers with which it could not compete, and the loss of almost 20% of its revenue due to Apple's defection, SanDisk implemented a plan to mask these significant weaknesses.

37.     One part of the plan involved reducing inventories, to limit the Company's expenses and create the appearance of strong performance.  While this strategy enabled SanDisk to tout the Company's industry-leading margins in 3Q2014 – immediately before the Class Period – it ultimately backfired, leaving SanDisk without sufficient supply to meet customer demand in the following quarters.

38.     A second, and larger, part of the plan involved expanding into the fast-growing and high-margin enterprise SSD market.  As SanDisk had no native experience with or products in that market, it acquired companies that already supplied NAND products to enterprise and hyperscale customers.

39.     Thus, SanDisk purchased Pliant in 2011, SMART Storage in 2013, and Fusion-io on July 23, 2014, shortly before the Class Period.  Each of these companies had different specialties within the enterprise market that related to the type of interface that they employed.  As the name suggests, an interface is the means by which an SSD connects to and communicates with a computer, server or other device.  SMART Storage used a Serial Advanced Technology Attachment ("SATA") interface, as well as a Serial Attached Small Computer System Interface ("SAS"), Pliant used a SAS interface, and Fusion-io used a

Peripheral Component Interconnect Express ("PCIe") interface.   SATA offers the lowest performance and expense, SAS is the next grade up in both of those categories, and PCIe offers the highest performance at the highest cost.

40.   SanDisk's purported goal with these acquisitions was to have the broadest suite of products of any player in the enterprise SSD market, so that it could win customers' business at whatever price and performance range they desired.   In the June 16, 2014 press release announcing the completion of the Fusion-io acquisition, Defendant Mehrotra was quoted as stating that the acquisition would "accelerate [SanDisk's] efforts to enable the flash-transformed data center," and gave SanDisk "the broadest set of enterprise flash solutions in the industry."

41.   Additionally, a portion of the $1.26 billion purchase price for Fusion-io – $61 million – was allocated to an acquired In-Process Research and Development ("IPR&D") project that, as discussed below, was supposed to enhance the performance of SSDs using Fusion-io's technology.   According to SanDisk's 2014 Form 10-K, the value of the IPR&D was determined by estimating future net cash flows and discounting them to their present values.   In this regard, SanDisk estimated that the project would be completed by 1Q2016 at an estimated cost of $12 million.

42.   With each acquisition, SanDisk's enterprise SSD revenue grew, with the publicly stated goal that this business line would be in a position to offset SanDisk's weaknesses discussed above.

**D.    As Recounted by Confidential Witnesses, Unbeknownst to the Market, but Known to Defendants, SanDisk's Enterprise SSD Business Actually Faced Massive Difficulties During the Class Period and Was Performing Poorly**

43.   Confidential Witness ("CW") 5 was a Senior Fellow and Vice President of Enterprise Technology from July 2014 through February 2016, based in the Company's Milpitas, California headquarters.   CW5 reported to the General Manager of Enterprise Storage Solutions, John Scaramuzzo ("Scaramuzzo"), who in turn reported to Defendant Mehrotra and also to the Chief Strategy Officer, Sumit Sadana ("Sadana").   A former Fusion-io employee, at SanDisk CW5 oversaw the development of legacy Fusion-io products, mainly PCIe SSDs, and

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:15-cv-01455-VC

1   also served as the primary point of contact for all major OEM customers of SanDisk's PCIe

2   SSD products.  This involved working on PCIe product roadmaps and devising go-to-market

3   strategies for those products.  CW5 had knowledge of SanDisk's enterprise business and

4   performance through his regular duties and through meetings with Scaramuzzo and Defendant

5   Mehrotra, as well as through conversations with other senior enterprise executives, including

6   Defendant Mehrotra, Scaramuzzo, and the Senior Vice President of Worldwide Commercial

7   Sales and Support, Henri Richard ("Richard").

8        44.    CW5 stated that, during the Class Period, senior SanDisk executives had regular

9   meetings during which SanDisk's enterprise business was discussed in detail.  One group of

10  meetings focused exclusively on the enterprise business and was attended by Defendant

11  Mehrotra, Scaramuzzo, Sadana, the Vice President and General Manager of Systems and

12  Software Solutions, Ravi Swaminathan, as well as executives that oversaw business operations

13  and financials.  A second group of meetings involved all of SanDisk's business segments and

14  was attended by, among others, Defendant Mehrotra, Defendant Bruner, the other C-level

15  executives, Scaramuzzo, Sadana, and Richard.  Both of these meetings were scheduled to occur

16  on a weekly basis, but, in practice, they tended to take place every other week.  CW5 had

17  knowledge of these meetings, and what was discussed in them, through conversations with

18  Scaramuzzo, Richard, and other participants.

19       45.    CW5 stated that, prior to and during the Class Period, SanDisk's enterprise

20  segment suffered from product delays, poor product qualification processes, and unconscionable

21  bugs that were not detected internally and were thus included in test products submitted to

22  OEM's for their own testing.  This is consistent with the statements of CWs 1, 2, and 3.

23  According to CW5, these self-inflicted wounds resulted from SanDisk's sloppy development

24  and test practices.

25       46.    As an example of how these product issues negatively impacted sales, CW5

26  explained that SanDisk's Lightning product line, which were SAS SSDs derived from legacy

27  Pliant Technology, lost business because Lightning products allowed corruption of the data they

28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:15-cv-01455-VC

were supposed to store.  CW5 elaborated that this was a significant concern because data corruption should never occur with SSDs.  It is also noteworthy that this problem occurred in SAS SSDs, which were supposed to be SanDisk's oldest and strongest enterprise products.

47.     As another example, CW5 noted that SanDisk's Optimus Max 4 Terabyte SSD, another SAS product, suffered delays on account of poor engineering at SanDisk and problems with a controller chip supplied by a third-party.  This is consistent with CW2's statements. Mehrotra and Sadana participated in high-level meetings with the controller chip supplier to attempt to alleviate these problems, as CW5 learned from meetings with Scaramuzzo

48.     CW5 stated that SanDisk's problems with product delays, validation and qualification issues, and bugs were discussed in the regular enterprise and business heads meetings, both of which Mehrotra attended and the latter of which Bruner attended.  CW5 also recounted that SanDisk's Vice President of Engineering, Samir Mittal ("Mittal"), was grilled by Scaramuzzo and other top-ranking executives due to those problems.

49.     In addition to the foregoing product shortcomings, prior to and during the Class Period, SanDisk's enterprise sales and customer support operations were also significantly deficient.  CW5 explained that enterprise sales were, by their nature, customer-centric and driven by close relationships between SSD suppliers and customers.  This is because customers typically purchase very large, expensive orders that have to be integrated into, and will shape, their technological ecosystems.  Thus, the relationship between supplier and customer must be strong enough to last years and depends on the supplier providing customers with insight over time into the supplier's future products, so that the customers can continue to update and design their own systems.  Enterprise sales are accordingly built on trust, as much as the underlying products.

50.     CW5 stated that this type of relationship-based selling was not part of SanDisk's sales experience, which was primarily focused on more impersonal sales to retail customers. Moreover, CW5 recounted that SanDisk was hostile to the industry-accepted, relationship-based model, so much so that Lance Smith ("Smith"), who had been the Chief Operating Officer of

13

Fusion-io and SanDisk's General Manager of IO Memory Solutions, quit the Company in frustration in October 2014.  CW5 stated that after Smith quit, Scaramuzzo was effectively in charge of SanDisk's enterprise business and SanDisk remained slow to adopt the customer-centric, relationship-based model under Scaramuzzo.  The foregoing is consistent with the statements of CWs 4 and 6.

51.   As set forth in further detail below, when Mehrotra announced on April 15, 2015 that SanDisk would overhaul its enterprise business, the overhaul focused on improving the product issues discussed previously and also on improving the lack of customer focus in sales discussed immediately above.  The overhaul also led to the demotion of Scaramuzzo and Sadana taking over SanDisk's enterprise segment.  Further, as set forth below, on May 19, 2015, Bruner explained that, after taking over enterprise, Sadana had attempted to make additional changes to create a more relationship-based sales force.  CW5 had discussions with Mehrotra regarding the overhaul of enterprise to improve the sales model.

52.   The relationship-based sales model was particularly important for PCIe sales.  As CW5 explained, prior to and during the Class Period, the market for enterprise PCIe products was not growing significantly because, with their high-capacity and high-cost, PCIe products only served a narrow spectrum of storage solutions.  Accordingly, CW5 stated that selling PCIe-based products to a wider range of customers required substantial efforts from the sales team to explain the benefits that PCIe offered.

53.   Scaramuzzo held weekly meetings during the Class Period that CW5 attended where, among other things, SanDisk's sales results for enterprise and PCIe were reviewed.  CW5 stated that internal sales forecasts were also regularly discussed during those weekly meetings, and that SanDisk's actual PCIe sales for 4Q2014 badly missed the Company's internal sales forecasts for that period, coming in between 34% to 50% low.  Scaramuzzo informed CW5 that he reviewed the sales results at the regular meetings discussed above in which Mehrotra and Bruner participated.  This is consistent with CW6's statements.  It is also consistent with Mehrotra's and Bruner's post-Class Period admissions, as discussed below, that

they began to see SanDisk's PCIe revenue fall during 4Q2014 and that they saw that trend accelerate over the course of 1Q2015.  Additionally, as discussed below, Defendants admitted, after the Class Period, that SanDisk's overall enterprise revenue decreased over the course of 1Q2015.

54.     CW6 served as the Vice President of Customer Service and Support at SanDisk from July 2014 through October 2014, based in the Company's Milpitas, California Headquarters.  CW6 reported to Richard (Senior Vice President of Worldwide Commercial Sales and Support), who in turn reported to Defendant Mehrotra.  A legacy Fusion-io employee, CW6's responsibilities at SanDisk included interfacing with large OEM customers to train their personnel on how to use PCIe technology purchased from the Company.  CW6 had knowledge of SanDisk's enterprise performance through his regular duties, as well as through meetings he attended and conversations he had with other senior executives.

55.     As CW6 recounted, Richard was responsible for devising the sales forecast for SanDisk's enterprise segment.  On a weekly basis, while CW6 was at SanDisk, Richard and his team of executive-level sales personnel met to discuss enterprise sales forecasts and actual results.  Participants in these meetings included CW6, the Vice President of Worldwide Enterprise Sales and Support, Erick Shiroke, the Vice President of Americas Commercial Sales, Richard Hedberg, and the Vice President of Worldwide Business Channel Sales, Ken Oberman.  Sales figures from the various executives at the meetings would be consolidated into a single master sales report and power point.

