1  SCOTT+SCOTT, ATTORNEYS AT LAW, LLP
   DEBORAH CLARK-WEINTRAUB, *pro hac vice*
2  MAX SCHWARTZ, *pro hac vice*
   The Helmsley Building
3  230 Park Avenue, 17th Floor
   New York, New York 10169
4  Telephone: (212) 223-6444
   Facsimile:  (212) 223-6334
5  Email: dweintraub@scott-scott.com
           mschwartz@scott-scott.com
6
7  *Attorneys for Lead Plaintiff*
   *Institutional Investor Group*
8
   [Additional counsel on signature page]
9

10              **UNITED STATES DISTRICT COURT**

11            **NORTHERN DISTRICT OF CALIFORNIA**

12               **SAN FRANCISCO DIVISION**

13  | IN RE: SANDISK LLC SECURITIES | Case No. 3:15-cv-01455-VC |
    | LITIGATION | |
14  | | Hon. Vince Chhabria |
15  | | **LEAD PLAINTIFFS' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES, MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |
16  | | |
17  | | |
18  | | |
19  | | |
20  | | DATE: March 29, 2018 |
    | | TIME:  10:00 AM |
21  | | COURTROOM: 4, 17th Floor |

22

23

24  **REDACTED VERSION OF
    DOCUMENT SOUGHT TO BE
25  FILED UNDER SEAL**

26

27

28

1

# TABLE OF CONTENTS

2

TABLE OF AUTHORITIES ........................................................................................... iii

NOTICE OF MOTION AND MOTION ........................................................................ 1

MEMORANDUM OF POINTS AND AUTHORITIES ................................................ 2

I.      STATEMENT OF ISSUES ................................................................................. 2

II.     PRELIMINARY STATEMENT ........................................................................ 2

III.    THE COMMON FACTS UNDERLYING PLAINTIFFS' CLAIMS ................. 4

        A.      Discovery Substantiates That Fusion-io Performed Poorly Throughout The
                Class Period, As Defendants Were Well Aware ..................................... 4

        B.      Discovery Substantiates That Enterprise Suffered Significant Engineering
                And Qualification Problems Throughout The Class Period, As Defendants
                Were Well Aware ................................................................................... 6

        C.      Despite Their Knowledge Of The Significant Deficiencies In Enterprise
                And Fusion-io, Defendants Misled The Market Regarding That Business ........... 7

        D.      The Proposed Class Representatives ...................................................... 9

        E.      The Proposed Class................................................................................. 9

IV.     ARGUMENT ...................................................................................................... 9

        A.      The Action Satisfies Rule 23(a) ............................................................ 10

                1.      The Class Is Sufficiently Numerous ......................................... 10

                2.      There Are Questions of Law and Fact Common to the Class .......... 10

                3.      Lead Plaintiffs' Claims Are Typical of Those of the Class ......... 12

                4.      Lead Plaintiffs Will Fairly and Adequately Protect the Class'
                        Interests ................................................................................... 12

        B.      The Action Satisfies Rule 23(b)(3) ....................................................... 14

                1.      Common Questions Predominate ............................................. 14

                        (a)     Common Questions of Reliance Predominate Because the
                                Class Can Invoke the Fraud-on-the-Market Presumption ........... 15

                                (i)     SanDisk's Stock Trades in an Efficient Market ............... 15

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Lead Pls.' Notice Of Motion And Motion For Class Certification And Appointment Of Class Representatives,
Memorandum Of Points And Authorities In Support Thereof - Case No. 3:15-cv-01455-VC

i

           (ii)      Lead Plaintiffs Purchased SanDisk Stock While It Was Artificially Inflated, Satisfying Market Timing.........20

           (iii)    Defendants' Alleged False Statements Were Well Publicized...........................................................20

      (b)     Common Questions of Class-Wide Damages Predominate Because Lead Plaintiffs Can Use the Widely Accepted Out-of-Pocket Damages Methodology...................................21

    2.     A Class Action Is Superior .......................................................22

C.     The Court Should Appoint Lead Counsel as Class Counsel Under Rule 23(g) .............................................................................23

V.     CONCLUSION.........................................................................................23

LEAD PLS.' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES, MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF - CASE NO. 3:15-CV-01455-VC

ii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abdullah v. U.S. Sec. Assocs., Inc.*,
  731 F.3d 952 (9th Cir. 2013) ...................................................................................................11

*Acticon AG v. China N.E. Petro. Holdings Ltd.*,
  692 F.3d 34 (2d Cir. 2012) ......................................................................................................21

*Amchem Prods., Inc. v. Windsor*,
  521 U.S. 591 (1997) .....................................................................................................12, 13, 14

*Amgen Inc. v. Conn. Ret. Plans & Trust Funds*,
  133 S. Ct. 1184 (2013) ...................................................................................................9, 14, 20

*Brown v. China Integrated Energy Inc.*,
  2015 WL 12720322 (C.D. Cal. Feb. 17, 2015) .............................................11, 12, 13, 14

*Cammer v. Bloom*,
  711 F. Supp. 1264 (D.N.J. 1989) ................................................................................ *passim*

*In re Cooper Cos. Inc. Sec. Litig.*,
  254 F.R.D. 628 (C.D. Cal. 2009) ............................................................................... *passim*

*In re Countrywide Fin. Corp. Sec. Litig.*,
  273 F.R.D. 586 (C.D. Cal. 2009) ............................................................................15, 17, 18

*Erica P. John Fund, Inc. v. Halliburton Co.*,
  131 S. Ct. 2179 (2011) ..........................................................................................................14, 15

*Halliburton Co. v. Erica P. John Fund, Inc.*,
  134 S. Ct. 2398 (2014) ...........................................................................................................15

*Hatamian v. Adv. Micro Devices, Inc.*,
  2016 WL 1042502 (N.D. Cal. Mar. 16, 2016) ..................................................14, 21, 22

*In re Intuitive Surgical Sec. Litig.*,
  2016 WL 7425926 (N.D. Cal. Dec. 22, 2016) ...............................................................10

*In re Juniper Networks, Inc. Sec. Litig.*,
  264 F.R.D. 584 (N.D. Cal. 2009) ............................................................................... *passim*

*Lehocky v. Tidel Techs., Inc.*,
  220 F.R.D. 491 (S.D. Tex. 2004) ...........................................................................................20

*In re LendingClub Sec. Litig.*,
  2017 WL 4750629 (N.D. Cal. Oct. 20, 2017) ................................................................12

*McCulloch v. Baker Hughes Inteq Drilling Fluids, Inc.*,
  2017 WL 2257130 (E.D. Cal. May 23, 2017) ................................................................10

*Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*,
  311 F.R.D. 590 (C.D. Cal. 2015) ........................................................................10

*Petrie v. Elec. Game Card, Inc.*,
  308 F.R.D. 336 (C.D. Cal. 2015) ..................................................................... *passim*

*Todd v. STAAR Surgical Co.*,
  2017 WL 821662 (C.D. Cal. Jan. 5, 2017) ..........................................15, 17, 22

*Torres v. Mercer Canyons Inc.*,
  835 F.3d 1125 (9th Cir. 2016) ............................................................................9

*In re VeriSign, Inc. Sec. Litig.*,
  2005 WL 7877645 (N.D. Cal. Jan. 13, 2005) ....................................................11