56.     After this weekly sales meeting, while CW6 was at SanDisk, Richard would meet with Mehrotra and other C-level executives to discuss sales figures for the enterprise segment about once a week.  At the meeting with Mehrotra and the other C-level executives, Richard would present them with the master sales report and power point.  Richard informed CW6 of his meetings with the C-level executives and that he presented the master sales report and power point to those executives.  Again, this is consistent with CW5's statements.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:15-cv-01455-VC

57.     CW6 also reiterated that a relationship-based, go-to-market strategy, in which SSD suppliers offer service and support to customers both before and after a sale, is critical in the enterprise market.  Through repeated conversations with other senior SanDisk executives, CW6 learned that SanDisk had acquired Fusion-io not just to secure PCIe technology, but also in an attempt to obtain an experienced enterprise sales and customer support organization, which SanDisk largely lacked.  However, CW6 stated that the vast majority of legacy Fusion-io sales executives at the Vice President level were either let go or left on their own following the acquisition by SanDisk.  Thus, despite acquiring Fusion-io, SanDisk still lacked the enterprise sales experience and personnel that was part of the rationale for the acquisition.  This is consistent with the statements of CWs 5 and 4.

58.     CW1 was a Director in Systems Design Management at SanDisk from 2007 until April 2015 based in the Company's Milpitas, California headquarters.  For the last two years of his tenure, which coincides with the Class Period, CW1 reported to Vice President of SSD Engineering Jason T. Lin.  CW1 was responsible for product validation for SATA-protocol SSDs and also helped define the PCIe/NVMe SSD validation infrastructure.  CW1 was generally knowledgeable about the issues relating to SanDisk's Enterprise business segment through ongoing interactions with personnel in that segment including Steven Sprouse, the Director of the Enterprise Architecture and Modeling Group, who was involved with the technological due diligence of Pliant leading up to that acquisition, and Carlos Gonzales, Senior Director of Engineering, Enterprise SSD Firmware.

59.     According to CW1, all three of the enterprise acquisitions performed poorly, and were widely perceived within SanDisk as "disasters" during the Class Period.  SanDisk struggled to integrate its native technology with Pliant's technology, which led to delays in product launches and the scrapping of certain products altogether before and during the Class Period.  Notably, as stated in SanDisk's 2013 Form 10-K, the Company had previously written off $36 million in IPR&D assumed as part of the Pliant acquisition.  SanDisk suffered similar setbacks with SMART Storage and experienced difficulties when attempting to incorporate pre-

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:15-cv-01455-VC

1   acquisition technologies that the Company used with legacy SMART Storage products.

2   According to CW1, together, these two acquisitions saddled SanDisk with substantial operating

3   expenses, while providing little return on investment, by the time that SanDisk announced the

4   loss of Apple's SSD business.

5        60.    The Fusion-io acquisition also proved problematic according to CW1.

6   According to CW1, Fusion-io's technology was designed for high-performance, high-end

7   storage systems utilized by enterprises such as EMC, Oracle, HP and Cisco, and built for so-

8   called hot data – *i.e.*, data that resides in the fastest (*i.e.*, highest computing speed) storage

9   devices, which are typically located in close proximity to the CPU, for quick and regular access.

10   However, the larger enterprise storage market primarily served massive data centers of

11   enterprises in which storage drives are high in volume, but high-end performance/speed is not

12   paramount because retrieval of this data – so-called cool data – is less frequent.  According to

13   CW1, Fusion-io's high-performance product was a more costly option for the larger Enterprise

14   customer base looking for cool data storage.  For these customers, SATA-based SSDs are a

15   workable and much less expensive option.  Consequently, CW1 stated that it became apparent

16   that, no later than 4Q2014, SanDisk would not be able to reduce production costs for Fusion-

17   io's PCIe products to enable it to effectively compete with SATA-based SSDs in the larger

18   Enterprise market segment.  As set forth below, Mehrotra and Bruner confirmed after the Class

19   Period that Defendants became aware of the market's shifting preference for SATA-based SSDs

20   no later than 4Q2014.

21        61.    Further, CW1 explained that Fusion-io's products used a proprietary command

22   set – which is one of the elements involved in transferring data between an SSD and a computer

23   or server – rather than the industry-wide, openly available command set, called NVMe.

24   Products using such a proprietary command set are less attractive to customers and destined to

25   become obsolete, because they are harder to integrate into other aspects of customers' servers,

26   which typically are built to utilize the open command set and have difficulty readily using the

27   proprietary command set.  CW1 stated that SanDisk products derived from Fusion-io's

28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:15-cv-01455-VC

proprietary command set have indeed become increasingly obsolete.  CW3 confirmed that SanDisk abandoned a project based on Fusion-io's proprietary command set, because the industry had moved on to NVMe.

62.   CW1 stated that SanDisk was able to conceal the poor performance of these acquisitions and its enterprise business because it did not separate out its enterprise SSD-derived revenue in its public financial reporting prior to and during the Class Period.  Indeed, SanDisk did not begin to separate out this information until after the Class Period, as late as January 2016.

63.   CW2 was a Senior Business Development Manager at SanDisk from February 2014 to August 2015, based in SanDisk's Milpitas, California headquarters.  CW2 reported to Senior Staff Business Development Manager Delya Jansen in a reporting line that went up to John Scaramuzzo, General Manager of Enterprise Storage Solutions.  CW2 was one of ten personnel in the Enterprise Business Development Group, which was tasked with forging strategic partnerships and alliances with other technology companies in an effort to develop and market competitive products integrating components and technology from the partners involved in a given venture.

64.   According to CW2, the Enterprise Business Development Group was in a state of perpetual change and disarray throughout his tenure, as it added personnel through acquisitions, and also underwent a series of restructurings and layoffs.  As these problems grew, the leaders of the Business Development Group, including Scaramuzzo, met regularly with and constantly received changing directions from SanDisk's Strategy Group, headed by Sumit Sadana, further hampering SanDisk's ability to gain traction with its enterprise products.  These shifting directions occurred amid infighting among SanDisk's various enterprise groups about what strategies SanDisk should pursue for its enterprise business.

65.   Corroborating CW1's statements, CW2 stated that SanDisk struggled to integrate the product lines, technology and personnel from the three acquisitions.  Consequently, SanDisk's enterprise product roadmaps were, across the board, consistently behind schedule

throughout the Class Period.  When SanDisk finally released the products for testing by its customers and partners, they invariably had many bugs, creating additional delays, which also occurred throughout the Class Period.

66.    One example of the many enterprise products that suffered from these problems was SanDisk's Optimus MAX 4 Terabyte SAS SSD, which was derived from SMART Storage technology and was supposed to offer the higher performance of a SAS SSD at the lower price points closer to that of a SATA SSD.  Although SanDisk eventually announced the release of this product in April 2014, the delays were so significant that SanDisk was not even able to begin producing it in any large-scale capacity for months after it had supposedly been released. As another example, SanDisk had persistent difficulty and delays incorporating the Guardian Technology Platform – a type of firmware designed by SMART Storage to enhance the performance of SSDs – into the SSDs that used SanDisk's native technology.  After the Class Period, as discussed below, SanDisk admitted that it had product qualification issues with its enterprise SAS products.

67.    Owing in part to SanDisk's inability to develop new enterprise products with the technology it had acquired from Pliant, SMART Storage and Fusion-io, CW2 stated that SanDisk eventually stopped focusing on pushing out the next generation of enterprise products and instead attempted to sell the older legacy products from those companies.  But, as CW2 learned from interactions with customers, customers were largely uninterested in purchasing those older products and instead, were waiting for SanDisk to produce the newer products that it had promised to develop.

68.    Alternately, and consistent with the CWs' statements, enterprise customers already had next-generation and superior products that they could purchase from SanDisk's competitors.

69.    CW3 worked at SanDisk from July 2005 through July 2015, in its Milpitas, California headquarters.  From October 2013 through July 2015, CW3 served as Senior Manager of Firmware Engineering.  Firmware is a software program that is used to control and

manipulate hardware, such as SSDs.  As Senior Manager of Firmware Engineering, CW3 was charged with developing firmware to meet the specific requests of major enterprise customers. In that role, CW3 reported to Rod Brittner, Director of Firmware Enterprise Storage Server, who in turn reported to Samir Mittal, Vice President of Engineering.

70.     Like CW1 and CW2, CW3 reiterated that SanDisk had significant difficulty integrating its enterprise acquisitions, and suffered significant setback as a result.  Throughout CW3's tenure as Senior Manager of Firmware Engineering, SanDisk repeatedly fell behind schedule with its enterprise product lines.  CW3 confirmed that the foregoing problems and delays impacted every single enterprise product that SanDisk released from April 2014 through 1Q2015.  Further, CW3 explained that this resulted in difficulty qualifying products with enterprise customers, including during the Class Period, as SanDisk would later admit.  CW3 stated that, for example, during January 2015, the problems qualifying one product line were so severe that SanDisk had to cancel the shipment of the entire line to enterprise customers.

71.     With respect to Fusion-io in particular, CW3 confirmed that SanDisk originally attempted to build PCIe products using Fusion-io's proprietary command set, and also noted that it did so at Scaramuzzo's direction.  But SanDisk had to abandon this project, as the industry and customers had moved to NVMe, the open command set.  CW3 said that this abandoned project was the $61 million IPR&D that SanDisk acquired with Fusion-io, which, as noted below, SanDisk completely wrote off immediately after the Class Period.

72.     CW4 worked as Director of Worldwide Sales and Support at SanDisk's Milpitas, California headquarters from January 2014 through June 2015.  Initially, CW4 reported to Eric Shiroke, Vice President of Worldwide Enterprise Sales, and later to Mike Lakowicz, Vice President of Americas Commercial Sales and Support, in a reporting line that went up to Henri Richard, Senior Vice President of Worldwide Commercial Sales and Support.  In his position as Director, CW4 set and executed SanDisk's global sales strategy for its enterprise products, worked with sales teams in each global territory to open and service accounts, and worked with SanDisk's Enterprise Business Development Group.

20

73.     CW4 confirmed that, prior to and during the Class Period, SanDisk's Enterprise Business Development Group suffered from lack of direction, infighting and poor execution, and explained that these problems extended to the Company's sales force as well.   SanDisk initially hired CW4 in early 2014 because its enterprise sales force was performing poorly, had insufficient knowledge of the enterprise market, and needed to be trained on proper enterprise sales strategies, which CW4 attempted to provide.

74.     When SanDisk acquired Fusion-io in July 2014, it also acquired Fusion-io's sales team.   Soon thereafter, CW4's primary role was to assist with the integration of Fusion-io's sales force into SanDisk's existing enterprise sales division.   CW4 explained that the addition of Fusion-io's sales force created new problems, as SanDisk failed to incorporate the legacy Fusion-io personnel into its larger sales force.   As a result of redundancies between the pre-existing SanDisk sales force and the legacy Fusion-io personnel, infighting occurred, with each group seeking to secure a role for themselves, and the two groups functioning independently, further hampering the ability of SanDisk to manage its enterprise sales strategy.   This problem persisted during the Class Period and eventually led to layoffs of sales personnel shortly after the Class Period.

## V.     DEFENDANTS' MATERIAL MISREPRESENTATIONS AND MISLEADING OMISSIONS DURING THE CLASS PERIOD

75.     On October 16, 2014, SanDisk issued a press release announcing its results for 3Q2014, ended September 28, 2014.   The press release reported 3Q2014 GAAP net income of $263 million, or $1.09 per share, compared to net income of $277 million, or $1.18 per share, in 3Q2013 and $274 million, or $1.14 per share, in 2Q2014.   The press release quoted Defendant Mehrotra as stating that "[t]hird quarter results reflect[ed] the strength of [SanDisk's] diversified product portfolio, broad customer engagements and solid execution."