*Vinh Nguyen v. Radient Pharms. Corp.*,
  287 F.R.D. 563 (C.D. Cal. 2012) ................................................16, 18, 19, 22

*Wal-Mart Stores, Inc. v. Dukes*,
  564 U.S. 338 (2011) ................................................................................. 10-11

**Rules and Statutes**

Fed. R. Civ. P. 23 ......................................................................................2, 9

Fed. R. Civ. P. 23(a) ................................................................................. *passim*

Fed. R. Civ. P.  23(a)(1) ..................................................................................10

Fed. R. Civ. P.  23(a)(2) ...........................................................................10, 11

Fed. R. Civ. P. 23(a)(3) ..................................................................................12

Fed. R. Civ. P. 23(a)(4) ..........................................................................2, 4, 12

Fed. R. Civ. P. 23(b) .........................................................................................1

Fed. R. Civ. P. 23(b)(3) ............................................................................. *passim*

Fed. R. Civ. P. 23(g) ................................................................................. *passim*

Fed. R. Civ. P. 23(g)(1)(A)(i)-(iv) ...................................................................23

H.R. Rep. No. 104-369 (1995), as reprinted in 1995 U.S.C.C.A.N. 730.....................................13

**NOTICE OF MOTION AND MOTION**

PLEASE TAKE NOTICE that on March 29, 2018, at 10:00 a.m., or as soon thereafter as the matter may be heard, before the Honorable Vince Chhabria of the United States District Court for the Northern District of California, 450 Golden Gate Avenue, San Francisco, California, Lead Plaintiffs City of Bristol Pension Fund, City of Milford, Connecticut Pension & Retirement Board, Pavers and Road Builders Pension, Annuity and Welfare Funds, the City of Newport News Employees' Retirement Fund, and Massachusetts Laborers' Pension Fund (collectively, the "Institutional Investor Group" or "Plaintiffs") will, and hereby do, move the Court for an order: (i) certifying the above-captioned action as a class action; (ii) appointing Lead Plaintiffs as class representatives; and (iii) appointing Scott+Scott, Attorneys at Law, LLP as class counsel.  This motion is brought pursuant to Rules 23(a), (b), and (g) of the Federal Rules of Civil Procedure ("FRCP") and is based upon this Notice of Motion, Motion, and Memorandum of Points and Authorities in support thereof, and any other matters properly before the Court.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    STATEMENT OF ISSUES

1.   Does the Action meet the Requirements of Rule 23(a) where:   (i) there were numerous shares – over 23 million – of SanDisk's common stock traded on the NASDAQ during the Class Period; (ii) Class members all suffered the same injury as a result of Defendants' alleged misconduct, giving rise to numerous common issues; (iii) Lead Plaintiffs' claims are typical, in that they arise from the same misconduct and are based on the same legal theory as the Class members' claims; and (iv) Lead Plaintiffs have demonstrated their commitment to obtaining a recovery for the Class, have no conflicts, and have retained competent counsel who have vigorously prosecuted the Action?

2.   Does the Action meet Rule 23(b)(3)'s predominance requirement where:   (i) Lead Plaintiffs can invoke the fraud-on-the-market presumption for class-wide reliance because SanDisk's common stock trades in an efficient market, Lead Plaintiffs purchased SanDisk common stock after its price was inflated by Defendants' false and misleading statements and omissions but before the truth was revealed, and Defendants made those statements in widely publicized press releases, conference calls with securities analysts, public appearances, and SEC filings; and (ii) damages are readily capable of being calculated on a class-wide basis using the widely accepted "out-of-pocket" damages methodology, which is consistent with Lead Plaintiffs' liability theory?

3.   Is Rule 23(b)(3)'s superiority requirement satisfied when, if the Action were to proceed as a class action, it would efficiently resolve a multitude of claims, and obviate the difficulties that would arise from a multitude of individual actions?

4.   Does Lead Counsel meet the requirements to serve as Class Counsel, under Rules 23(a)(4) & (g), when it has committed substantial resources to investigating Defendants' alleged misconduct and prosecuting the claims, has the resources to continue representing the Class, and has a long track record of achieving successful results in similar actions?

## II.    PRELIMINARY STATEMENT

The securities fraud claims at issue present the quintessential candidates for class certification under Fed. R. Civ. P. 23.  Lead Plaintiffs, five large institutional investors who collectively manage billions of dollars, allege that Defendants misled the market regarding the financial and operational performance of SanDisk's critical Enterprise business and Fusion-io segment.  This artificially propped up or inflated SanDisk's stock price and caused investors substantial losses when the truth was revealed.  As set forth below, ongoing discovery strongly supports these allegations.

First, the Action satisfies the requirements of FRCP 23(a).  With millions of SanDisk shares traded on the NASDAQ exchange during the Class Period, there are likely thousands of

LEAD PLS.' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES, MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF - CASE NO. 3:15-CV-01455-VC

2

1    Class members, and the Class is certainly so numerous that joinder is impracticable.  There are

2    also multiple common questions of fact and law, including whether Defendants' affirmative

3    statements and omissions were material and misleading, and whether the price of SanDisk's

4    shares was artificially inflated as a result of those misrepresentations and omissions.  Lead

5    Plaintiffs' claims are typical of the other Class members' claims, because they allege that the

6    same actionable misstatements and omissions from Defendants caused the same injury to the

7    entire Class in connection with their purchases of SanDisk's stock at artificially inflated prices.

8    Finally, Lead Plaintiffs will fairly and adequately represent the Class, as they have demonstrated

9    through their active participation in the litigation of this Action, as well as their selection of

10   experienced counsel with the resources to successfully prosecute this Action.

11       Second, the Action meets the predominance prong of Rule 23(b)(3).  In securities fraud

12   class actions, plaintiffs generally demonstrate predominance when they can invoke the fraud-on-

13   the market presumption for class-wide reliance.  As set forth in the Expert Report of Chad

14   Coffman, CFA ("Coffman Report") (Ex. O), SanDisk's common stock traded in an efficient

15   market during the Class Period, establishing reliance here.  The false and misleading statements

16   at issue were also well publicized – issued for example at conference calls with securities

17   analysts – and Lead Plaintiffs purchased SanDisk's common stock after those statements were

18   made but before the truth was revealed.  Additionally, courts widely recognize that securities

19   fraud damages are readily capable of class-wide measurement under the "out-of-pocket"

20   methodology, which the Coffman Report concludes is the appropriate damages methodology

21   here.

22       Third, the Action meets Rule 23(b)(3)'s superiority prong.  There are numerous Class

23   members here, and, for many of them, the considerable expense of individual litigation would be

24   prohibitive, making class-wide resolution far superior.  Further, proceeding as a class action will

25   not raise any difficulties in terms of management.

26

27

28

Lead Pls.' Notice Of Motion And Motion For Class Certification And Appointment Of Class Representatives, Memorandum Of Points And Authorities In Support Thereof - Case No. 3:15-cv-01455-VC

3

1    Fourth, Lead Counsel meet the requirements to serve as Class Counsel under Rules

2    23(a)(4) and (g), as they have substantial experience in securities fraud cases, have devoted

3    extensive time and resources to prosecuting the Action, and are dedicated to continue doing so.

4    Accordingly, Lead Plaintiffs request that the Court certify the Class defined below,

5    appoint Lead Plaintiffs as Class Representatives, and appoint Lead Counsel as Class Counsel.