76.     Defendants held a conference call with securities analysts the same day during which they made a series of materially false and misleading statements concerning SanDisk's all-important enterprise SSD business and the Fusion-io acquisition.

77.     In this regard, Defendant Mehrotra stated:

**With acquisition of Fusion-io, SanDisk now has the most comprehensive enterprise portfolio in the industry.** Our solutions range from the highest performance, lowest latency products that enable application acceleration and disrupt traditional IP architectures to products that have a compelling value proposition to replace hard drive in a variety of applications.

**This portfolio, coupled with our broad and expanding customer reach and well-established vertical integration capabilities, positions us well to accelerate our momentum in the fast-growing market for enterprise flash.** We expect our enterprise SSD revenue to surpass $1 billion in 2015, a year ahead of our previously stated timeline.

\* \* \*

**The Fusion-io business performed in line with our expectations post-acquisition[].**

On the product front, multiple OEMs have now qualified and are offering our next-generation Fusion-io PCIe products.

\* \* \*

Following the completion of the Fusion-io acquisition in late July, **we have made excellent progress in integrating Fusion-io into SanDisk**.

\* \* \*

Finally, enterprise and hyperscale customers continued to work with market leaders like SanDisk to find new ways to use flash in an ever-increasing number of applications and workloads, as flash technology is a critical foundation of the modern day responsive enterprise.  To summarize, we believe that near-term and secular demand drivers for flash remain strong and we continue to be confident in the future prospects for the industry.

\* \* \*

We are driving hard in innovation and execution in a vibrant industry with strong secular demand drivers.  **SanDisk has an industry-leading solutions portfolio and roadmap, and our deep ecosystem and customer engagement are second to none.** [2]

78.     Defendant Bruner acknowledged the existence of supply constraints but also assured investors that demand for SanDisk's products continued to be high, stating "[f]or the fourth quarter, we have strong demand signals from our customers in all key product

---

[2]     Unless otherwise noted, all emphasis is added.

22

categories."   Defendant Bruner also reiterated that SanDisk had "***the broadest portfolio of enterprise and consumer flash solutions in the industry***" and was "***uniquely positioned to capitalize on the opportunities ahead.***"

79.   In the Q&A session with securities analysts that followed their prepared remarks, the Individual Defendants repeated the foregoing assurances.  Defendant Bruner reiterated that Defendants were "***very pleased with how the [Fusion-io] integration [was] going***" and "believe[d] that the Fusion-io revenue [would] grow from this point forward."   Likewise, Defendant Mehrotra reiterated that Defendants "see strong demand in all product categories for [SanDisk's] business in 2015 timeframe" and that SanDisk was "***really executing very well***" on its strategy.

80.   Further, Defendant Mehrotra emphasized that "regardless of the considerations that may occur in one market segment versus another," SanDisk was "***uniquely positioned with a broad engagement with customers, diversified set of customers in all markets, all channels, all end market applications, and we, as Judy has said, have the broadest portfolio of solutions, as well[] . . . and really tremendous sales and customer support reach, I believe there's huge advantage in us continuing to drive the business***[.]"

81.   When asked "how challenging the pricing is in the SSD market specifically," Defendants gave no hint of pricing pressures and extolled SanDisk's market position, stating:

> **MEHROTRA:**   ***SanDisk with our vertical integration capabilities and particularly in enterprise side, with the recent acquisition of Fusion-io, and in the past starting with Pliant and then SMART Storage, and adding capabilities in software area, I believe we have the best capabilities that are out there in terms of driving the enterprise SSD growth***.
>
> And on the client side, as well, we have really, as you have seen, we have grown revenue, I think, brilliantly well over the course of last couple of years in client SSD.   ***So SanDisk really, all client SSD as well as on the enterprise SSD side has what it takes to continue to build its market leadership position***.
>
> **BRUNER:**   ***I don't think there's a competitor out there that can match up to the breadth of the SSD product line that we have, particularly in enterprise with our SAS products, our SATA products, PCIe, DDR, software on top of that.  We really do have the most complete portfolio.***

82.     Further dispelling investor concerns regarding pricing, Defendants touted SanDisk's operating margins, which were dependent on the high margins in the Company's enterprise business.  In this regard, Defendant Mehrotra stated:

> [W]hen you look at our operating margins, in our industry, I believe they are the best.  When you look at by any measure in the semiconductor industry, our operating margins are among the very best.

> In terms of our price decline, if you look at it on a year-over-year basis, I believe we are on track to have our price decline to be less than the industry price decline in 2014 timeframe. ***All of this is because of SanDisk capabilities to really have a strong portfolio of solutions, a strong value proposition for our customers, and to continue to drive a strong mix of our business as well***.

83.     On November 3, 2014, SanDisk filed its Form 10-Q for 3Q2014, which ended September 28, 2014.  That 10-Q containing the results previously reported on October 16, 2014.  The Form 10-Q also contained more detailed disclosures concerning the Fusion-io acquisition including that the Fusion-io's tangible and intangible assets included $61MM in In Process Research and Development ("IPR&D") and $542.6MM in Goodwill.  The Form 10-Q described these values as "provisional" and as having been "based upon their estimated fair values as of July 23, 2014."

84.     The foregoing statements in ¶¶77-82 were materially false and misleading because:

(a) SanDisk did not possess the most comprehensive or broad set of products in the enterprise market.  To the contrary, each category of SanDisk's enterprise products – SATA, SAS, and PCIe – suffered from a host of engineering and qualification problems, performed worse than products offered by SanDisk's competitors, and, in fact, did not provide the solutions that customers required at any level of the enterprise market;

(b) SanDisk's enterprise business was, at that time, not well positioned to secure sales, take advantage of the growing demand for enterprise products, or for growth; in truth, SanDisk was experiencing significant difficulties integrating the various product lines and technologies that it acquired from Pliant, SMART Storage and Fusion-io with its own technology, causing SanDisk to delay its next-generation enterprise products and

fall ever further behind its competitors; in the face of these problems, SanDisk's senior executives were unable to agree on or identify a winning strategy for the Company's enterprise business; and

(c) SanDisk was not executing its enterprise business strategy well; rather, SanDisk was struggling and failing to integrate the personnel and technologies acquired from Pliant, SMART Storage, and Fusion-io, and to incorporate their products with its own technology; SanDisk's enterprise products were consistently behind their roadmaps, and plagued by design problems and bugs, which also led to substantial difficulty and delay qualifying those products with customers; on top of that, much of SanDisk's sales force had little experience with or success selling enterprise products, and the sales force could not execute a coherent strategy because it was broken into factions that derived from the various companies SanDisk had acquired.

85.     Paragraphs 77 and 79 also contain materially false and misleading statements regarding SanDisk's integration of Fusion-io.  Far from proceeding excellently, SanDisk had been unable to incorporate its technology with Fusion-io's, to reduce the cost of Fusion-io's PCIe products to a competitive level, to make progress with Fusion-io's proprietary command set, to meld Fusion-io's sales force and other personnel into SanDisk's enterprise teams, or to create a strategy for Fusion-io's products that was consistent with SanDisk's goals.

86.     On November 10, 2014, Defendant Bruner participated in RBC Capital Markets Technology, Internet, Media & Telecom Conference and falsely touted the condition of the Company's SSD business and the status of the Fusion-io acquisition.  Specifically, Bruner stated:

> We have done very well in diversifying our business and in the third quarter SSDs comprised 27% of our revenue.  That is both client SSDs and enterprise SSDs. **And within the enterprise business, we now have the broadest set of enterprise SSDs in the industry with SATA, SAS, PCIe, and our ULLtraDIMM product.**
>
> We closed the Fusion-io acquisition in the third quarter and **the integration of that business is going extremely well.**  And so we are very happy with how that's going. . .

87.     The foregoing statements were materially false and misleading because:

(a) SanDisk did not possess the most comprehensive or broad set of products in the enterprise market.  To the contrary, each category of SanDisk's enterprise products – SATA, SAS, and PCIe – suffered from a host of engineering and qualification problems, performed worse than products offered by SanDisk's competitors, and, in fact, did not provide the solutions that customers required at any level of the enterprise market;

(b) SanDisk's enterprise business was, at that time, not well positioned to secure sales, take advantage of the growing demand for enterprise products, or for growth; in truth, SanDisk was experiencing significant difficulties integrating the various product lines and technologies that it acquired from Pliant, SMART Storage, and Fusion-io with its own technology, causing SanDisk to delay its next-generation enterprise products and fall ever further behind its competitors; in the face of these problems, SanDisk's senior executives were unable to agree on, or identify, a winning strategy for the Company's enterprise business;

(c) SanDisk was not executing its enterprise business strategy well; rather, SanDisk was struggling and failing to integrate the personnel and technologies acquired from Pliant, SMART Storage, and Fusion-io and to incorporate their products with its own technology; SanDisk's enterprise products were consistently behind their roadmaps and plagued by design problems and bugs, which also led to substantial difficulty and delay qualifying those products with customers; on top of that, much of SanDisk's sales force had little experience with, or success selling, enterprise products and the sales force could not execute a coherent strategy because it was broken into factions that derived from the various companies SanDisk had acquired; and

(d) SanDisk's integration of Fusion-io was not going extremely well; instead, SanDisk had been unable to incorporate its technology with Fusion-io's, to reduce the cost of Fusion-io's PCIe products to a competitive level, to make progress with Fusion-io's proprietary command set, to meld Fusion-io's sales force and other personnel into

26

SanDisk's enterprise teams, or to create a strategy for Fusion-io's products that was consistent with SanDisk's goals.

88.     On January 12, 2015, SanDisk issued a press release announcing preliminary results for its 4Q2014, ended December 28, 2014.  The press release stated that SanDisk estimated total revenue would be approximately $1.73 billion, lower than the previously forecasted revenue range of $1.80 billion to $1.85 billion, as a result of weaker than expected sales of retail and iNAND products.  In addition, the press release revealed that non-GAAP gross margin for 4Q2014 was expected to be approximately 45% compared to the previously guided range of 47% to 49%.  In response, the price of SanDisk stock plummeted $13.47 per share to close at $83.57 per share, a decline of nearly 14% on volume of 23.2 million shares.

89.     On January 21, 2015, SanDisk issued a press release announcing its 4Q2014 and FY2014 results consistent with the January 12, 2015 pre-announcement.  The press release reported 4Q2014 GAAP net income of $202 million, or $0.86 per share.  GAAP net income for fiscal 2014 was a reported $1.01 billion, or $4.23 per share.  The release quoted Defendant Mehrotra as stating:

> We delivered record revenue in 2014 with continued progress in shifting our portfolio towards high value solutions. . . .  Our SSD solutions reached 29 percent of revenue in 2014, with strong growth from both client and enterprise SSDs.  We are disappointed with our fourth quarter results, which were impacted primarily by supply constraints.  We believe that NAND flash industry fundamentals are healthy, and we expect our financial results to improve as we move through 2015.