6    **III.    THE COMMON FACTS UNDERLYING PLAINTIFFS' CLAIMS**

7    Based on the accounts of six CWs and Defendants' later admissions, the SAC alleges

8    that, as Defendants knew by the start of the Class Period (*i.e.*, October 16, 2014), SanDisk's

9    Enterprise business and its Fusion-io segment, were beset with performance deficiencies that

10   undermined Fusion-io's 4Q2014 financial results as well as Enterprise's ongoing ability to

11   generate revenue.  With respect to Fusion-io, which SanDisk acquired shortly before the Class

12   Period and which made enterprise products called PCIe SSDs, these deficiencies stemmed from

13   SanDisk's: (i) inability to reduce the high cost of its PCIe SSDs relative to other suitable

14   products; (ii) decision to build its PCIe SSDs with an increasingly obsolete proprietary command

15   set rather than the open NVMe command set that customers had adopted; and (iii) decision to

16   largely dismantle Fusion-io's sales team.  Meanwhile, the other two segments of SanDisk's

17   Enterprise business had substantial deficiencies as well.  Its SAS SSDs suffered from critical

18   engineering flaws and difficulty qualifying with customers, while its SATA SSDs were a

19   generation behind what competitors supplied and customers demanded.  (¶¶43-74, 108-128).

20   **A.    Discovery Substantiates That Fusion-io Performed Poorly Throughout The Class Period, As Defendants Were Well Aware**

21   Discovery to date has largely substantiated the SAC's allegations.

22
23
24
25
26
27
28

Lead Pls.' Notice Of Motion And Motion For Class Certification And Appointment Of Class Representatives, Memorandum Of Points And Authorities In Support Thereof - Case No. 3:15-cv-01455-VC

4

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



[1] Cites to "Ex. –" reference the Exhibits in the accompanying Deborah Clark-Weintraub Declaration.

LEAD PLS.' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES, MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF - CASE NO. 3:15-CV-01455-VC

5

1

2

3    As the SAC alleged, and discovery has confirmed, a number of factors caused Fusion-

4  io's deteriorating performance

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22    Fusion-io was, accordingly, a major source of Enterprise's poor performance during the

23  Class Period.

24    **B.    Discovery Substantiates That Enterprise Suffered Significant Engineering
          And Qualification Problems Throughout The Class Period, As Defendants
25        Were Well Aware**

26    At the same time, SanDisk's other Enterprise product lines, in particular the SAS SSDs

27  that had made up the bulk of Enterprise's revenue, were experiencing debilitating engineering,

28

Lead Pls.' Notice Of Motion And Motion For Class Certification And Appointment Of Class Representatives,
Memorandum Of Points And Authorities In Support Thereof - Case No. 3:15-cv-01455-VC

6

1    qualification and performance problems with SanDisk's SAS SSDs,

2

3

4

5

6

7

8

9

10

11

12

13

14

15    The adverse impact on revenues from SanDisk's inability to qualify its SSDs continued

16    into 2015 as well.

17

18

19

20

21

22

23    **C.    Despite Their Knowledge Of The Significant Deficiencies In Enterprise And
          Fusion-io, Defendants Misled The Market Regarding That Business**

24    Defendants' optimistic public statements to investors regarding Enterprise and Fusion-io

25    stand in stark contrast to their indisputable personal knowledge of the many performance issues

26    adversely impacting that business.  In this regard, on the first day of the Class Period, in a

27    conference call with securities analysts, Defendants falsely touted SanDisk's Enterprise business

28

as "position[ed] well to accelerate [its] momentum in the fast-growing market for enterprise flash" (¶77), even as the substantial problems discussed above were undermining any momentum.   Similarly, Defendant Bruner, though acknowledging the existence of supply constraints, misled investors that demand for SanDisk's products continued to be high, stating "*[f]or the fourth quarter, we have strong demand signals from our customers in all key product categories*." (¶78).   Defendants also falsely assured the market that SanDisk was benefiting from the Fusion-io acquisition, with Mehrotra stating that "[t]he Fusion-io business [had] performed in line with our expectations post-acquisition" (¶77), while omitting the internal warnings and obstacles SanDisk had identified regarding Fusion-io's performance.

Notwithstanding the worsening trends that were even more readily apparent by the end of 2014, Defendants' optimistic statements concerning Enterprise continued on January 21, 2015. Forced to announce disappointing results for SanDisk as a whole in 4Q2014, which they attributed to weaker sales of retail and iNAND products, Defendants attempted to deflect the market by hailing the Enterprise business and Fusion-io as a source of strength for the Company that would counterbalance the other product lines.   Again omitting any mention of Fusion-io's substantial failure to meet SanDisk's internal sales target along with its ever declining revenue and sales forecasts, Mehrotra misled the market by stating, although Fusion-io was "not at the run rate that it was pre-acquisition," its performance was in-line was SanDisk's expectations.   He continued in this vein, proclaiming that SanDisk had "a strong road map for Fusion-io products," and "expect[ed] in Q1 [2015] to have sequential growth in that part of the business."   Indeed, Mehrotra guaranteed that "enterprise SSD solutions" would certainly achieve $1 billion in revenue for 2015 and that Fusion-io would "be a significant contributor" to this goal, explaining that SanDisk had accelerated the $1 billion Enterprise goal to 2015 from 2016 precisely because it had "acquired Fusion-io." (¶94).

Defendants continued making such misleading statements throughout the Class Period as the problems with Enterprise and Fusion-io only grew more severe.   For example, at an investor

Lead Pls.' Notice Of Motion And Motion For Class Certification And Appointment Of Class Representatives, Memorandum Of Points And Authorities In Support Thereof - Case No. 3:15-cv-01455-VC

8

1   conference on March 3, 2015, Mehrotra touted the success of SanDisk's Enterprise business,

2   which he summed up as "firing on all cylinders" (¶106), when it had completely fallen apart.

3        Defendants did not begin to reveal the truth concerning the Enterprise business until

4   March 26, 2015, when a short SanDisk press-release pre-announced a reduced guidance for

5   1Q2015 and FY2015, due to lower sales of enterprise products.  The full truth was not revealed

6   until April 15, 2015, when Defendants finally disclosed that the Enterprise business was

7   suffering from, among other things, "product issues including qualification delays" (¶9) and a

8   market shift away from Fusion-io's higher priced PCIe SSDs to lower cost SATA SSDs.  (¶113).

9        **D.    The Proposed Class Representatives**

10        As discussed in further detail below, all of the Court-appointed Lead Plaintiffs are

11  institutional investors that purchased SanDisk's common stock during the Class Period at

12  artificially inflated prices and suffered significant losses when the truth was revealed, and are

13  willing and able to serve as representative parties for the benefit of the Class.

14        **E.    The Proposed Class**

15        This Motion seeks to certify a Class of: all persons and entities who purchased or

16  otherwise acquired SanDisk's publicly traded common stock during the period from October 16,

17  2014 through April 15, 2015 (inclusive), and were damaged thereby.  Excluded from the Class

18  are Defendants and their immediate family members; the officers and directors of the Company

19  during the Class Period and their immediate family members; any entity in which Defendants

20  have or had a controlling interest; and the legal representatives, heirs, successors, assigns, or

21  affiliates of any excluded person.