90.     The same day Defendants held a conference call with securities analysts to discuss the earnings miss, which Defendants attributed to (i) the Company's inability "to service [its] customers' demand variability with [its] lowered levels of inventory," which "creat[ed] supply shortfalls in certain products"; (ii) unplanned maintenance activities at its Yokkaichi, Japan fabrication facility and "lower yield on certain memory die," which led to unexpected reductions in production output and "made [SanDisk's] ability to meet [its] customer demand even more challenging during a seasonally strong period"; and (iii) a more rapid than expected

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:15-cv-01455-VC

reduction in demand for previous generation products, "while [SanDisk] had limited ability to service demand for [its] newer products due to supply constraints."

91.    Notwithstanding the earnings miss, Defendants touted the Company's enterprise products and the progress made in integrating Fusion-io.  In this regard, Defendant Mehrotra stated:

> ***We have largely completed our overall Fusion-io integration, and we are excited about the opportunities ahead with the broadest portfolio of enterprise SSD products in the industry.  We made solid progress in moving the Fusion-io go-to-market strategy to an OEM-centric model and enhancing sales force productivity.***  We continue to expect that our enterprise solutions revenue will achieve $1 billion in 2015.

92.    Although Mehrotra disclosed that the decision of a major client (believed to be Apple) "to move away from [the Company's] client SSD solution starting in Q1" was a "headwind for [its] client SSDs," Defendants nevertheless estimated that total SSD revenue, including enterprise revenue, would remain 29% of total revenue in 2015 as it had been in 2014 because they expected "significantly higher sales in enterprise[.]"

93.    In responding to questions following their prepared remarks, Defendant Mehrotra was even more bullish regarding SanDisk's enterprise SSD business stating, "***enterprise SSD solutions will certainly achieve $1 billion for us in 2015 for our revenue.***"  For her part, Defendant Bruner emphasized that the increasing mix of enterprise SSD business would have a positive impact on margins.

94.    With respect to Fusion-io, Defendant Mehrotra represented that, although the business was "not at the run rate that it was pre-acquisition," this had been expected at the time of the acquisition.  Mehrotra reiterated that SanDisk had "***made strong progress in terms of integration***," had "***an excellent team, a strong road map for Fusion-io products***," and "expect[ed] in Q1 to have sequential growth in that part of the business."  Mehrotra also stated that Fusion-io would "be a significant contributor" to SanDisk's "$1 billion goal in 2015 for enterprise SSD solutions," emphasizing that the $1 billion goal had been accelerated to 2015 from 2016 "once [SanDisk] acquired Fusion-io."  Bruner reiterated that SanDisk expected the

Fusion-io acquisition to be accretive in the second half of 2015 consistent with what was said at the time of the acquisition.

95.    Defendant Mehrotra concluded the call by stating that the Company's "*Q4 results and the near-term outlook [discussed on the call was] nothing but a temporary setback*" and that he "look[ed] forward to a solid progress in [the Company's] business through the course of the year resulting in substantial momentum in our business in the second half of 2015."

96.    The foregoing statements in ¶¶91 and 94 were materially false and misleading because SanDisk had not made substantial progress completing, let alone completed, the integration of Fusion-io.  To the contrary, SanDisk had been unable to incorporate its technology with Fusion-io's, to reduce the cost of Fusion-io's PCIe products to a competitive level, to make progress with Fusion-io's proprietary command set, to meld Fusion-io's sales force and other personnel into SanDisk's enterprise teams, or to create a strategy for Fusion-io's products that was consistent with SanDisk's goals.

97.    Additionally, the foregoing statements in ¶¶91, 93-95 were materially false and misleading because:

(a) SanDisk's enterprise business was, at that time, not well positioned to secure sales, take advantage of the growing demand for enterprise products, or for growth; in truth, SanDisk was experiencing significant difficulties integrating the various product lines and technologies that it acquired from Pliant, SMART Storage, and Fusion-io with its own technology, causing SanDisk to delay its next-generation enterprise products and fall ever further behind its competitors; in the face of these problems, SanDisk's senior executives were unable to agree on or identify a winning strategy for the Company's enterprise business; indeed each category of SanDisk's enterprise products – SATA, SAS, and PCIe – suffered from a host of engineering and qualification problems, performed worse than products offered by SanDisk's competitors, and, in fact, did not provide the solutions that customers required at any level of the enterprise market; and

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:15-cv-01455-VC

(b)   SanDisk was not executing its enterprise business strategy well; rather, SanDisk was struggling and failing to integrate the personnel and technologies acquired from Pliant, SMART Storage, and Fusion-io, and to incorporate their products with its own technology; SanDisk's enterprise products were consistently behind their roadmaps, and plagued by design problems and bugs, which also led to substantial difficulty and delay qualifying those products with customers; on top of that, much of SanDisk's sales force had little experience with or success selling enterprise products, and the sales force could not execute a coherent strategy because it was broken into factions that derived from the various companies SanDisk had acquired.

98.   On February 11, 2015, Defendant Bruner participated in Goldman Sachs' Technology & Internet Conference and again falsely touted the condition of the Company's SSD business and the status of the Fusion-io acquisition.  Specifically, in her prepared remarks and in response to questions by Goldman Sachs analyst Mark Delaney, Bruner gave the materially false and misleading impression that the Company's SSD business was on track for growth:

> **[W]e have the most diversified set of solutions with products now addressing SATA SSDs, SAS SSDs and PCIe SSDs.**
>
> * * *
>
> **We are very excited about our enterprise portfolio and the progress we're making there.** . . .  [W]e believe that we will achieve $1 billion in revenue in our enterprise revenue this year.  So we're very excited about that.  And of course, that's a strong margin business for us. . . .

99.   Asked to address what it was about SanDisk that positioned it to win SSD business given the competitive environment, Defendant Bruner stated:

> In terms of our real competitive strength in the enterprise market, I would point to, as we just described, **our broad range of interfaces, our vertical integration and that vertical integration is really all the way from the memory design and manufacturing, all the way through to the software[.]** . . . **So we really have all the elements to really know how to optimize the performance, the reliability, the endurance of the SSD.**

30

She also stated that she expected enterprise SSDs to remain one of the most margin accretive products for SanDisk.

100.    When asked when the Fusion-io acquisition would be accretive to earnings, Bruner stated:

> We still believe, as we've said when we announced the acquisition, that it will become accretive to EPS for us in the second half of 2015.  We think we're on track for that.  In terms of the key elements of that, clearly one is ramping the revenue and the scale of that.  *Another key factor has been realigning the go-to-market model for that part of the business to make it more OEM-centric, as we were discussing before, and streamlining the expenses of that part of the business.  That's largely done at this point*.

101.    The foregoing statements in ¶¶98 and 99 were materially false and misleading because:

(a) SanDisk did not possess the most comprehensive or broad set of products in the enterprise market.  To the contrary, each category of SanDisk's enterprise products – SATA, SAS, and PCIe – suffered from a host of engineering and qualification problems, performed worse than products offered by SanDisk's competitors, and, in fact, did not provide the solutions that customers required at any level of the enterprise market;

(b) SanDisk's enterprise business was, at that time, not well positioned to secure sales, take advantage of the growing demand for enterprise products, or for growth; in truth, SanDisk was experiencing significant difficulties integrating the various product lines and technologies that it acquired from Pliant, SMART Storage, and Fusion-io with its own technology, causing SanDisk to delay its next-generation enterprise products and fall ever further behind its competitors; in the face of these problems, SanDisk's senior executives were unable to agree on, or identify, a winning strategy for the Company's enterprise business; and

(c) SanDisk was not executing its enterprise business strategy well; rather, SanDisk was struggling and failing to integrate the personnel and technologies acquired from Pliant, SMART Storage, and Fusion-io and to incorporate their products with its own technology; SanDisk's enterprise products were consistently behind their roadmaps

and plagued by design problems and bugs, which also led to substantial difficulty and delay qualifying those products with customers; on top of that, much of SanDisk's sales force had little experience with, or success selling, enterprise products and the sales force could not execute a coherent strategy because it was broken into factions that derived from the various companies SanDisk had acquired.  Additionally, ¶84 contained materially false and misleading statements regarding SanDisk's integration of Fusion-io. Far from being complete, SanDisk had been unable to incorporate its technology with Fusion-io's, to reduce the cost of Fusion-io's PCIe products to a competitive level, to make progress with Fusion-io's proprietary command set, to meld Fusion-io's sales force and other personnel into SanDisk's enterprise teams, or to create a strategy for Fusion-io's products that was consistent with SanDisk's goals.

102.    Additionally, ¶100 contained materially false and misleading statements regarding SanDisk's integration of Fusion-io.  Far from being complete, SanDisk had been unable to incorporate its technology with Fusion-io's, to reduce the cost of Fusion-io's PCIe products to a competitive level, to make progress with Fusion-io's proprietary command set, to meld Fusion-io's sales force and other personnel into SanDisk's enterprise teams, or to create a strategy for Fusion-io's products that was consistent with SanDisk's goals.

103.    On March 3, 2015, Defendant Mehrotra participated in Morgan Stanley's Technology, Media & Telecom Conference and falsely touted the strength of the Company's enterprise SSD business and the status of the Fusion-io acquisition.  With respect to enterprise SSD, in his prepared remarks, Defendant Mehrotra stated:

> **[W]e have the broadest portfolio of flash storage solutions in the industry** and that played well for us in terms of 2014 being a record year for the Company in revenues as well as in non-GAAP EPS.
>
> * * *
>
> **Let me just make [a] couple of more comments on enterprise strategy.  This is [the] key element of our strategy of continuing to shift the revenue portfolio towards higher-value solutions.  Within enterprise, SanDisk, now with our strong hardware, software, and firmware capabilities, is really very well positioned to understand the varying workload requirements, whether they are**

32

1
2

*in a hyper-scale environment or enterprise environment or OEM customer requirements for enterprise storage solutions.  And this deep understanding is really leading us to have the most differentiated product solutions in the marketplace today.*

3

104.    Defendant Mehrotra was similarly effusive in discussing the Fusion-io

4

acquisition, stating "*[a]nd now, with the acquisition of Fusion-io, we have the broadest and*

5

*most complete set of solutions offerings, going from SAS to SATA to PCIe solutions.*"

6

105.    Defendant Mehrotra concluded his prepared remarks at the conference by stating:

7

[T]he demand drivers for NAND Flash continue to be vibrant, continue to be

8

healthy, and we expect health industry supply-demand environment in 2015.  *We are very well positioned to capitalize on the demand trends in the marketplace*

9

*with our broad portfolio of solutions with our vertical integration and deep customer reach.*

10

106.    When asked to comment on enterprise SSD and the Company's acquisitions in

11

this area, Defendant Mehrotra stated:

12

If you look at enterprise SSD, in 2011, SanDisk had really no presence in

13

enterprise SSD; and now, we have built it to target to become a billion-dollar business for us in 2015 time frame and we are absolutely aiming for number one

14

market share leadership position in the future with total enterprise business. *So very pleased with the rapid progress that SanDisk has made.  The SMART*

15

*Storage acquisition, Fusion-io acquisition, these all are in terms of integration going quite well.*  Fusion-io now gives us number one market share position in

16

PCIe solutions.