22  **IV.   ARGUMENT**

23        Rule 23 governs class certification.   Courts "consider merits questions at the class

24  certification stage only to the extent they are relevant to whether Rule 23 requirements have been

25  met." *Torres v. Mercer Canyons Inc.*, 835 F.3d 1125, 1133 (9th Cir. 2016).  *See also Amgen Inc.*

26  *v. Conn. Ret. Plans & Trust Funds*, 133 S. Ct. 1184, 1194-95 (2013) ("Rule 23 grants courts no

27  license to engage in free-ranging merits inquiries," and such inquiries "may be considered to the

28

Lead Pls.' Notice Of Motion And Motion For Class Certification And Appointment Of Class Representatives, Memorandum Of Points And Authorities In Support Thereof - Case No. 3:15-cv-01455-VC

9

extent – but only to the extent – that they are relevant to determining whether the Rule 23 prerequisites for class certification are satisfied").  The Action merits certification because it satisfies Rules 23(a), (b)(3) & (g).

### A.    The Action Satisfies Rule 23(a)

As set forth below, Lead Plaintiffs meet all four subparts of Rule 23(a):  numerosity, commonality, typicality, and adequacy.

### 1.    The Class Is Sufficiently Numerous

Rule 23(a)(1) tests whether a class is "so numerous that joinder of all members is impracticable."  "This 'does not mean that joinder must be impossible, but rather means only that the court must find that the difficulty or inconvenience of joining all members of the class makes class litigation desirable.'"  *McCulloch v. Baker Hughes Inteq Drilling Fluids, Inc.*, 2017 WL 2257130, at *7 (E.D. Cal. May 23, 2017) (internal citations omitted).[2]  "As a general matter, courts have found that numerosity is satisfied when class size exceeds 40 members."  *Moore v. Ulta Salon, Cosmetics & Fragrance, Inc.*, 311 F.R.D. 590, 602-03 (C.D. Cal. 2015).

Here, during the Class Period, SanDisk had hundreds of millions of outstanding shares of common stock which were traded on a national exchange, the NASDAQ.  Coffman Report at ¶66.  "District courts have consistently found a proposed class to be sufficiently numerous in securities fraud cases where 'several million shares of stock were purchased during the class period.'"  *In re Intuitive Surgical Sec. Litig.*, 2016 WL 7425926, at *4 (N.D. Cal. Dec. 22, 2016) (proposed class sufficiently numerous where defendant had between 39 million and 40 million shares of outstanding stock during the class period).  Accordingly, the numerosity requirement is easily met here.

### 2.    There Are Questions of Law and Fact Common to the Class

Rule 23(a)(2) requires a showing that there are "questions of law or fact common to the class."  Sufficient commonality exists where class members "suffered the same injury" and their claims "depend upon a common contention" that is capable of class-wide resolution.  *Wal-Mart*

---

[2]    Unless otherwise stated, all internal citations are omitted and all emphases are added.

LEAD PLS.' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES, MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF - CASE NO. 3:15-CV-01455-VC

10

1    *Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011).   "This does not, however, mean that *every*

2    question of law or fact must be common to the class: all Rule 23(a)(2) requires is 'a single

3    *significant* question of law or fact.'"   *Abdullah v. U.S. Sec. Assocs., Inc.*, 731 F.3d 952, 957 (9th

4    Cir. 2013) (quoting *Mazza v. Am. Honda Motor Co.*, 666 F.3d 581, 589 (9th Cir. 2012))

5    (emphases in original).   "Commonality, like numerosity, is a prerequisite which plaintiffs

6    generally, and which Plaintiffs here, satisfy very easily."   *In re VeriSign, Inc. Sec. Litig.*, 2005

7    WL 7877645, at *5 (N.D. Cal. Jan. 13, 2005).

8          Here, class members have suffered a common injury – losses on their investments in

9    SanDisk common stock – and their claims depend upon numerous common issues capable of

10   class-wide resolution, including:

11         •   whether Defendants' statements or omissions violated the Exchange Act;

12         •   whether Defendants' statements and omissions were materially false and

13             misleading;

14         •   whether Defendants acted knowingly or recklessly (*i.e.*, with scienter);

15         •   whether the price of SanDisk's shares was artificially inflated as a result of

16             Defendants' misrepresentations and/or omissions; and

17         •   whether disclosures of Defendants' wrongdoing caused Class members to suffer

18             damages.

19         These issues provide more than sufficient commonality.   *See, e.g.*, *Brown v. China*

20   *Integrated Energy Inc.*, 2015 WL 12720322, at *14 (C.D. Cal. Feb. 17, 2015) (plaintiffs'

21   allegations that defendant company "made various misstatements in its SEC filings, Registration

22   Statement, press releases, and public statements" are "enough to satisfy the commonality

23   requirement."); *In re Juniper Networks, Inc. Sec. Litig.*, 264 F.R.D. 584, 588 (N.D. Cal. 2009)

24   ("Repeated misrepresentations by a company to its stockholders satisfy the commonality

25   requirement of Rule 23(a)(2)."); *In re Cooper Cos. Inc. Sec. Litig.*, 254 F.R.D. 628, 635 (C.D.

26   Cal. 2009) (allegations that defendants violated Exchange Act, knowingly misrepresented

27   material facts, and caused the defendant company's stock price to be artificially inflated were

28

1  "common questions" that "form the core of a case for securities fraud" and are "extremely

2  similar to questions of law and fact that other courts have found to be common in previous

3  securities fraud cases").  Accordingly, Lead Plaintiffs have established commonality.

4         **3.**      **Lead Plaintiffs' Claims Are Typical of Those of the Class**

5        Typicality under Rule 23(a)(3) requires that "the claims or defenses of the representative

6  parties are typical of the claims or defenses of the class[.]"  "[T]he Ninth Circuit does not require

7  the named Plaintiffs' injuries to be identical with those of the other class members" but rather

8  requires only that "the unnamed class members have injuries similar to those of the named

9  plaintiffs and that the injuries result from the same injurious course of conduct."  *Brown*, 2015

10  WL 12720322, at *14 (finding sufficient typicality where plaintiffs alleged that lead plaintiffs

11  purchased shares of defendant company during the class period and suffered damages from

12  defendants' alleged misrepresentations and omissions).  "Like the commonality requirement, the

13  typicality requirement is permissive."  *Juniper Networks*, 264 F.R.D. at 589.  Here, Lead

14  Plaintiffs' claims and the claims of the other Class members arise from the same alleged

15  misconduct:  they all purchased SanDisk's common stock at artificially inflated prices on

16  account of Defendants' knowing or reckless material misrepresentations or omissions.  Further,

17  they all suffered the same injury when the truth was revealed causing the stock price to decline.

18  This is sufficient to establish typicality in securities fraud actions.

19         **4.**      **Lead Plaintiffs Will Fairly and Adequately Protect the Class'**
               **Interests**

20        To serve as class representatives, Lead Plaintiffs must "fairly and adequately protect the

21  interests of the class."  Fed. R. Civ. P. 23(a)(4).  "FRCP 23(a)(4) imposes only a modest burden."