17

SanDisk has a solid market share position with SAS drive a number two market share position there.  SATA solution, this is a market that is just growing for us.

18

We reported in Q4 strong hyper-scale growth with our SATA drives.  *So this broadest portfolio that we have now with fast data PCIe supported by a strong*

19

*value proposition of software solutions and now the new category that we'll be announcing today . . . in terms of showing really new opportunities for flash*

20

*deployment in enterprise applications.  This is all really very exciting for us and it's absolutely strong focus of the Company; it's a high-margin, high-growth*

21

*business for us.  And at least SanDisk is really firing on all cylinders in this area.*

22

107.    The foregoing statements in ¶¶103 through 106 were materially false and

23

misleading because:

24

(a) SanDisk did not possess the most comprehensive or broad set of products in

25

the enterprise market; to the contrary, each category of SanDisk's enterprise products –

26

SATA, SAS, and PCIe – suffered from a host of engineering and qualification problems,

27

performed worse than products offered by SanDisk's competitors, and, in fact, did not

28

provide the solutions that customers required at any level of the enterprise market;

(b) SanDisk's enterprise business was, at that time, not well positioned to secure sales, take advantage of the growing demand for enterprise products, or for growth; in truth, SanDisk was experiencing significant difficulties integrating the various product lines and technologies that it acquired from Pliant, SMART Storage, and Fusion-io with its own technology, causing SanDisk to delay its next-generation enterprise products and fall ever further behind its competitors; in the face of these problems, SanDisk's senior executives were unable to agree on, or identify, a winning strategy for the Company's enterprise business;

(c) SanDisk was not executing its enterprise business strategy well; rather, SanDisk was struggling and failing to integrate the personnel and technologies acquired from Pliant, SMART Storage, and Fusion-io and to incorporate their products with its own technology; SanDisk's enterprise products were consistently behind their roadmaps and plagued by design problems and bugs, which also led to substantial difficulty and delay qualifying those products with customers; on top of that, much of SanDisk's sales force had little experience with, or success selling, enterprise products and the sales force could not execute a coherent strategy because it was broken into factions that derived from the various companies SanDisk had acquired; and

(d) SanDisk had not completed or made substantial progress on its integration with Fusion-io; instead, SanDisk had been unable to incorporate its technology with Fusion-io's, to reduce the cost of Fusion-io's PCIe products to a competitive level, to make progress with Fusion-io's proprietary command set, to meld Fusion-io's sales force and other personnel into SanDisk's enterprise teams, or to create a strategy for Fusion-io's products that was consistent with SanDisk's goals.

## VI.   THE TRUTH EMERGES:  CORRECTIVE DISCLOSURES AND POST-CLASS PERIOD EVENTS

108.    On March 26, 2015, before the market opened, the Company issued a press

release announcing that it expected revenue for 1Q2015 "to be approximately $1.3 billion, depending on final sell-through results, compared to the previously forecasted revenue range of $1.40 billion to $1.45 billion." The Company stated that this reduction in guidance was due to, among other things, "*lower than expected sales of enterprise products and lower pricing in some areas of the business*." In addition, the Company announced that it expected continued impact to its 2015 financial results from these factors, as well as the previously identified supply challenges, and forecasted 2015 revenue to be lower than the previous forecast. On this news, SanDisk's share price dropped precipitously to $14.98 per share, or 18.45%, to close on March 26, 2015 at $66.20 per share, on unusually heavy volume.

109. Analysts expressed shock at this announcement, given Defendants' prior statements, and sharply criticized the Company for providing little detail regarding the reasons for the expected earnings miss, the second in as many quarters. For example, on March 26, 2015, UBS analyst Steven Chin expressed "*surprise[] that weakness is coming from enterprise as this was one of the segments that was expected to drive sales growth this year* . . . *and partially replace the Apple SSD socket loss*." The same day, Deutsche Bank analysts Sidney Ho and Ross Seymore also expressed "surprise[] and disappoint[ment]," while Evercore ISI's C.J. Muse and Ada Menaker stated that "management credibility ha[d] clearly taken a hit."

110. On April 15, 2015, SanDisk issued a press release announcing its financial results for 1Q2015, ended March 29, 2015. The press release was included as an exhibit to a Form 8-K filed with the SEC the same day. For the quarter, SanDisk announced disappointing revenue of $1.33 billion, a 12% reduction on a year-over-year basis, and 23% less than in 4Q2014. Net income for the quarter was just $39 million, or $0.17 per share, compared to net income of $269 million, or $1.14 per share, in 1Q2014 and $202 million, or $0.86 per share, in 4Q2014. These results included an impairment charge of $61 million for an in-process R&D project from the Fusion-io acquisition, as well as $41 million in restructuring and other charges.

111. In a conference call with analysts the same day, Defendant Mehrotra attributed the Company's poor 1Q2015 performance and diminution in outlook for 2015 to several factors,

including "product issues including qualification delays impacting embedded and enterprise sales," "reduced 2015 opportunity in the enterprise market," and "supply challenges."

112.   With regard to the enterprise product issues, Mehrotra stated that some of SanDisk's SAS products suffered from "demand changes and *delays in customer qualifications*.  As a result, we are reducing our estimates of 2015 sales of our SAS products."

113.   Additionally, Mehrotra attributed the "*reduced opportunity for [the Company] in the enterprise market*" to a shift from higher-cost PCIe solutions, including Fusion-io PCIe solutions, to lower-cost solutions using enterprise SATA SSDs.  This resulted in "Q1 results as well as 2015 revenue estimates for [the Company's] Fusion-io PCIe solutions [that were] significantly below [the Company's] original plan."  Moreover, SanDisk was unable to adjust to this demand shift because its 2-terabyte enterprise SATA product was not ready for production and would not be ready until later in 2015, which also adversely impacted 2015 revenue estimates.

114.   Mehrotra also stated that, as a result of supply constraints, SanDisk had been "unable to meet the timing of delivery required to fulfill all of the demand for a large hyperscale customer in enterprise SATA," which "resulted in a reduced share award" with the customer. Separately, Mehrotra disclosed that the Company's "overall petabyte supply for the year ha[d] been somewhat reduced," due to the fact that SanDisk was "now planning for a higher mix of 1Y technology relative to 15-nanometer in the second half of 2015."

115.   Thus, SanDisk had substantial difficulty with all three of the enterprise product types that it offered – SATA, SAS, and PCIe.  Notwithstanding SanDisk's purportedly broad suite of enterprise products that would supposedly allow the Company to provide solutions to customers at any price and performance point, SanDisk was not able to supply the enterprise market with viable enterprise products.

116.   Moreover, as discussed above and as Defendants knew, the product qualification delays that Mehrotra referenced had been impacting SanDisk's enterprise products prior to, and during, the Class Period.  SanDisk's inability to meet its product roadmaps, to timely release

enterprise products, and to qualify those products – in part as a result of its failure to integrate its acquisitions, including Fusion-io – also meant that demand did not simply change or shift, as Mehrotra claimed, but rather, that SanDisk was unable to keep up with its own plans to release next-generation products in keeping with its competitors and with its customers' needs.  That failure, along with SanDisk's falling enterprise revenue, was compounded by SanDisk's limited experience in enterprise sales, as the Company's inadequate enterprise sales team proved unable to adopt the customer-centric, relationship-based sales model necessary for the enterprise market.

117.    SanDisk's enterprise performance had, in fact, been so poor, and its inability to integrate the three enterprise acquisitions so severe, that management decided it needed to overhaul the Company's enterprise operations.  Mehrotra described the overhaul during the same conference call:

> [I]n order to position ourselves to successfully achieve our long-term growth objectives, and to better align ourselves with the market and customers we are serving, . . . **we are combining all of our enterprise solutions teams, including our InfiniFlash system solutions and software under a unified enterprise group** led by Sumit Sadana, our Chief Strategy Officer.
>
> This will enable greater synergies between the teams, accelerate decision making and improve execution in enterprise.  John Scaramuzzo, Senior Vice President Enterprise Storage Solutions, and Ravi Swaminathan, Vice President Systems and Software Solutions, will report to Sumit.
>
> \* \* \*
>
> In addition, we have created a Chief Technology Officer position that will be assumed by Kevin Conley. . . .  **Having Kevin in this new position with his background in customer relationships will improve our ability to both predict technology trends and tailor our road map and investments to meet customer needs.  We believe all of these organizational changes will simplify and improve our product road map execution as well as enhance our focus on the customer**.
>
> Within our global engineering organization, **we are strengthening our product development, validation and qualification processes.  For example, we are deepening our engagements with our customers to validate our solutions on their next-generation platforms earlier in the development cycle and before entering the final qualification.**
>
> In enterprise, we have had to support multiple hardware and firmware platforms as we integrated several companies that were acquired over a fairly short time frame.  **We are now reducing the number of platforms and product architectures**

1  *as we converge the road map.*   This will increase leverage of engineering resources and improve our product execution.

2  118.   Thus, the overhaul sought to address the very problems that Defendants had

3  failed to disclose and that the CWs had described as long plaguing SanDisk's enterprise

4  business: shortcomings in product qualification and ability to follow product roadmaps,

5  insufficient focus on customer relationships and customer needs, and an inability to integrate the

6  different technologies and groups from the three enterprise acquisitions that undermined product

7  execution.

8  119.   Indeed, when asked later on the April 15 conference call what SanDisk could do

9  better, in terms of managing and qualifying products, as well as with its operations, Mehrotra

10  reiterated those problems:

11
12  *As we mentioned, certainly we have had some issues related to execution and in terms of certain product qualifications and our ability to meet in a timely fashion some of the market requirements.*

13  * * *

14
15  And these are the things we are addressing here in terms of some of the organizational changes that we discussed, as well as mentioning how *we are focusing on improving the processes and planning related to our engineering execution, road map execution, and working closely with the customers to understand their requirements, and sometimes working closely with them to address the qualification early in the development cycle.  These are all the actions we are taking that help us enhance our customer focus, make us more nimble in responding to the market changes and customer requirements, and will enhance our execution going forward.*

16
17
18

19  120.   Notably, contrary to his and Bruner's repeated statements during the Class

20  Period, Mehrotra also acknowledged that, as a result of the foregoing problems, SanDisk did

21  not, in fact, have the most complete or a broad suite of enterprise products that were actually

22  able to address customers' needs and provide SanDisk with a diverse base of revenue:

23
24  It's correct that some of these execution-related challenges, particularly those that are tying with engineering platforms and that require engineering development. As you know, those kind of engineering programs take a few quarters to recover in terms of product readiness that meets the market requirements.  So we are very much focused on that.  We are continuing to strengthen our product road map.