22  *In re LendingClub Sec. Litig.*, 2017 WL 4750629, at *7 (N.D. Cal. Oct. 20, 2017).  "The

23  adequacy inquiry under Rule 23(a)(4) serves to uncover conflicts of interest between named

24  parties and the class they seek to represent."  *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 625

25  (1997).  Within the Ninth Circuit, the adequacy inquiry is governed by two questions:

26  "(1) whether 'the named plaintiffs and their counsel have any conflicts of interest with other

27  class members,' and (2) whether 'the named plaintiffs and their counsel [will] prosecute the

1   action vigorously on behalf of the class.'"  *Brown*, 2015 WL 12720322, at *15 (quoting *Hanlon*

2   *v. Chrysler Corp.*, 150 F.3d 1011, 1020 (9th Cir. 1998)).   There is "considerable overlap"

3   between the adequacy and the typicality requirements of Rule 23(a).  *Cooper*, 254 F.R.D. at 636

4   (quoting *In re Unioil Sec. Litig.*, 107 F.R.D. 615, 622 (C.D. Cal. 1985)).

5       As discussed above, Lead Plaintiffs' interests are directly aligned with and typical of the

6   Class, because they were all injured by the same materially false and misleading statements and

7   omissions.  *See Amchem*, 521 U.S. at 625-26 ("a class representative must be part of the class

8   and 'possess the same interest and suffer the same injury' as the class members").

9       Further, Lead Plaintiffs have shown that they are willing and able to actively participate

10   in and control the litigation.  For example, Lead Plaintiffs have spent significant time managing

11   and participating in the case, through regular consultation with counsel, review of filings and

12   discovery.[3]  They also are familiar with the allegations in the case, and their duties as Class

13   Representatives, which they have faithfully and effectively pursued.[4]   Lead Plaintiffs are,

14   moreover, large institutional investors that together manage billions of dollars – the precise type

15   of plaintiffs that the PSLRA favors as class representatives.  *See* H.R. Rep. No. 104-369, at 34

16   (1995) (Conf. Rep.), as reprinted in 1995 U.S.C.C.A.N. 730, 733.  Nor is there any evidence of

17   conflicts of interest between Lead Plaintiffs and the Class.  *See Juniper Networks*, 264 F.R.D. at

18   590 (finding that lead plaintiffs were adequate representatives because there was no evidence of

19   conflicts of interest between the lead plaintiffs and the class).

20       Lead Plaintiffs have selected Lead Counsel Scott+Scott as proposed Class Counsel, a law

21   firm that is unquestionably competent to prosecute this Action.  Scott+Scott has demonstrated its

22   qualification and commitment to prosecute this Action by, among other things, undertaking a

23   thorough investigation of Defendants' alleged misconduct, drafting complaints, successfully

24

---

25   [3]  Exs. P, Q, T, U, V (Waldron Tr. at 11:17-13:11, 27:23-29:9; Cody Tr. at 12:8-13:11, 89:11-
26   90:3; McAnarney Tr. at 106:3-12; 107:11-18; 109:19-23; 110:11-16; Goodwin Tr. at 20:24-21:3; 27:18-24;  46:10-14;  113:15-23;  119:24-120:3;  Montelle  Tr.  at  11:21-13:12,  31:3-6,  32:17-33:13).
27   [4]  *Id.* (Waldron Tr. at 112:19-113:20, 121:6-122:18, 164:7-165:4; Cody Tr. at 102:9-104:2, 104:25-105:16, 120:4-121:6; McAnarney Tr. at 104:15-105:9, 112:2-13, 124:12-16; 129:4-10;
28   Goodwin Tr. at 114:18-115:8, 116:6-14, 127:18-128:14; 129:18-25; Montelle Tr. 146:20-148:3, 154:15-19, 173:6-22; 174:2-4).

LEAD PLS.' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES, MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF - CASE NO. 3:15-CV-01455-VC

13

1   opposing in part Defendants' motion to dismiss, and managing a considerable amount of

2   discovery material.  This is consistent with its long and successful track record in securities class

3   actions.  *See* Ex. S.  *See Juniper Networks*, 264 F.R.D. at 590 (finding adequate representation

4   after reviewing resumes of lead plaintiffs' counsel showing counsel to have sufficient experience

5   in securities litigation).

6       Lead Plaintiffs are accordingly adequate Class Representatives, and have met all of Rule

7   23(a)'s requirements.

8       **B.     The Action Satisfies Rule 23(b)(3)**

9       Under Rule 23(b)(3), an action may proceed as a class action if:  (i) "questions of law or

10  fact common to class members predominate over any questions affecting only individual

11  members," and (ii) "a class action is superior to other available methods for fairly and efficiently

12  adjudicating the controversy."  Fed. R. Civ. P. 23(b)(3).  The Action readily meets this standard.

13      **1.     Common Questions Predominate**

14      "[T]he predominance inquiry focuses on 'whether proposed classes are sufficiently

15  cohesive to warrant adjudication by representation.'"  *Hatamian v. Adv. Micro Devices, Inc.*,

16  2016 WL 1042502, at *3 (N.D. Cal. Mar. 16, 2016).  For a class to be sufficiently cohesive, the

17  common questions must "present a significant aspect of the case" and be capable of resolution

18  "for all members of the class in a single adjudication."  *Brown*, 2015 WL 12720322, at *15.

19      The predominance test is generally met in securities fraud cases.  *Amchem*, 521 U.S. at

20  625.  To establish liability under Section 10(b), plaintiffs must show: "(1) a material

21  misrepresentation or omission of fact; (2) scienter; (3) a connection with the purchase or sale of a

22  security; (4) transaction and loss causation ["transaction causation" being used interchangeably

23  with "reliance"]; and (5) economic loss (damages)."  *Cooper*, 254 F.R.D. at 638.  Virtually all of

24  these elements involve common questions of law and fact that predominate over individualized

25  issues.  *Amgen*, 133 S. Ct. at 1196-97 (materiality); *Erica P. John Fund, Inc. v. Halliburton Co.*

26  ("*Halliburton I*"), 131 S. Ct. 2179, 2186 (2011) (loss causation); *Cooper*, 254 F.R.D. at 640 (all

27  elements).  Indeed, "when 'a common nucleus of misrepresentations, material omissions and

28

Lead Pls.' Notice Of Motion And Motion For Class Certification And Appointment Of Class Representatives, Memorandum Of Points And Authorities In Support Thereof - Case No. 3:15-cv-01455-VC

14

market manipulations exists, the common questions predominate over any differences between individual class members with respect to damages, causation or reliance.'"  *Cooper*, 254 F.R.D. at 639-40.

Reliance is also a predominant common question when the plaintiffs can invoke the "fraud-on-the-market" presumption.  *Halliburton I*, 131 S. Ct. at 2185.  In turn, when they can invoke that presumption, predominance is satisfied.  *Id*. at 2184.

### (a)   Common Questions of Reliance Predominate Because the Class Can Invoke the Fraud-on-the-Market Presumption

The fraud-on-the-market theory "holds that 'the market price of shares traded on well-developed markets reflects all publicly available information, and hence, any material misrepresentations.'"  *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2408 (2014) ("*Halliburton II*") (affirming and quoting *Basic Inc. v. Levinson*, 485 U.S. 224, 246-47 (1988)).  Accordingly, whenever an "investor buys or sells stock at the market price, his 'reliance on any public material misrepresentations . . . may be presumed for purposes of a Rule 10b-5 action.'"  *Id*. (quoting *Basic*, 485 U.S. at 247).