25

26  *But, yes, in terms of execution it will take us a few quarters, several quarters, before we are able to have the most complete and solid product road map to address the enterprise opportunity fully.*

27

28
38

121.   Further, on the April 15 conference call, Mehrotra admitted that he saw the Company's Fusion-io derived PCIe sales decrease in late 2014 and that he saw this trend accelerate during 1Q2015, as PCIe SSDs proved unable to compete with lower-priced SATA SSDs:

> As I mentioned, on the PCIe side, due to the higher price points on PCIe that have exist[ed], there have been opportunities to [in]stead utilize lower price points SATA solutions with acceptable performance to ultimately make the infrastructure for data centers more cost effective. **We began to see some of this trend late last year.**
>
> But certainly, we should have adjusted better in terms of understanding that this was a trend that was building into a wider trend in the marketplace. **And we understood that during the course of the first quarter certainly.**

This confirms the statements of CWs 5 and 6 that Mehrotra received enterprise sales reports on a regular basis, the statement of CW5 that SanDisk badly missed its internal PCIe sales forecasts for 4Q2014, and the statement of CW1 that it was apparent, no later than 4Q2014, that SanDisk's PCIe products would not be able to compete with cheaper SATA SSDs.

122.   Moreover, despite its supposedly broad suite of products across all enterprise SSDs, SanDisk was not able to offset the reduced PCIe sales with increased SATA sales.  This was because SanDisk was stuck with an older SATA product, a 1-terabyte SATA SSD, and the Company was too slow to produce a usable version of a 2-terabyte SATA SSD, the SATA product that customers wanted and that the Company's competitors offered.  On the April 15 conference call, Mehrotra conceded that SanDisk was unable to generate a 2-terabyte SATA SSD and prevent this loss of business to competitors, even though the Company recognized the previous year that customers wanted the more advanced SATA product:

> I would also like to comment on enterprise SATA.  I mentioned there that we have seen a rapid shift in hyperscale market in particular toward 2-terabyte capacity points because that gives overall higher capacity points.   With availability of that capacity point in the industry, enables a more cost effective infrastructure in the data center. **We had expected even last year that the market would be needing 2-terabyte capacity points in 2015 time frame**, and we have been working closely with hyperscale customers in this regard.
>
> I would like to point out that enterprise [SATA] as a market, that we actually just beg[a]n to engage with about four quarters ago.   And our first quarter of

meaningful revenue shipments with enterprise SATA in hyperscale market was fourth quarter of last year.

So, as we began our engagements last year with the customers, we saw the need for 2 terabytes.  But what's happened here is that during the first quarter, the customers themselves decided to switch, with availability of 2-terabyte capacity points becoming available in the market, from 1-terabyte capacity points to 2-terabyte capacity points . . . again because of the cost benefit.

***Of course we had been engaged with the customers with our portfolio of solutions up to 1 terabyte of capacity point.  We need now 2-terabyte capacity point, which I mentioned we will have later in the year.***

123.    Additionally, on the same conference call, Bruner acknowledged that the $61 million impairment charge resulted from management's decision to cancel a Fusion-io project and focus on next generation products:

Our Q1 GAAP expenses include a $61 million impairment charge for an in-process R&D project from the Fusion-io acquisition.  ***The impairment charge was driven by our decision to cancel this project in order to reduce the number of platforms under development and to redirect resources toward our next-generation PCIe platform***.

This is consistent with the statements of CWs 1 and 3, who explained that SanDisk cancelled the Fusion-io project, which was based on a proprietary PCIe command set, so that they could begin developing PCIe products using a standard command set that the industry had adopted.

124.    As a result of these disclosures, the price of SanDisk common stock dropped $3.21 per share, to close at $67.91 on April 16, 2015, a one-day decline of nearly 5% on volume of 23.6 million shares.

125.    During a May 19, 2015 JPMorgan Global Technology, Media and Telecom Conference, Bruner admitted that she too saw the Company's Fusion-io derived PCIe sales decrease in late 2014 and that she saw this trend accelerate during 1Q2015:

***And if you look at where we have had issues, PCIe and SATA are two areas that are pretty new to us.***  The PCIe portion of our enterprise business we, of course, acquired through the Fusion-io acquisition in July 2014 and really ***in the fourth quarter, the first full quarter that we owned the Fusion-io assets, we probably began to see some signs of softness in the PCIe market and we really studied it in detail in the first quarter and in the first quarter came to believe that a portion of that PCIe TAM had moved to very low-cost SATA solutions***[.]

Again, this is consistent with the statements of CWs 5 and 1.

126.    At the May 19 conference, Bruner also reiterated that, as part of SanDisk's overhaul of the enterprise unit, SanDisk was still seeking to improve its relationships and communications with customers:

> But to answer your question about what could we do and what are we doing to keep a better pulse on the market, we have made a number of organizational changes.  ***One of those is to combine all parts of the enterprise business under Sumit Sadana in one business unit. . . he has already made a number of changes within this new organization that he now owns, which I believe will create better lines of communication between the salesforce and the marketing parts of the business unit and between the customer and the business unit*** and also those changes I believe will allow us to have streamlined decision-making, faster reaction time.

127.    The problems plaguing SanDisk's enterprise business were significant and extended even after the Class Period.  As described in SanDisk's quarterly investor conference calls on April 15, 2015, July 22, 2015, and January 27, 2016, and contained in the accompanying presentations, the revenue generated by SanDisk's enterprise business decreases sequentially from 4Q2014 to 1Q2015, from 1Q2015 to 2Q2015, and from 2Q2015 to 3Q2015. Although SanDisk's enterprise revenue did grow sequentially from 3Q2015 to 4Q2015, the 4Q2015 enterprise revenue was still far below where it had been in 4Q2014, at the start of the Class Period.  Thus, notwithstanding that SanDisk had revenue from Fusion-io's legacy products for all of 2015, as opposed to just the second half of 2014, SanDisk's total enterprise revenue for 2015 only modestly surpassed its total enterprise revenue for 2014 by no more than 10%.

128.    In an October 21, 2015 press release, SanDisk announced that it had recently been acquired by, and would merge with, a company called Western Digital.  That transaction was subsequently approved by SanDisk's and Western Digital's boards and was completed on May 12, 2016.

## VII.    ADDITIONAL SCIENTER ALLEGATIONS

129.    Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein.

130.    As detailed above, the Individual Defendants were aware, from attending regular meetings that addressed SanDisk's enterprise business and receiving regular reports on enterprise sales, of the problems undermining that business.  Thus, the Individual Defendants knew, or with deliberate recklessness disregarded, that the material misrepresentations and omissions contained in the Company's public statements would adversely affect the integrity of the market for the Company's securities and would cause the price of such securities to be artificially inflated. The Individual Defendants acted knowingly, or in such a deliberately reckless manner, as to constitute a fraud and deceit upon Plaintiffs and other Class members. Other grounds demonstrating scienter, including the core operations inference and motive, are set forth below.

**A.    Defendants' Imputed Knowledge of Facts Critical to Core Operations**

131.    Defendants Mehrotra and Bruner have been CEO and CFO, respectively, of SanDisk for many years.  They were admittedly hands-on managers who were responsible for, and remained well informed of, integral business issues, including customer needs, the Fusion-io integration, and financial guidance, alleged herein to be falsely represented.  Consequently, their experience and responsibilities necessarily informed them that the aforementioned statements made during the Class Period were materially false and misleading.

132.    For example, Defendant Mehrotra co-founded SanDisk in 1988 and has been its President and CEO since 2011.  Prior to that, he served in a variety of capacities at the Company, such as Chief Operating Officer, Executive Vice President, Vice President of Engineering, Vice President of Product Development, and Director of Memory Design and Product Engineering.  He has over 30 years of experience in the semiconductor industry and holds a B.S. and M.S. in Electrical Engineering and Computer Sciences from UC Berkeley. This experience gave Defendant Mehrotra particular insight into the Company's core operations.  Indeed, as the Company's Schedule 14A, dated April 28, 2015, touted: "The Board values Mr. Mehrotra's experience with the Company as its co-founder, President and Chief

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:15-cv-01455-VC

Executive Officer, which gives the Board *a detailed understanding of the Company's business and operations*."

133.    Similarly well experienced, Defendant Bruner has served as SanDisk's CFO since 2004.  She has over 30 years of financial management experience and previously served as the CFO of Palm, Inc.  She holds a B.A. in Economics from UCLA and a MBA from Santa Clara University.  Notably, the Company has demonstrated how valuable Defendant Bruner's experience is when it paid her a bonus equal to 125% of her annual salary for fiscal year 2014, based upon the Compensation Committee's consideration of her "contributions to the Company's *financial matters, investor relations* and other administrative and infrastructure functions and corporate management of the Company, including with respect to her *leadership on the integration of Fusion-io*."

134.    In addition to their vast experience, Defendants also acknowledged their involvement in developing and executing SanDisk's business strategies.  Specifically, on May 28, 2014, Defendant Mehrotra acknowledged the executives' "day in and day out" focus on execution:

> So in terms of anything going wrong, it is about if we don't execute well on our plan. And *we never take our execution for granted*. *This is what our team day in and day out, very much focuses on*.  We believe we have a very solid strategy. And *it requires tremendous execution, day in and day out execution. This is what we stay focused on*.

135.    Likewise, Defendants frequently emphasized their experience, knowledge, and robust level of customer engagement.  For instance, Defendant Mehrotra highlighted SanDisk's engagement with its customers on an April 15, 2014 conference call:

> We are really doing very well with our broadened portfolio of SAS solutions, as well as *engaging with a broad set of Fortune 1,000, hyperscale, storage OEM server customers across the board* with our solutions of SAS and SATA SSD products. So, really tremendous growth opportunity ahead. We are very excited. Our vertical integration model and our strong portfolio of products and broadening customer engagement is really working to our advantage in this area. I expect continuous solid growth in enterprise revenue through the year and in the future years for us, as well.

136.    Defendants further acknowledged that expanding the Enterprise SSD business through high-value solutions was their "primary focus" and a "key strategic objective," and they further disclosed that the Fusion-io acquisition was a critical part of accomplishing this objective. For example, on March 3, 2014, Defendant Mehrotra explained that SanDisk's strategy to drive revenue through high-value solutions as a "primary focus" for the Company:

> ***Our strategy is really again through high-value add solutions to really drive our revenue share in the industry***. And I believe that our revenue share will continue to outperform our bit share in the industry. ***So the strategy is our primary focus*** and it is working out well with respect to our very prudent focus, I believe, on supply managing supply growth, it's really working well for us.

137.    Shortly thereafter, on June 16, 2014, Defendant Mehrotra commented on the significance of the Fusion-io acquisition to one of SanDisk's "key strategic objectives":

> One of SanDisk's ***key strategic objectives*** is to ***grow our position in highvalue solutions, particularly those aimed at enterprise applications***. We have made significant progress on this vector of our strategy, and ***the acquisition of Fusion-io is another major step in SanDisk's evolution into an important enterprise solutions provider***.

138.    Then on March 3, 2015, Defendant Mehrotra explained that PCIe was a "strong focus" for the Company:

> So this broadest portfolio that we have now with ***fast data PCIe supported by a strong value proposition of software solutions*** . . . [t]his is all really very exciting for us and it's ***absolutely strong focus of the Company; it's a high-margin, high-growth business for us***. And at least SanDisk is really firing on all cylinders in this area.