To invoke the fraud-on-the-market presumption at class certification, the plaintiffs must show market efficiency, market timing, and publicity.  *Id*. at 2412, 2416.  Lead Plaintiffs have established each of those elements, and therefore predominance.

### (i)   SanDisk's Stock Trades in an Efficient Market

SanDisk is listed on the NASDAQ exchange, which is a very strong indicator of efficiency.  *Todd v. STAAR Surgical Co.*, 2017 WL 821662, at *6 (C.D. Cal. Jan. 5, 2017) (noting that "federal courts are unanimous in their agreement that a listing on the NASDAQ or a similar national market is a good indicator of efficiency").  Further, the *Cammer* factors that guide the analysis of market efficiency are easily satisfied here.  *See, e.g.*, *In re Countrywide Fin. Corp. Sec. Litig.*, 273 F.R.D. 586, 610 (C.D. Cal. 2009) (citing *Cammer v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989)).

The *Cammer* factors are:  "first, whether the stock trades at a high weekly volume; second, whether securities analysts follow and report on the stock; third, whether the stock has

Lead Pls.' Notice Of Motion And Motion For Class Certification And Appointment Of Class Representatives, Memorandum Of Points And Authorities In Support Thereof - Case No. 3:15-cv-01455-VC

15

1  market makers and arbitrageurs; fourth, whether the company is eligible to file SEC registration

2  form S–3, as opposed to form S–1 or S–2; and fifth, whether there are 'empirical facts showing a

3  cause and effect relationship between unexpected corporate events or financial releases and an

4  immediate response in the stock price.'" *Vinh Nguyen v. Radient Pharms. Corp.*, 287 F.R.D.

5  563, 571 (C.D. Cal. 2012) (quoting *Binder v. Gillespie*, 184 F.3d 1059, 1065 (9th Cir. 1999))

6  (adopting and applying the *Cammer* factors).  Those five factors are often "supplemented by

7  other measures, such as '(6) the company's market capitalization; (7) the bid-ask spread; (8) the

8  float, or issue amount outstanding excluding insider-owned securities; and (9) the percentage of

9  institutional ownership.'" *Petrie v. Elec. Game Card, Inc.*, 308 F.R.D. 336, 349 (C.D. Cal. 2015).

10      All of the *Cammer* factors, as well as the other factors listed in *Petrie*, demonstrate

11  market efficiency here.  In support, Lead Plaintiffs submit with this Motion the expert report of

12  Dr. Chad Coffman, Ph.D., which analyzes those factors and concludes that SanDisk's common

13  stock traded in an efficient market during the Class Period.

14  **SanDisk's Shares Experienced High Trading Volume**

15      A high average trading volume tends to show market efficiency because it suggests

16  "significant investor interest in the company" and, in turn, a "likelihood that many investors are

17  executing trades on the basis of newly available or disseminated corporate information."

18  *Cammer*, 711 F. Supp. at 1286.  "Turnover, 'measured by average weekly trading of 2% or more

19  of the outstanding shares would justify a strong presumption that the market for the security is an

20  efficient one; 1% would justify a substantial presumption.'"  *Petrie*, 308 F.R.D. at 349; *see also*

21  *Vinh Nguyen*, 287 F.R.D. at 570.

22      SanDisk's common stock far surpassed that threshold.  During the Class Period, its

23  average weekly trading volume was 22 million shares, which is 10.02% of its outstanding shares.

24  Coffman Report ¶28 (noting that SanDisk's weekly trading volume also compared favorably to

25  the NYSE's and the NASDAQ's weekly average trading volume of 2.21%).

26

27

28

**Numerous Analysts Covered SanDisk**

Coverage by securities analysts supports market efficiency "because it implies that available information on the company was 'closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors,' which would in turn affect the price of the stock." *Petrie*, 308 F.R.D. at 350 (quoting *Cammer*, 711 F. Supp. at 1286.).

During the Class Period, at least 26 different analyst firms issued at least 133 separate reports on the Company. Coffman Report ¶33. This satisfies the second *Cammer* factor. Beyond analyst reports, thousands of unique articles were published regarding SanDisk during the Class Period, further disseminating information regarding the Company. Coffman Report ¶35.

**SanDisk Stock Had Numerous Market Makers for Its Stock**

"A market-maker is one who helps establish a market for securities by reporting bid-and-asked quotations (the price a buyer will pay for a security and the price a seller will sell a security) and who stands ready to buy or sell at these publicly quoted prices." *Petrie*, 308 F.R.D. at 351 (quoting *Countrywide*, 273 F.R.D. at 613-14). A greater number of market makers for a particular security supports an inference that (1) the security is liquid, and therefore (2) the market is efficient. *Petrie*, 308 F.R.D. at 351; *Countrywide*, 273 F.R.D. at 614. *Cammer* holds that "[t]en market makers for a security would justify a substantial presumption that the market for the security is an efficient one." 711 F. Supp. at 1293. Again, SanDisk far surpasses that threshold, with 128 market makers for its stock. Coffman Report ¶41.

Further, as noted above, SanDisk common stock trades on the NASDAQ, which is a modern market that uses a centralized computer system to match orders and to provide quotes for the stocks that it lists. To support those functions, the NASDAQ provides price, volume, and trade details for its stocks on a continuous and public basis. Markets with such characteristics are often assumed to be efficient, and the NASDAQ is in fact one of the largest and most liquid markets in the world. *See Todd*, 2017 WL 821662, at *6; Coffman Report ¶40. By contrast, over-the-counter markets, which were more prevalent at the time of the *Cammer* decision, rely

LEAD PLS.' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES, MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF - CASE NO. 3:15-CV-01455-VC

17

1   on decentralized market makers to provide liquidity for the stocks they list.  *Id*.  Thus, while the

2   128 market makers enhanced the efficiency in the market for SanDisk common stock, by fact of

3   trading on the NASDAQ, SanDisk common stock already had considerable liquidity, along with

4   the ability to swiftly and efficiently respond to information regarding the Company.

5   **SanDisk Was Eligible to File a Form S-3 with the SEC**

6       Form S-3 "is a short form registration statement reserved for companies (1) with $75

7   million in common equity held by non-affiliates of the registrant and (2) that have filed reports

8   with the Securities and Exchange Commission for 12 consecutive months."  *Vinh Nguyen*, 287

9   F.R.D. at 573.  SanDisk satisfies this factor, and has indeed filed Form S-3s.  Coffman Report

10  ¶44.  Moreover, similar to a company's eligibility to file a Form S-3, the large size of SanDisk's

11  public float also supports market efficiency.

12  **There Was A Cause-and-Effect Relationship Between News and SanDisk Stock Prices**

13      One of the most convincing ways to demonstrate market efficiency is by illustrating,

14  "over time, a cause and effect relationship between company disclosures and resulting

15  movements in stock price."  *Cammer*, 711 F. Supp. at 1291.  "Event studies are by far the most

16  common test for a causal connection."  *Petrie*, 308 F.R.D. at 352 (quoting *Countrywide*, 273

17  F.R.D. at 614).  An event study is a statistical technique that measures the effect of new

18  information – such as press releases, earnings reports, or SEC filings – on the market price of

19  publicly traded securities.  Coffman Report ¶¶46-47.  The study determines how much of a stock

20  price's movement can be attributed to company-specific information, and how much is

21  attributable to outside market factors.  *Id*.