139.    In light of the acknowledged importance of the Fusion-io acquisition and enterprise business to the Company's overall business strategy, and the substantial problems they were suffering, the Individual Defendants can be presumed to have had knowledge of adverse facts affecting this strategy.   Likewise, Defendants' steady repetition of specific statements to investors concerning the importance and focus spent on this "key strategic objective" further supports their knowledge of these adverse facts.  Indeed, that is supported by the statements of CWs 5 and 6, set forth in detail above, describing Defendants' regular involvement in SanDisk's enterprise business.

**B.      SanDisk's Potential Sale Provided Motivation to Inflate SanDisk's Stock**

140.     SanDisk held talks regarding its potential combination with an unidentified company.  The other company initiated these talks and, by December 5, 2014, Mehrotra met with that company's CEO.  This information was contained in SanDisk's Joint Proxy Statement filed on February 5, 2016, which also noted that such discussion had occurred from time to time over the preceding two years.

141.     With SanDisk's prospects diminished by the shrinking retail flash market, its late development of 3D NAND, and the loss of Apple SSDs, falsely touting SanDisk's business in the high-value enterprise market provided a means of inflating SanDisk's stock and, thereby, obtaining a higher value for SanDisk in any corporate acquisition.  This would, in turn, benefit the Individual Defendants, who had large holdings of SanDisk securities.

## VIII.  LOSS CAUSATION

142.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic losses suffered by Plaintiffs and members of the Class. During the Class Period, Plaintiffs and Class members purchased SanDisk common stock at artificially inflated prices caused by Defendants' misconduct, as alleged herein.  The price of the Company's common stock declined significantly when the material risks concealed by Defendants materialized and Defendants' material misrepresentations and omissions were revealed to the market, causing investors' losses.

143.     Before the end of the Class Period, on April 15, 2015, investors had been unaware of the following material facts about SanDisk that had been known to Defendants throughout the Class Period:

(a) SanDisk did not possess the most comprehensive or broad set of products in the enterprise market.  To the contrary, each category of SanDisk's enterprise products – SATA, SAS, and PCIe – suffered from a host of engineering and qualification problems, performed worse than products offered by SanDisk's competitors, and, in fact, did not provide the solutions that customers required at any level of the enterprise market;

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:15-cv-01455-VC

(b) SanDisk's enterprise business was, at that time, not well positioned to secure sales, take advantage of the growing demand for enterprise products, or for growth; in truth, SanDisk was experiencing significant difficulties integrating the various product lines and technologies that it acquired from Pliant, SMART Storage, and Fusion-io with its own technology, causing SanDisk to delay its next-generation enterprise products and fall ever further behind its competitors; in the face of these problems, SanDisk's senior executives were unable to agree on, or identify, a winning strategy for the Company's enterprise business;

(c) SanDisk was not executing its enterprise business strategy well; rather, SanDisk was struggling, and failing, to integrate the personnel and technologies acquired from Pliant, SMART Storage, and Fusion-io and to incorporate their products with its own technology; SanDisk's enterprise products were consistently behind their roadmaps and plagued by design problems and bugs, which also led to substantial difficulty and delay qualifying those products with customers; on top of that, much of SanDisk's sales force had little experience with, or success selling, enterprise products, and the sales force could not execute a coherent strategy because it was broken into factions that derived from the various companies SanDisk had acquired; and

(d) SanDisk had not completed, or made substantial progress on, its integration with Fusion-io; instead, SanDisk had been unable to incorporate its technology with Fusion-io's, to reduce the cost of Fusion-io's PCIe products to a competitive level, to make progress with Fusion-io's proprietary control set, to meld Fusion-io's sales force and other personnel into SanDisk's enterprise teams, or to create a strategy for Fusion-io's products that was consistent with SanDisk's goals.

144. Defendants' misrepresentations and omissions and fraudulent scheme, as alleged in §V, *supra*, misrepresented and concealed the true adverse material facts from the market during the Class Period, leading investors to wrongly believe that SanDisk's enterprise business was experiencing success, on account of a broad suite of quality products, and was poised for

growth, while the integration of Fusion-io was progressing well and completed, allowing SanDisk to benefit from Fusion-io's products.

145.    As alleged in §VI, *supra*, these material facts were partially revealed to investors for the first time on March 26, 2015, and fully revealed for the first time on April 15, 2015.  For example, on March 26, 2015, Defendants disclosed that SanDisk had "lower than expected sales of enterprise products."  As a further example, on April 15, 2015, Defendants disclosed that SanDisk suffered from "product issues including qualification delays impacting embedded and enterprise sales," that it had a "reduced 2015 opportunity in the enterprise market," and that its products derived from Fusion-io had suffered a sales decline.

146.    When this new information came to light, the market was caught entirely by surprise, and certain analysts noted the gap between the market's perception and the concealed reality.  For instance, as set forth above, UBS analyst Steven Chin expressed "surprise that weakness is coming from enterprise as this was one of the segments that was expected to drive sales growth this year . . . and partially replace the Apple SSD socket loss."

147.    Defendants' disclosure of SanDisk's poor enterprise execution and performance, along with its failure to integrate Fusion-io, was the materialization of the previously concealed risk of the aforementioned material facts.

148.    The market reacted swiftly and negatively to these disclosures.  On March 26, 2015, the same day that SanDisk made its partial disclosure, the price of the Company's common stock plummeted from its previous day's close price of $81.18 to a closing price of $66.20, a drop of 18.4%, on unusually heavy trading volume.  Similarly, the day after the Company's April 15, 2015 disclosure, SanDisk's common stock dropped approximately 5% from $71.12 to 67.91, once again on unusually heavy trading volume.

## IX.    CLASS ACTION ALLEGATIONS

149.    Plaintiffs bring this action as a class action, pursuant to Fed. R. Civ. P. 23(a) and 23(b)(3), on behalf of a class consisting of all persons and entities that purchased, or otherwise acquired, the securities of SanDisk during the Class Period, seeking to pursue remedies under

the Exchange Act (the "Class"). Excluded from the Class are Defendants; the officers and directors of the Company, at all relevant times; members of their immediate families and their legal representatives, heirs, successors, or assigns; and any entity in which any of the Defendants have, or had, a controlling interest.

150.   The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, SanDisk common stock was actively traded on the NASDAQ Global Select Market (the "NASDAQ"). While the exact number of Class members is unknown to Plaintiffs at this time, and can only be ascertained through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Millions of SanDisk shares were traded publicly during the Class Period on the NASDAQ. As of January 30, 2015, the Company had 213,013,780 shares of common stock outstanding. Record owners and other members of the Class may be identified from records maintained by SanDisk or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

151.   Plaintiffs' claims are typical of the claims of Class members, who were all similarly affected by Defendants' wrongful conduct in violation of federal securities laws, which is complained of herein. Further, Plaintiffs will fairly and adequately protect the interests of Class members and have retained counsel competent and experienced in class and securities litigation.

152.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' conduct alleged herein;

(b)   whether statements made by Defendants to the investing public during the Class Period omitted or misrepresented material facts about the business, operations, and prospects of SanDisk; and

(c)    to what extent Class members have sustained damages and the proper measure of damages.

153.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy, since joinder of all members is impracticable. Further, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation makes it impossible for Class members to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## X.    APPLICABILITY OF THE FRAUD-ON-THE-MARKET AND *AFFILIATED UTE* PRESUMPTIONS OF RELIANCE

154.    The market for SanDisk common stock was open, well developed, and efficient at all relevant times. As a result of Defendants' materially false or misleading statements and material omissions, the Company's common stock traded at artificially inflated prices during the Class Period.  On December 8, 2014, the Company's stock closed at a Class Period high of $106.00 per share.  Plaintiffs and other members of the Class purchased or otherwise acquired the Company's common stock, relying on the integrity of the market price of such securities and on publicly available market information relating to SanDisk. Plaintiffs and Class members have been damaged thereby.

155.    During the Class Period, the artificial inflation of the value of SanDisk common stock was caused by the material misrepresentations and omissions alleged in this Complaint, thereby causing the damages sustained by Plaintiffs and other Class members. As alleged herein, during the Class Period, Defendants made or caused to be made a series of materially false or misleading statements about the Company's business, prospects, and operations, causing the price of the Company's common stock to be artificially inflated at all relevant times. When the truth was disclosed, it drove down the value of the Company's common stock, causing Plaintiffs and other Class members that had purchased the securities at artificially inflated prices to be damaged as a result.

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:15-cv-01455-VC

156.    At all relevant times, the market for SanDisk common stock was efficient for the following reasons, among others:

(a)    SanDisk stock met the requirements for listing and it was listed and actively traded on the NASDAQ, a highly efficient and automated market.

(b)    As a regulated issuer, SanDisk filed periodic public reports with the SEC and/or the NASDAQ.

(c)    SanDisk regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services.

(d)    SanDisk was followed by securities analysts employed by brokerage firms, who wrote reports about the Company, which reports were distributed to the sales force and certain customers of their respective brokerage firms and were made publicly available.

157.    Based on the foregoing, during the Class Period, the market for SanDisk common stock promptly digested information regarding the Company from all publicly available sources and impounded such information into the price of SanDisk stock. Under these circumstances, the market for SanDisk common stock was efficient during the Class Period and, therefore, investors' purchases of SanDisk common stock at artificially inflated market prices give rise to a Class-wide presumption of reliance under the fraud-on-the-market doctrine.

158.    In the alternative, the *Affiliated Ute* presumption of reliance applies to the extent that Defendants' statements during the Class Period involved omissions of material facts, which concealed that:

(a) SanDisk did not possess the most comprehensive or broad set of products in the enterprise market.  To the contrary, each category of SanDisk's enterprise products – SATA, SAS, and PCIe – suffered from a host of engineering and qualification problems,

50

performed worse than products offered by SanDisk's competitors, and, in fact, did not provide the solutions that customers required at any level of the enterprise market;

(b) SanDisk's enterprise business was at that time not well positioned to secure sales, take advantage of the growing demand for enterprise products, or for growth; in truth, SanDisk was experiencing significant difficulties integrating the various product lines and technologies that it acquired from Pliant, SMART Storage, and Fusion-io with its own technology, causing SanDisk to delay its next-generation enterprise products and fall ever further behind its competitors; in the face of these problems, SanDisk's senior executives were unable to agree on, or identify, a winning strategy for the Company's enterprise business;

(c) SanDisk was not executing its enterprise business strategy well; rather, SanDisk was struggling and failing to integrate the personnel and technologies acquired from Pliant, SMART Storage, and Fusion-io, and to incorporate their products with its own technology; SanDisk's enterprise products were consistently behind their roadmaps and plagued by design problems and bugs, which also led to substantial difficulty and delay qualifying those products with customers; on top of that, much of SanDisk's sales force had little experience with, or success selling, enterprise products and the sales force could not execute a coherent strategy because it was broken into factions that derived from the various companies SanDisk had acquired; and

(d) SanDisk had not completed or made substantial progress on its integration with Fusion-io; instead, SanDisk had been unable to incorporate its technology with Fusion-io's, to reduce the cost of Fusion-io's PCIe products to a competitive level, to make progress with Fusion-io's proprietary control set, to meld Fusion-io's sales force and other personnel into SanDisk's enterprise teams, or to create a strategy for Fusion-io's products that was consistent with SanDisk's goals.