22      A common method for conducting event studies is through running a regression model.

23  As Mr. Coffman explains in his report, he used such a model here to compare, over trading days

24  in the Analysis Period, the price movement of SanDisk common stock to the price movement of

25  the S&P Index and an equal weighted Peer Index (of 10 public companies that SanDisk lists as

26  its competitors).  *Id*. at ¶49 & n.45-46.  The model indicates a positive correlation between

27  SanDisk common stock and both the S&P Index and the Peer Index.  This means that SanDisk's

28

1    common stock price tended to move in the same directions, and at similar rates, as both of those

2    indices.  *Id*. at ¶51.  To analyze whether specific new information regarding SanDisk had a

3    causal effect on the Company's common stock price, Mr. Coffman then examined how the price

4    of SanDisk common stock reacted on days when SanDisk issued new earnings announcements

5    during the Analysis Period.  *Id*. at ¶55.  On all such days, there was a statistically significant

6    price movement above the 95% (in fact, above the 99%) confidence level.  *Id*. at ¶56-57.

7        As Mr. Coffman concludes, this demonstrates a clear, prompt cause-and-effect

8    relationship between new material news regarding SanDisk and changes in the price of the

9    Company's common stock.  *Id*. at ¶64.  Moreover, given the high confidence level, that reaction

10   cannot be explained by randomness.  *Id*. at ¶¶52-53, 56-57.  Further, Mr. Coffman analyzed dates

11   with no Company-specific news and found that none of those dates had statistically significant

12   price movements.  Mr. Coffman further supports his conclusion with additional analyses he

13   conducted, involving the substantially higher average price movement and average trading

14   volume of SanDisk common stock on days when the Company provided earnings

15   announcements versus days with no news.  *Id*. ¶¶59-62.

16   **SanDisk Had a Substantial Market Capitalization**

17       Market capitalization – shares outstanding multiplied by prevailing share price – may be

18   an indicator of market efficiency, because there is a greater incentive for stock purchasers to

19   invest in more highly capitalized corporations.  *Id.* at ¶65; *Petrie*, 308 F.R.D. at 349.  Consistent

20   with that criteria, SanDisk had a substantial market capitalization during the Class Period,

21   averaging $16.8 billion.  *Id*. at ¶67.  That fell between the 91st and 95th percentile of firms on the

22   NASDAQ and NYSE.  *Id*.

23   **SanDisk Stock Had a Narrow Bid-Ask Spread**

24       Whereas a large bid-ask spread is indicative of an inefficient market, a narrow bid-ask

25   spread indicates less uncertainty regarding a stock's valuation.  *See Id.* at ¶69; *Vinh Nguyen*, 287

26   F.R.D. at 574.  SanDisk's bid-ask spread during the Class Period ranged from 0.018% to

27   0.033%.  Coffman Report at ¶70.  This was not just *extremely* narrow, indicating market

28

1   efficiency, but far below the average bid-ask spread (0.76%) of a random sample of 100 other

2   common stocks trading on the NASDAQ and NYSE during the same period. *Id.*

3   **Additional Factors Demonstrate Market Efficiency**

4         In addition to the factors discussed above, which establish market efficiency, other

5   factors further support that conclusion. For example, institutional investors, which have

6   substantial resources to analyze information disseminated regarding the securities they purchase,

7   owned an average of 89.9% of SanDisk's public float during the Class Period. *Id.* at ¶71. There

8   also was considerable option trading in SanDisk during that time, a practice associated with

9   decreases in bid-ask spreads, increases in trading volume, increases in trading frequency and

10   increases in transaction size – factors that, as discussed above, enhance market efficiency. *Id.* at

11   ¶76. Moreover, employing an "autocorrelation" analysis – "an accepted test for determining

12   market efficiency," *Lehocky v. Tidel Techs., Inc.*, 220 F.R.D. 491, 506-07 n.20 (S.D. Tex. 2004)

13   – the Coffman Report concluded that SanDisk stock rapidly reacted to and incorporated new,

14   Company-specific information, Coffman Report at ¶¶72-75.

15         As SanDisk common stock satisfies the *Cammer*, *Petrie* and additional factors, it

16   indisputably traded in an efficient market during the Class Period.

17             **(ii)   Lead Plaintiffs Purchased SanDisk Stock While It Was Artificially Inflated, Satisfying Market Timing**

18

19         The market timing requirement simply asks whether a lead plaintiff purchased the

20   relevant stock when its price was distorted on account of the defendants' material misstatements

21   or omissions. *Amgen*, 133 S. Ct. at 1198 n.8, 1209. Lead Plaintiffs easily comply with that

22   requirement, having purchased SanDisk common stock after Defendants made the alleged

23   misstatements (beginning on October 16, 2014) but before the truth was fully revealed on April

24   15, 2015 (and also before it was partially revealed on March 26, 2015). (¶¶108, 124).

25             **(iii)   Defendants' Alleged False Statements Were Well Publicized**

26         Defendants made the alleged false and misleading statements in conference calls with

27   analysts and investors. (¶¶75-106). Thus, there is no question that the false and misleading

28

LEAD PLS.' NOTICE OF MOTION AND MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES, MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF - CASE NO. 3:15-cv-01455-VC

20

1   statements were made publicly and widely disseminated, or taken together with market timing

2   and market efficiency, that the fraud-on-the-market theory applies here.

                    **(b)**         **Common Questions of Class-Wide Damages Predominate**

3                                       **Because Lead Plaintiffs Can Use the Widely Accepted Out-of-**

4                                       **Pocket Damages Methodology**

5         As explained in the Coffman Report (¶¶77-78), class-wide damages can be calculated

6   here using the widely accepted "out-of-pocket" methodology.  Under that methodology, damages

7   are quantified in terms of the "artificial inflation" per share caused by material

8   misrepresentations and omission.  *Id.*; *see also Acticon AG v. China N.E. Petro. Holdings Ltd.*,

9   692 F.3d 34, 38 (2d Cir. 2012) (out-of-pocket damages in securities fraud cases are "the

10  difference between the price paid [for stock] and the 'value' of the stock when bought").  Courts

11  have long held that the out-of-pocket methodology in conjunction with an event study can be

12  used to measure class-wide damages in securities fraud class actions.  *Hatamian*, 2016 WL

13  1042502, at *8-9 (accepting the out-of-pocket methodology in securities fraud class action and

14  granting class certification motion).

15        The out-of-pocket methodology is so commonly used in securities fraud class actions

16  because it is ideally suited for measuring class-wide damages.  Whether misrepresentations and

17  omissions artificially inflate a company's stock price, and the extent of such inflation, are

18  questions that the out-of-pocket methodology answers simultaneously for all Class members.

19  Coffman Report ¶78.  The artificial inflation, or damages, per share is thus the result of a

20  common calculation.  *Id.*  (noting that individual damages for each Class member can also be

21  determined formulaically by applying the commonly derived damages per share to each

22  individual's relevant transactions in SanDisk securities).  This methodology is also entirely

23  consistent with Lead Plaintiffs' theory of liability – that Defendants' materially false and

24  misleading statements and omissions artificially inflated the price of SanDisk common stock,

25  that Class members then relied on the inflated market price in purchasing that stock, and that

26  they were damaged when disclosure of the truth dissipated the artificial stock price inflation.