## XI.   NO SAFE HARBOR

159.   The statutory safe harbor provided for forward-looking statements under certain

51

1  circumstances does not apply to any of the statements alleged to be false or misleading herein

2  that relate to then-existing facts and conditions, nor does it apply to any material omissions

3  alleged herein. To the extent that statements alleged to be false or misleading are characterized

4  as forward-looking, the statutory safe harbor does not apply to such statements because they

5  were not sufficiently identified as "forward-looking statements" when made, there were no

6  meaningful cautionary statements identifying important factors that could cause actual results to

7  differ materially from those in the forward-looking statements, and Defendants had actual

8  knowledge that the forward-looking statements were materially false or misleading at the time

9  each such statement was made.

10  **XII.   COUNTS**

11  

**FIRST COUNT**
**Violation of §10(b) of The Exchange Act and**

12  **Rule 10b-5 Promulgated Thereunder Against All Defendants**

13     160.   Plaintiffs repeat and reallege each and every allegation set forth above as if fully

14  set forth herein. This claim is asserted against all Defendants.

15     161.   During the Class Period, Defendants: (i) knowingly, or with deliberate

16  recklessness, deceived the investing public, including Plaintiffs and Class members, as alleged

17  herein; (ii) artificially inflated the market price of SanDisk common stock; and (iii) caused

18  Plaintiffs and Class members to purchase, or otherwise acquire, SanDisk common stock at

19  artificially inflated prices.

20     162.   Each of the Defendants, in violation of §10(b) of the Exchange Act and Rule

21  10b-5(b), made false statements of material facts and omitted to state material facts necessary to

22  make the statements made by Defendants not misleading, which operated as a fraud and deceit

23  upon Plaintiffs and the Class, in an effort to create or maintain an artificially inflated price of

24  SanDisk common stock during the Class Period. Defendants' material misrepresentations and

25  omissions are alleged in §V, *supra*.

26     163.   As a result of their making and/or substantially participating in the creation of

27  affirmative statements to the investing public, Defendants had a duty to promptly disseminate

28

52

truthful information that would be material to investors in compliance with applicable laws and regulations.

164. As officers, directors, and controlling persons of a publicly held Company, whose common stock is registered with the SEC, pursuant to the Exchange Act, traded on the NASDAQ, and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information regarding the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings, and present and future business prospects, and to correct any previously issued statements that had become materially false or misleading, so that the market price of the Company's publicly traded securities would be based upon truthful and accurate information.

165. Defendants, individually and in concert, directly and indirectly, by the use, means, or instrumentalities of interstate commerce and/or of the mails, made, or substantially participated in, the creation and/or dissemination of false or misleading statements of material fact, as set forth herein, or with deliberate recklessness failed to ascertain and disclose truthful facts, even though such facts were available to them.

166. The facts alleged herein give rise to a strong inference that each of the Defendants acted with scienter. Each of the Defendants knew, or with deliberate recklessness disregarded, that the Class Period statements set forth in §V, *supra*, contained material misrepresentations and omissions for the reasons set forth herein.

167. By virtue of the Individual Defendants' positions of management and control within SanDisk, they had access to undisclosed adverse information about the Company, its business, operations, operational trends, finances, and present and future business prospects. The Individual Defendants would ascertain such information through the Company's internal corporate documents; conversations and connections with each other and corporate officers and employees; attendance at sales, management, and Board of Directors meetings, including

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:15-cv-01455-VC

committees thereof; and reports and other information provided to them in connection with their roles and duties as SanDisk officers and/or directors.

168.    The Individual Defendants were aware of, or with deliberate recklessness disregarded, that material misrepresentations and omissions were being made regarding the Company, and approved or ratified such statements in violation of the federal securities laws.

169.    As a result of Defendants' dissemination of the materially false or misleading information and their failure to disclose material facts, as alleged herein, the market price of SanDisk common stock was artificially inflated throughout the Class Period. Unaware that the market price of SanDisk common stock was artificially inflated; relying directly or indirectly on the false or misleading statements made by Defendants, at the times such statements were made, or relying upon the integrity of the markets in which SanDisk common stock traded; and in the absence of material adverse information that was known, or with deliberate recklessness disregarded, by Defendants, but not disclosed to the public, Plaintiffs and Class members purchased or otherwise acquired SanDisk common stock at artificially inflated prices.

170.    Had Plaintiffs and the other Class members known the truth regarding the problems that SanDisk was experiencing, which was not disclosed by Defendants, Plaintiffs and other Class members would not have purchased, or otherwise acquired, SanDisk common stock, or, if they had acquired such securities during the Class Period, they would not have done so at the artificially inflated prices which they paid.

171.    As a direct and proximate result of Defendants' wrongful conduct, Plaintiffs and the other Class members suffered damages in connection with their respective purchases and sales of SanDisk common stock during the Class Period, when the artificial inflation in the price of such securities dissipated, as the truth regarding Defendants' conduct was revealed, causing the price of SanDisk common stock to decline, resulting in economic losses to Plaintiffs and the Class.

172.    By reason of the foregoing, Defendants violated §10(b) of the Exchange Act and Rule 10b-5(b), promulgated thereunder, and they are liable to Plaintiffs and the Class for

damages suffered in connection with their transactions in SanDisk common stock during the Class Period.

## SECOND COUNT
### Violation of §20(a) of the Exchange Act
### <u>Against the Individual Defendants</u>

173.   Plaintiffs repeat and reallege each and every allegation set forth above as if fully set forth herein. This claim is asserted against the Individual Defendants.

174.   SanDisk is a primary violator of §10(b) and Rule 10b-5, promulgated thereunder.

175.   The Individual Defendants acted as controlling persons of SanDisk within the meaning of §20(a) of the Exchange Act. Each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, are presumed to have had the power to control or influence, and during the Class Period, did exercise their power to control and influence, the conduct giving rise to the violations of the federal securities laws alleged herein. The Individual Defendants prepared, or were responsible for preparing, the Company's press releases and SEC filings, and made statements to the market in SEC filings, annual reports, press releases, news articles, and conference calls. The Individual Defendants controlled SanDisk and each of its employees.

176.   The Individual Defendants were able to, and did, control the content of the various SEC filings, press releases, and other public statements pertaining to the Company during the Class Period. The Individual Defendants were provided with copies of the documents, as alleged herein, to contain material misrepresentations and omissions prior to, or shortly after, their issuance and had the ability and/or opportunity to prevent the issuance of such documents or cause them to be corrected. Accordingly, the Individual Defendants are responsible for the accuracy of the Company's public reports and releases.

177.   By virtue of their positions as controlling persons of SanDisk, and by reason of the conduct described in this Count, the Individual Defendants are liable pursuant to §20(a) of the Exchange Act for controlling a primary violator of the federal securities laws. As a direct and proximate result of the Individual Defendants' wrongful conduct, Plaintiffs and other Class

1   members suffered damages in connection with their purchases of the Company's securities

2   during the Class Period.

3   **XIII.   PRAYER FOR RELIEF**

4        WHEREFORE, Plaintiffs pray for relief and judgment, as follows:

5        (a)      Determining that this action is a proper class action under Rule 23 of the

6   Federal Rules of Civil Procedure;

7        (b)      Awarding compensatory damages in favor of Plaintiffs and all other Class

8   members against all Defendants, jointly and severally, for all damages sustained as a

9   result of Defendants' wrongdoing, in an amount to be proven at trial, including interest

10  thereon;

11       (c)      Awarding Plaintiffs and the Class their reasonable costs and expenses incurred

12  in this action, including counsel fees and expert fees; and

13       (d)      Such other and further relief as the Court may deem just and proper.

14  **XIV.   JURY TRIAL DEMANDED**

15       Plaintiffs hereby demand a trial by jury.

16  Dated:  July 15, 2016                    **SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**

17                                           By:  _s/Deborah Clark-Weintraub_
18                                           DEBORAH CLARK-WEINTRAUB
                                             MAX R. SCHWARTZ
19                                           The Chrysler Building
                                             405 Lexington Avenue, 40th Floor
20                                           New York, NY 10174
                                             Telephone:  (212) 223-6444
21                                           Facsimile:   (212) 223-6334
                                             Email:    dweintraub@scott-scott.com
22                                                       mschwartz@scott-scott.com

23                                           DAVID R. SCOTT
                                             **SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
24                                           156 South Main Street
                                             P.O. Box 192
25                                           Colchester, CT 06415
                                             Telephone:  (860) 537-5537
26                                           Facsimile:   (860) 537-4432
                                             Email:    david.scott@scott-scott.com

27

28

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:15-cv-01455-VC

JOHN T. JASNOCH (Bar No. 281605)
**SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
707 Broadway, Suite 1000
San Diego, CA 92101
Telephone:  (619) 233-4565
Facsimile:   (619) 233-0508
Email:    jjasnoch@scott-scott.com

*Attorneys for Lead Plaintiff the Institutional Investment Group*

JOEL H. BERNSTEIN
ERIC DAVID GOTTLIEB
IRA A. SCHOCHET
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone:  (212) 907-0869
Facsimile:   (212) 818-0477
Email:    jbernstein@labaton.com
                egottlieb@labaton.com
                ischochet@labaton.com

*Attorneys for Newport News Employees' Retirement Fund and Massachusetts Laborers' Pension Fund and Additional Counsel for the Class*

CHRISTOPHER LOMETTI
KENNETH M. REHNS
**COHEN MILSTEIN
SELLERS AND TOLL PLLC**
88 Pine Street, 14th Floor
New York, NY 10005
Telephone:  (212) 838-7797
Facsimile:   (212) 838-7745
Email:    clometti@cohenmilstein.com
                krehns@cohenmilstein.com

*Attorneys for Pavers and Road Builders Annuity, Welfare and Pension Funds and Additional Counsel for the Class*

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:15-cv-01455-VC

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on July 15, 2016, I caused the foregoing to be electronically filed with the Clerk of the Court using the CM/ECF system, which will send notification of such filing to the email addresses denoted on the Electronic Mail Notice List, and I hereby certify that I caused the foregoing document or paper to be mailed via the United States Postal Service to the non-CM/ECF participants indicated on the Manual Notice List.

I certify under penalty of perjury that the foregoing is true and correct.

Executed on July 15, 2016.

*s/Deborah Clark-Weintraub*
DEBORAH CLARK-WEINTRAUB
**SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**
The Chrysler Building
405 Lexington Avenue, 40th Floor
New York, NY 10174
Telephone:  (212) 223-6444
Facsimile:  (212) 223-6334
Email:   dweintraub@scott-scott.com

SECOND AMENDED CONSOLIDATED CLASS ACTION COMPLAINT
Case No. 3:15-cv-01455-VC