27

28

Lead Pls.' Notice Of Motion And Motion For Class Certification And Appointment Of Class Representatives,
Memorandum Of Points And Authorities In Support Thereof - Case No. 3:15-cv-01455-VC

21

1    By demonstrating that damages can be measured on a class-wide basis consistent with

2    their liability theory, and class-wide reliance, Lead Plaintiffs have satisfied Rule 23(b)(3)'s

3    predominance requirement.

4                    **2.      A Class Action Is Superior**

5    Superiority under Rule 23(b)(3) turns on the following four factors: "(1) the class

6    members' interests in individually controlling a separate action; (2) the extent and nature of

7    litigation concerning the controversy already begun by or against class members; (3) the

8    desirability of concentrating the litigation in the particular forum; and (4) the manageability of a

9    class action." *Juniper Networks*, 264 F.R.D. at 592.   "District courts have consistently

10   recognized that the common liability issues involved in securities fraud cases are ideally suited

11   for resolution by way of a class action." *Cooper*, 254 F.R.D. at 641.   "If united by a common

12   core of facts, and a presumption of reliance on an efficient market, class actions are the superior

13   way to litigate a case alleging violations of securities fraud." *Vinh Nguyen*, 287 F.R.D. at 575.

14   This litigation is no exception.   Resolving the claims of all Class members through a class

15   action is far superior to adjudicating numerous individual suits for the many investors who

16   purchased SanDisk common stock.   With regard to the first two superiority factors, the expense

17   and burden of litigating each individual claim compared to the potential recovery makes it

18   unlikely that many individuals will attempt to bring such claims. *Todd*, 2017 WL 821662, at

19   *11.   Nor are Lead Plaintiffs aware of any other securities fraud actions under the Exchange Act

20   currently pending against Defendants related to the Complaint's allegations – indicating that

21   individuals have a minimal interest in commencing separate actions.   Moreover, concentrating

22   the litigation in this forum is appropriate because SanDisk maintains its headquarters in this

23   district. *Hatamian*, 2016 WL 1042502, at *10.   Finally, with respect to managing the litigation,

24   "this factor involves the same considerations as Rule 23(b)(3)'s predominance requirement," and

25   is satisfied for the reasons set forth above. *Id.*   A class action is therefore superior here.

26

27

28

Lead Pls.' Notice Of Motion And Motion For Class Certification And Appointment Of Class Representatives, Memorandum Of Points And Authorities In Support Thereof - Case No. 3:15-cv-01455-VC

22

1    **C.    The Court Should Appoint Lead Counsel as Class Counsel Under Rule 23(g)**

2         Pursuant to Rule 23(g), in appointing lead counsel, the Court must take into account the

3    following considerations:  "(i) the work counsel has done in identifying or investigating potential

4    claims in the action; (ii) counsel's experience in handling class actions, other complex litigation,

5    and the types of claims asserted in the action; (iii) counsel's knowledge of the applicable law;

6    and (iv) the resources that counsel will commit to representing the class."  Fed. R. Civ. P.

7    23(g)(1)(A)(i)-(iv).  These considerations all militate in favor of appointing Lead Counsel as

8    Class Counsel.

9         Lead Counsel have devoted extensive time and resources to identifying and prosecuting

10   the claims in this Action.  To investigate those claims, draft two amended complaints, oppose

11   Defendants' motion to dismiss, and pursue discovery, Lead Counsel assembled a team of

12   attorneys that is familiar with the Action and dedicated to continue representing the Class.

13   Moreover, Lead Counsel have considerable experience successfully prosecuting complex

14   securities fraud actions, as well as the resources to prosecute this Action. *See* Ex. S.  In short,

15   Lead Counsel will fairly and adequately represent the Class, and pursuant to Lead Plaintiffs'

16   request, should be appointed Class Counsel.

17   **V.    CONCLUSION**

18        For the reasons set forth above, Lead Plaintiffs respectfully request that the Court certify

19   the Action as a class action pursuant to Rules 23(a) & (b)(3), appoint Lead Plaintiffs as Class

20   Representatives, and appoint Lead Counsel as Class Counsel.

21                                    Respectfully submitted,

22   Dated: January 19, 2018          **SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**

23

24                                    By:  *s/Deborah Clark-Weintraub*
                                      DEBORAH CLARK-WEINTRAUB
25                                    MAX R. SCHWARTZ
                                      The Helmsley Building
26                                    230 Park Avenue, 17th Floor
                                      New York, NY 10169
27                                    Telephone: (212) 223-6444
                                      Facsimile:  (212) 223-6334
28                                    Email: dweintraub@scott-scott.com

Lead Pls.' Notice Of Motion And Motion For Class Certification And Appointment Of Class Representatives, Memorandum Of Points And Authorities In Support Thereof - Case No. 3:15-cv-01455-VC

23

1

mschwartz@scott-scott.com

2

JONATHAN GARDNER (pro hac vice)

3

CAROL C. VILLEGAS (pro hac vice)
ROSS M. KAMHI (pro hac vice)

4

LABATON SUCHAROW LLP
140 Broadway

5

New York, NY 10005
Telephone: (212) 907-0700

6

Facsimile: (212) 818-0477
Email: jgardner@labaton.com

7

cvillegas@labaton.com
rkamhi@labaton.com

8

STEVEN J. TOLL (pro hac vice)

9

ELIZABETH ANISKEVICH
COHEN MILSTEIN SELLERS & TOLL PLLC

10

1100 New York Avenue, NW
Suite 500

11

Washington, DC 20005
Telephone: (202) 408-4600

12

Facsimile: (202) 408-4699
Email: stoll@cohenmilstein.com

13

eaniskevich@cohenmilstein.com

14

CHRISTOPHER LOMETTI (pro hac vice)
COHEN MILSTEIN SELLERS & TOLL PLLC

15

88 Pine Street, 14th Floor
New York, NY 10005

16

Telephone: (212) 838-7797
Facsimile: (212) 838-7745

17

Email: clometti@cohenmilstein.com

18

19

20

21

22

23

24

25

26

27

28

Lead Pls.' Notice Of Motion And Motion For Class Certification And Appointment Of Class Representatives, Memorandum Of Points And Authorities In Support Thereof - Case No. 3:15-cv-01455-VC

24

**CERTIFICATE OF SERVICE**

I hereby certify that on January 19, 2018, I caused the foregoing document to be served via both electronic mail and United States Postal Service to the participants indicated on the attached Notice List.

Executed on January 19, 2018

**SCOTT+SCOTT, ATTORNEYS AT LAW, LLP**

By: *Deborah Clark-Weintraub*
Deborah Clark-Weintraub
Max Schwartz
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile: (212) 223-6334
Email: dweintraub@scott-scott.com
          mschwartz@scott-scott.com

Lead Pls.' Notice Of Motion And Motion For Class Certification And Appointment Of Class Representatives, Memorandum Of Points And Authorities In Support Thereof - Case No. 3:15-cv-01455-VC

25

1

## NOTICE LIST

2

**KEITH E. EGGLETON**
keggleton@wsgr.com

3

4

**BORIS FELDMAN**
boris.feldman@wsgr.com

5

**CATHERINE MORENO**
cmoreno@ wsgr.com

6

7

**MICHAEL ROLAND PETROCELLI**
mpetrocelli@wsgr.com

8

**WILSON SONSINI GOODRICH & ROSATI**
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone: (650) 493-9300
Facsimile: (650) 493-6811

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28