# EXHIBIT O

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN FRANCISCO DIVISION**

_____

IN RE: SANDISK LLC SECURITIES  ) Case No. 3:15-cv-01455-VC
LITIGATION                                        )
                                                        ) Hon. Vince Chhabria
                                                        )
                                                        )
                                                        )
_____ )

**<u>EXPERT REPORT OF CHAD COFFMAN, CFA</u>**

**January 19, 2018**

# Table of Contents

**Page**

I.     **INTRODUCTION** ...................................................................................... **3**

II.    **QUALIFICATIONS** ................................................................................... **3**

III.   **SUMMARY OF OPINIONS** ...................................................................... **4**

IV.   **OVERVIEW OF THE COMPANY AND ALLEGATIONS** ....................... **5**

V.     **DISCUSSION OF RELIANCE ELEMENT** ............................................ **7**

VI.   **CAMMER FACTORS** ............................................................................... **10**

VII.   **APPLICATION OF EFFICIENCY FACTORS TO SANDISK COMMON STOCK** ..... **11**

     A.    OVERVIEW ................................................................................... 11

     B.    CAMMER FACTOR 1: AVERAGE WEEKLY TRADING VOLUME ............................... 13

     C.    CAMMER FACTOR 2: ANALYST COVERAGE ................................. 15

     D.    CAMMER FACTOR 3: MARKET MAKERS ...................................... 17

     E.    CAMMER FACTOR 4: SEC FORM S-3 ELIGIBILITY .................... 19

     F.    CAMMER FACTOR 5: PRICE REACTION TO NEW INFORMATION ........................... 20

     G.    ADDITIONAL FACTOR 1: MARKET CAPITALIZATION ................ 30

     H.    ADDITIONAL FACTOR 2: THE BID-ASK SPREAD .................... 31

     I.    ADDITIONAL FACTOR 3: INSTITUTIONAL OWNERSHIP ........... 32

     J.    ADDITIONAL FACTOR 4: AUTOCORRELATION ....................... 33

     K.    ADDITIONAL FACTOR 5: OPTIONS ........................................ 34

VIII.   **DAMAGES** .............................................................................................. **34**

IX.   **CONCLUSION** ........................................................................................ **35**

## I.   INTRODUCTION

1.     I, Chad Coffman, am the President of Global Economics Group, a Chicago-based firm that specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including, as here, in the context of litigation. I have been asked by counsel for the Lead Plaintiff in this matter to examine and opine on whether the market for SanDisk Corporation ("SanDisk" or the "Company") common stock ("SanDisk Common Stock") was efficient during the period from October 16, 2014 through April 15, 2015, inclusive ("Class Period").[1] In addition, I have been asked to opine on whether calculating damages in this matter is subject to a common methodology under Section 10(b) of the Securities Exchange Act of 1934 (the "Exchange Act") and SEC Rule 10b-5 adopted thereunder (collectively "Section 10(b)").

2.     The materials I have considered in forming my opinions are summarized in **Appendix A**. Global Economics Group is being compensated at an hourly rate of $700 per hour for my work on this matter, and at rates between $165 and $380 for members of my staff who performed work in connection with this report under my direction and supervision. My compensation is in no way contingent on the outcome of this case. My qualifications are described below.

## II.   QUALIFICATIONS

3.     I hold a Bachelor's Degree in Economics with Honors from Knox College and a Master's of Public Policy from the University of Chicago. I am also a CFA charter-holder. The CFA, or Chartered Financial Analyst, designation is awarded to those who have sufficient

---

[1] Second Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws filed July 15, 2016, in *UNION ASSET MANAGEMENT HOLDING AG, et al., vs. SANDISK CORPORATION, et al.,* Case No. 15-cv-01455, ("Complaint") p. 1.

practical experience and complete a rigorous series of three examinations over three years that cover a wide variety of financial topics including financial statement analysis and valuation.

4.      I, along with several others, founded Global Economics Group on March 25, 2008.[2] Prior to starting Global Economics Group, I was employed by Chicago Partners LLC for over twelve years where I was responsible for conducting and managing analysis in a wide variety of areas including securities valuation and damages, labor discrimination, and antitrust. I have been engaged numerous times as a valuation expert both within and outside the litigation context. My experience in class action securities cases includes work for plaintiffs, defendants, D&O insurers, and a prominent mediator (Retired Judge Daniel Weinstein) to provide economic analysis and opinions in dozens of securities class actions as well as other matters. As a result of my involvement in these cases, much of my career has been spent analyzing and making inferences about how quickly and reliably, and to what degree, new information impacts securities prices.

5.      My qualifications are further detailed in my curriculum vitae, which is attached as **Appendix B**.

## III.   SUMMARY OF OPINIONS

6.      After analyzing SanDisk's Common Stock during the Class Period and giving careful consideration to the efficiency factors described in detail throughout this report, I have formed the opinion that the market for SanDisk's Common Stock was efficient during the Class Period.

7.      I have also formed the opinion that damages can be calculated on a class-wide basis. These opinions are based upon my analysis described below.

---

[2] Prior to March 16, 2011, Global Economics Group was known as Winnemac Consulting, LLC.

8.     The remainder of this report is organized as follows: **Section IV** of this report provides an overview of SanDisk's business operations and the allegations in this case. **Section V** discusses the reliance requirement for the claims under Section 10(b) of the Exchange Act and the "fraud on the market" theory. **Section VI** introduces the *Cammer* factors and other factors that financial economists and courts apply when evaluating market efficiency under the "fraud on the market" theory. **Section VII** provides the results of my empirical evaluation of each *Cammer* factor and other factors for SanDisk Common Stock during the Class Period. **Section VIII** addresses how damages in this matter are subject to a common approach and methodology that can be applied class-wide. Finally, **Section IX** offers my conclusions.

9.     I reserve the right to amend this report, including to reflect new information that becomes available to me in light of the discovery process and/or future rulings from the Court.

## IV.     OVERVIEW OF THE COMPANY AND ALLEGATIONS

10.     SanDisk was incorporated in the state of Delaware with its headquarters in California. SanDisk described its business during the Class Period as follows:

> SanDisk Corporation is a global leader in flash storage solutions with a strong history of innovative products. Flash storage technology allows digital information to be stored in a durable, compact format that retains the data even without power. Our flash-based products enable businesses and consumers to efficiently and effectively capture, share and preserve digital content. Our products include flash storage solutions for enterprise data centers and client computing platforms, as well as removable and embedded flash products for mobile devices, cameras, automotive, connected home electronics and other applications. Our products are used in a variety of large markets, and we distribute our products globally through commercial and retail channels. We offer simple, reliable and affordable flash storage solutions for use by consumers and enterprises in a wide variety of devices and applications.[3]

---

[3] SanDisk 10-K for FYE 2014, p. 4.

11.   As of 2014, SanDisk sold products with regard to four primary end markets (i.e.,

Enterprise and Hyperscale Data Centers, Client Computing, Mobile and Connected Applications,

and Consumer Electronics).[4] The firm only reports consolidated financials, however, and as of

2014 reported the following financial figures: revenues of $6.6 billion, gross profit $3.1 billion,

and net income of $1.0 billion.[5] As of December 2014, SanDisk employed over 8,600

employees[6] and its shares traded on the NASDAQ under the ticker "SNDK."[7]

12.   Plaintiffs' Complaint alleges that SanDisk and the Individual Defendants[8] issued

false and misleading statements and omitted material information during the Class Period,

ultimately causing damages to purchasers of SanDisk Common Stock who unknowingly bought

SanDisk Common Stock at artificially inflated prices and were damaged when the stock price

ultimately reflected the concealed information.[9]

13.   More specifically, the Complaint alleges that, by the start of the Class Period (i.e.,

October 16, 2014), SanDisk's Enterprise business and, in particular, its Fusion-io segment, were

beset with performance issues that were negatively impacting financial results for 4Q2014 and

the Company's revenue trajectory for 2015.  With respect to Fusion-io, these issues included: (i)

the expense of PCIe products relative to other suitable products; (ii) SanDisk's determination to

build Fusion-io products with an increasingly obsolete command set rather than the widely

accepted NVMe command set; and (iii) the decision to largely dismantle Fusion-io's sales team

In addition, the Enterprise business's other two segments – SATA (from the SMART Storage

---

[4] SanDisk 10-K for the FYE 2014, p. 6.

[5] SanDisk 10-K for the FYE 2014, p. F-5.

[6] SanDisk 10-K for the FYE 2014, p. 10.

[7] SanDisk 10-K for the FYE 2014, p. 36.

[8] Complaint ¶¶ 21-23.

[9] Complaint ¶ 142.

acquisition) and SAS (from the Pliant and SMART Storage acquisitions) – were also being adversely impacted by product issues that were negatively effecting sales.  Specifically, SanDisk's SATA products could not compete because they were a generation behind at a capacity of only 1-terabyte, while SanDisk's SAS products, such as the Optimus Max, had serious performance issues that caused delays in customer qualifications and negatively impacted revenue.  The Complaint alleges that through a set of partial disclosures the market finally learned of the headwinds facing SanDisk's Enterprise business and the price of its shares fell, harming investors who bought at inflated prices.[10]

## V.   DISCUSSION OF RELIANCE ELEMENT

14.   Class members' reliance on the alleged misstatements and material omissions is a required element for Lead Plaintiff's Section 10(b) claims. Lead Plaintiff asserts the "fraud on the market" theory of reliance in this matter.[11] The "fraud on the market" theory is based on the fact that in an efficient market (one in which widely-available public information is quickly incorporated into the market price of a security), all purchasers implicitly rely on any material misrepresentations or omissions since the value of those misrepresentations or omissions is incorporated into each class member's purchase price. The "fraud on the market" theory was first addressed by the U.S. Supreme Court in *Basic Inc. v. Levinson*:

> … [I]n an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business…Misleading statements will therefore defraud purchasers of stock even if the purchasers do not directly rely on the misstatements…The causal connection between the defendants' fraud and the

---

[10] Complaint ¶¶ 1-10.

[11] Complaint ¶¶ 154-158.

plaintiffs' purchase of stock in such a case is no less significant than in a case of direct reliance on misrepresentations.[12]

15.  The Supreme Court recently reaffirmed this theory in *Halliburton II*:

> More than 25 years ago, we held that plaintiffs could satisfy the reliance element of the Rule 10b-5 cause of action by invoking a presumption that a public, material misrepresentation will distort the price of stock traded in an efficient market, and that anyone who purchases the stock at the market price may be considered to have done so in reliance on the misrepresentation. We adhere to that decision and decline to modify the prerequisites for invoking the presumption of reliance.[13]

16.  As indicated in *Basic* and reaffirmed in *Halliburton II*, in an open, developed and efficient market, market prices reflect what is publicly known about a company. If a company provides the market with misleading information regarding its financial strength or business practices, the market price will be inflated (or deflated) compared to what the price would have been if the truth were known (but-for misleading information). Thus, in an efficient market, where the plaintiff asserts there were material misrepresentations or omissions, all purchasers implicitly relied on those misrepresentations and/or lack of disclosure by paying the inflated (or deflated) price.

17.  Determining whether the market for a security was "open and developed" or "efficient" to the degree required for a presumption of reliance under the "fraud on the market" theory is an empirical exercise.[14] The esteemed economist Dr. Eugene Fama, in his seminal

---

[12] *Basic Inc. v. Levinson*, 485 U.S. 224, 241-42 (1988) ("*Basic*").

[13] *Halliburton Co. v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398, 2418 (2014) ("*Halliburton II*").

[14] To recognize the presumption of reliance, the *Basic* Court explained, was not "conclusively to adopt any particular theory of how quickly and completely publicly available information is reflected in market price." *Basic*, 485 U.S. at 248 n.28. The *Basic* Court instead based the presumption on the fairly modest premise that "market professionals generally consider most publicly announced material statements about companies, thereby affecting stock market prices." *Basic*, 485 U.S. at 246 n.24. *Basic's* presumption of reliance thus does not rest on a "binary" view of market efficiency, but rather, market efficiency is a matter of degree.

research, first outlined definitions of an "efficient market."[15] He described different levels of efficiency which he called "weak-form," "semi-strong-form," and "strong-form" efficiency.[16]

18.    The market efficiency standard adopted by *Basic* and reaffirmed by *Halliburton II* as necessary for the presumption of reliance conforms most closely with Dr. Fama's "semi-strong form" efficiency. "Semi-strong form" efficiency implies that all publicly available information is reflected in a security's current market price. This implies that security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information. *Basic* stated: "In an open and developed securities market, the price of a company's stock is determined by the available material information regarding the company and its business."[17] The Supreme Court's effective adoption of the "semi-strong form" efficiency standard is economically sensible because it recognizes that insiders often possess non-public information and that securities prices do not necessarily reflect this non-public information, but that to presume reliance, the market price must reflect publicly available information.

19.    In the next section, I explain the factors that are regularly considered by financial economists and courts in determining whether the market for a particular security is efficient.

---

[15] Eugene F. Fama, Efficient Capital Markets: A Review of Theory and Empirical Work, 25 J. Fɪɴ. 383 (1970).

[16] "Weak-form" efficiency requires that historical prices are not predictive of future prices. Under this form of efficiency, excess returns cannot be earned using strategies based on historical prices. Therefore, technical analysis will not produce consistent excess returns over time. "Semi-strong form" efficiency implies that all public information is reflected in a stock's current market price. Security prices adjust to new publicly available information rapidly and in an unbiased fashion so that it is impossible to earn excess returns by trading on that information. Under this form of efficiency, neither fundamental nor technical analysis can produce consistent excess returns. "Strong-form" efficiency implies all information in the market, whether public or private, is accounted for in the market price. In this market, investors cannot consistently earn excess returns over a long period of time even if they have inside information.

[17] *Basic,* 485 U.S. at 241.

## VI.  *CAMMER* FACTORS

20.    In *Cammer v. Bloom*, the Court identified the following factors as relevant to the determination of whether an efficient market exists for a given security: 1) average weekly trading volume, 2) analyst coverage, 3) market makers, 4) SEC Form S-3 eligibility, and 5) price reaction to unexpected information.[18]

21.    The *Cammer* decision relied on Bromberg & Lowenfels' definition of efficiency. As articulated below, the adopted definition of efficiency is consistent with Fama's definition of "semi-strong" efficiency. For the purposes of this exercise, I adopt Bromberg & Lowenfels' definitions for the terms "open," "developed," and "efficient" as described below:

> An *open market* is one in which anyone, or at least a large number of persons, can buy or sell.
>
> A *developed market* is one which has a relatively high level of activity and frequency, and for which trading information (e.g., price and volume) is widely available. It is principally a secondary market in outstanding securities. It usually, but not necessarily, has continuity and liquidity (the ability to absorb a reasonable amount of trading with relatively small price changes).
>
> An *efficient market* is one which rapidly reflects new information in price.
>
> These terms are cumulative in the sense that a developed market will almost always be an open one. And an efficient market will almost invariably be a developed one.[19]

22.    While there is a well-accepted economic theory of market efficiency, there are no broadly accepted bright-line empirical tests that allow one to classify a particular market as "efficient" or "inefficient." In my view, the *Cammer* decision identified important metrics to consider when evaluating efficiency for purposes of the "fraud on the market" theory. I also

---

[18] *Cammer, v. Bloom*, 711 F. Supp. 1264 (D.N.J. 1989) ("*Cammer*").

[19] *Cammer,* 711 F. Supp. at 1276 n.17 (citing Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6 (Aug. 1988) ("Bromberg & Lowenfels")) (emphasis added).

consider a number of other factors that courts have utilized beyond the *Cammer* factors. However, since there are no bright-line tests for efficiency, it is important to consider the identified efficiency factors as a whole because none of the individual tests or metrics is determinative as to whether a particular market is efficient.

23.    In the subsequent sections, I evaluate the market for SanDisk Common Stock during the Class Period under each of the *Cammer* factors, as well as the following additional factors that courts have also considered in assessing market efficiency: 1) market capitalization, 2) bid-ask spread, 3) the fraction of shares held by institutional investors, 4) autocorrelation (meaning whether there is a pattern in a security's returns so that future returns can be predicted based upon past returns), and 5) options trading.

## VII.  APPLICATION OF EFFICIENCY FACTORS TO SANDISK COMMON STOCK

### A.  OVERVIEW

24.    After giving careful consideration to each of the efficiency factors described in detail below, I find that each factor supports the conclusion that the market for SanDisk Common Stock was efficient throughout the Class Period. In addition to the discussion below, **Exhibit 1** summarizes how, for each of the factors examined, the empirical evidence supports a finding that SanDisk Common Stock traded in an efficient market. As further background to my analyses, **Exhibit 2** displays SanDisk Common Stock closing price and trading volume for each day throughout the Class Period.

25.    In summary, and as discussed more fully below, SanDisk Common Stock traded in an efficient market during the Class Period. First, the average weekly trading volume of SanDisk Common Stock during the Class Period far exceeded benchmarks that courts have established. During the Class Period, the average weekly trading volume for SanDisk Common Stock was 22

million shares, which represents 10.02% of shares outstanding, higher than the average security traded on the New York Stock Exchange ("NYSE") and/or the NASDAQ Exchange. Second, there were a large number of securities analysts following and reporting on SanDisk. Third, SanDisk Common Stock was actively traded on the NASDAQ, fulfilling the *Cammer* factor regarding market makers. Fourth, SanDisk filed multiple SEC Form S-3's and S-3 ASR's before the Class Period, met the important eligibility criteria, and was apparently eligible to file a Form S-3 throughout the Class Period since the Company had previously provided substantial public information to the market in its previous SEC filings. Fifth, SanDisk Common Stock had a large market capitalization relative to all other firms that traded on the NYSE and NASDAQ. Sixth, SanDisk Common Stock had a low bid-ask spread relative to other exchange-traded common stocks. Seventh, institutions, which are considered generally to be well-informed investors, held, on average, over 89.9% of the public float of SanDisk Common Stock during the quarters of interest. Eighth, there was no evidence of statistically significant autocorrelation during the Class Period. Ninth, there was considerable trading in SanDisk options throughout the Class Period. Finally, there was a strong cause-and-effect relationship between new Company-specific information and the market price of SanDisk Common Stock during the Class Period as well as a broader time period (the "Analysis Period").[20] My analyses of all of these factors support the

---

[20] The Analysis Period is from October 16, 2013 through April 15, 2015. For some elements of my report, I analyzed the broader time period of the Analysis Period because the Class Period of 124 trading days is not sufficiently long to provide enough data for certain analyses. By analyzing and applying the methodologies described herein to the longer period, of which the Class Period is a subset, I am able to opine that the evidence supports efficiency during the Class Period. The Analysis Period was selected as follows. I first considered using a period including the four earnings announcements prior to the start of the Class Period and the four earnings announcements following the end of the Class Period. After the end of the Class Period, however, Western Digital Corporation announced its acquisition of SanDisk (*See,* "Western Digital Announces Acquisition Of SanDisk," *PR Newswire*, October 21, 2015, 7:30 AM ET.) Following this announcement, SanDisk may have been viewed differently by the market as a result of the proposed acquisition. Therefore, I determined it was appropriate to terminate the Analysis Period on April 15, 2015, the last day of the Class Period, which still gave me nine earnings to analyze which is a robust number. Incidentally, while I did not include it, the next earnings following the end of

conclusion that SanDisk Common Stock traded in an open, developed, and efficient market throughout the Class Period.

## B. *CAMMER* FACTOR 1: AVERAGE WEEKLY TRADING VOLUME

26.    The first *Cammer* Factor is the average weekly trading volume of a security. According to one authority cited by the *Cammer* court,

> Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for the security is an efficient one; 1% would justify a substantial presumption.[21]

27.    Volume as a fraction of shares outstanding is an important indicator of market efficiency. First, volume is objectively quantifiable and comparable across securities. Second, high volume is generally indicative of continuity, liquidity, and market depth – which are highly indicative of market efficiency.[22] Third, substantial volume would indicate there is likely a market for the collection and distribution of information about the security. As Thomas and Cotter explain, "[t]rading volume was also considered as an eligibility standard because it affects

---

the Class Period was also statistically significant (i.e. Q2 2015 earnings released after market hours on July 22, 2015).

[21] *Cammer*, 711 F. Supp. at 1293 (citing Bromberg & Lowenfels).

[22] Continuity means that trades may occur at any time. Liquidity in this context means that investors can convert cash into shares or shares into cash at a price similar to that of the prior trade (assuming no new information). William Sharpe, Gordon J. Alexander & Jeffrey W. Bailey, *Investments*, Prentice Hall, 44-45 (5th ed. 1995).

Bromberg and Lowenfels define a market that has continuity and liquidity as "the ability to absorb a reasonable amount of trading with relatively small price changes." *Cammer*, 1276 n.17 (citing Bromberg & Lowenfels).

Market depth refers to "the number of shares that [can] be traded at the quoted bid and ask prices." A deep market will have significant orders on the buy and sell side so that the market can experience a relatively large market order without greatly altering the market price. *See* Amihud, Y., et al., *Liquidity and Asset Prices*, 1 FOUND. & TRENDS FIN. 269 (2005), 317.

information dissemination to the market, and was an important criterion for investment analysts in deciding which stocks to follow."[23]

28.     SanDisk Common Stock easily surpasses the threshold level of average weekly trading volume necessary for an efficient market. The average weekly trading volume for SanDisk Common Stock during the Class Period was 10.02% of shares outstanding, compared to 2.21% for the NYSE and NASDAQ. Based on this figure, the weekly trading volume for SanDisk Common Stock far exceeds the 1% or 2% threshold cited by Cammer. **Exhibit 3** plots SanDisk Common Stock's trading volume as a fraction of shares outstanding for each week during the Class Period.[24] Indeed, the average weekly trading volume during the Class Period was 22 million shares. The volume of trading for SanDisk Common Stock supports the conclusion that the market for this security was efficient throughout the Class Period.

29.     Another way to measure trading volume is annualized turnover velocity, which is essentially the first *Cammer* factor expressed in dollar terms.[25] To be more specific, instead of looking at shares traded divided by shares outstanding, turnover velocity is the dollar value of shares traded (i.e., shares traded multiplied by price per share) divided by the dollar value of all shares outstanding (i.e., shares outstanding multiplied by price per share). This is the same ratio because the numerator and denominator are multiplied by price per share. The advantage of this measure is that once quoted in annualized terms, SanDisk Common Stock's turnover velocity

---

[23] Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*. 63 LAW & CONTEMP. PROBS. 105, 108 (2000). Randall S. Thomas is a Director of the Law and Business Program at Vanderbilt University. Dr. James Cotter is an Associate Professor of Finance at Wake Forest University.

[24] For the purposes of this analysis, a "trading week" consists of 5 consecutive trading days, which may not follow the calendar week.

[25] Turnover velocity is simply the average trading volume as a percentage of shares outstanding (the first *Cammer* Factor) expressed in dollar terms:

**Turnover Velocity Ratio** = (Volume x Price)/(Shares Outstanding x Price) = Dollars Traded/Dollars Outstanding.

can be compared directly with other publicly traded stocks based on exchange-reported statistics. For example, over the Class Period, the annualized turnover velocity ratio for SanDisk Common Stock was 475% compared with the NYSE and NASDAQ average of 115% for the Class Period.[26] Thus, SanDisk Common Stock had an average annualized turnover that was substantially higher than the average stock trading on the NYSE and NASDAQ, further supporting that it traded in an efficient market.

30.    In short, the relatively high trading volume in SanDisk Common Stock throughout the Class Period supports the conclusion that the market for SanDisk Common Stock was efficient.

## C. *CAMMER* FACTOR 2: ANALYST COVERAGE

31.    The *Cammer* decision stated the following related to analyst coverage:

> … [I]t would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors.[27]

32.    Analyst coverage can be important evidence of efficiency. Significant analyst coverage implies that there is sufficient interest in a company and its securities, that there is an active market for information regarding the company and its securities, and that the information is widely distributed.

33.    During the Class Period, there was an abundance of analyst coverage for SanDisk. **Exhibit 4** shows that there were at least 133 reports issued during the Class Period and lists 26

---

[26] Turnover velocity for the NYSE and NASDAQ is calculated from data provided by the World Federation of Exchanges. *See* https://www.world-exchanges.org/home/index.php/statistics/monthly-reports.

[27] *Cammer*, 711 F. Supp. at 1286.

separate firms that had equity analysts issue reports on SanDisk, including major firms such as Credit Suisse, UBS, Deutsche Bank, Jefferies, JP Morgan, and Morgan Stanley.[28] These reports served the purpose of disseminating publicly available information along with commentary, news, updates, analyses, and recommendations of the analysts to investors. The extensive coverage of SanDisk by securities analysts supports the conclusion that SanDisk Common Stock traded in an efficient market throughout the Class Period.

34.     Since 1989, when the *Cammer* decision was rendered, there has been a significant increase in alternative methods by which publicly available information about publicly-traded securities is disseminated to investors. For example, since the *Cammer* decision, through the Internet, 24-hour cable news networks, email, RSS feeds,[29] and other media, the ability of individual and institutional investors to obtain information about publicly-traded securities and the market in general has revolutionized the manner in which investors and investment professionals receive and process information.

35.     Moreover, information regarding the market price, the current bid-ask spread, and the ability to trade online is available almost instantaneously via the Internet for anyone with an online brokerage account. Thus, in addition to the substantial analyst coverage of SanDisk, there were many other sources of public information dissemination. For example, there was substantial

---

[28] I obtained SanDisk analyst reports from Investext. The number of analyst reports I identify is likely understated since many are not available through third party data providers such as Investext. For example, it is clear that analysts from Goldman Sachs Group, Inc., B. Riley & Co., LLC, and Nomura Securities Co. Ltd., participated on earnings conference calls during the Class Period, but I did not have access to research reports of those firms through Investext in connection with preparing this report.

[29] RSS is an acronym for Really Simple Syndication or Rich Site Summary. RSS files are formed as XML files and are designed to provide content summaries of news, blogs, forums or website content. The RSS feeds are generally simple headlines and brief descriptions; if the user is interested, the user can click to see additional information. Content viewed in the RSS reader or news aggregator is known as an RSS feed. RSS is becoming increasing popular since it is a free and easy way to promote a site and its content without the need to advertise or create complicated content sharing partnerships (*see* http://www.rss-specifications.com/, and http://www.rss-specifications.com/what-is-rss.htm).

public press regarding SanDisk. A search for articles classified as related to SanDisk by Factiva over the Class Period resulted in 924 unique articles (and 2,211 articles over the Analysis Period).[30] In addition, there were numerous SEC filings available online at the SEC EDGAR search database at no cost, as well as various other sources of public information available throughout the Analysis Period that I do not attempt to quantify. The degree of news coverage and publicly available information further supports the conclusion that there was substantial supply of, and demand for, information regarding SanDisk in the public arena throughout the Analysis Period, and thus the Class Period.

36.    In summary, the number of analyst reports and the substantial public dissemination of news and other information regarding SanDisk provides evidence of a robust and active market for public information about SanDisk and evidence that its common stock traded in an efficient market during the Class Period.

### D.  *CAMMER* FACTOR 3: MARKET MAKERS

37.    A market maker is a firm that is ready to buy or sell a particular stock on a regular and continuous basis.[31] The third *Cammer* factor states:

> For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the

---

[30] Factiva is a business information and research tool owned by Dow Jones & Company. Factiva aggregates content from both licensed and free sources, and provides organizations with search, alerting, dissemination, and other information management capabilities. The 924 (2,211) unique articles were identified as a result of a search for "All Sources" with the company field "SanDisk Corporation" or keyword field "SanDisk Corp" for the period "October 16, 2014 – April 16, 2015" ("October 16, 2013 – April 16, 2015"). The last earnings release included in the Class Period was after-market hours on April 15, 2015. Thus, I have included April 16, 2015 in my search for news articles. Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder. I acknowledge that this may not reflect all news as the Factiva database is limited to certain sources and content type.

[31] *See* http://www.sec.gov/answers/mktmaker.htm.

security is an efficient one; five market makers would justify a more modest presumption.[32]

38.     The premise that the number of market makers can serve as an efficiency criterion relates to the notion that market makers are:

> … [P]resumably knowledgeable about the issuing company and the stocks' supply and demand conditions (i.e., the "order flow"). Therefore, it is believed the larger the number of market makers in a given security, the more information is available about it and the quicker its dissemination in the price.[33]

39.     SanDisk Common Stock traded on a major exchange (i.e., NASDAQ) with continuous public price and volume reporting, as opposed to an over-the-counter market without volume reporting, which is the context in which *Cammer* indicated this was a relevant criterion.[34] On such over-the-counter markets, there may be reason for concern regarding liquidity and information dissemination. However, these concerns are generally not applicable to stocks trading on large, modern exchanges such as the NYSE and NASDAQ, which are presumed to be efficient, report volume and trade details, and tend to have rules that virtually guarantee a liquid market.[35]

40.     The NYSE and NASDAQ are two of the largest and most liquid security exchanges in the world with billions of shares traded each day. Unlike over-the-counter markets that rely on

---

[32] *Cammer*, 711 F. Supp. at 1293.

[33] Barber, B., et al., The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency, 19 J. CORP. L. 285 (1994), 291.

[34] *See Cammer,* 711 F. Supp. at 1292, citing Bromberg & Lowenfels: "We think that, at a minimum, there should be a presumption – probably conditional for class determination – that certain markets are developed and efficient for virtually all the securities traded there: the New York and American Stock Exchanges, the Chicago Board Options Exchange and the NASDAQ National Market System."

[35] For example, there are rules for minimal market capitalization and specialists are *required* to maintain an orderly market; s*ee Section 102* http://wallstreet.cch.com/LCM/Sections/. *See also*, William Sharpe, Gordon J. Alexander & Jeffrey W. Bailey, *Investments*, Prentice Hall, 45-53 (5th ed. 1995); Frank J. Fabozzi, Franco Modigliani & Frank J. Jones, *Foundations of Financial Markets and Institutions*, Prentice Hall, Chapter 18 – Appendix A (4th ed. 2010).

decentralized market makers providing liquidity for trading, the NYSE and NASDAQ rely on a computerized system to match orders and provide quotes.[36] The minimum requirements to be listed on the NYSE or NASDAQ and remain in good standing virtually guarantee a liquid market for that security. Therefore, the number of "market makers" itself is not a particularly relevant metric in this case.

41.    Nevertheless, according to Bloomberg, throughout the Class Period, there were 128 market makers for SanDisk Common Stock.[37] Therefore, SanDisk Common Stock easily meets the letter and spirit of this factor, further supporting the efficiency of the market during the Class Period.

### E.  *CAMMER* FACTOR 4: SEC FORM S-3 ELIGIBILITY

42.    The fourth *Cammer* Factor is SEC Form S-3 eligibility, which states,

> …[I]t would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency.[38]

43.    Through Form S-3, the SEC allows certain companies that have previously provided sufficiently high levels of public information to incorporate prior SEC filings by reference into current filings and not repeat the information, since it is already deemed to be widely publicly available.[39] In order to be eligible to issue a Form S-3, among other things, a

---

[36] For NYSE, *see* https://www.nyse.com/market-model/overview#dmms-2; https://www.nyse.com/market-model/dmm-case-studies; and https://www.nyse.com/publicdocs/nyse/listing/fact_sheet_dmm.pdf. For NASDAQ, *see* http://www.nasdaq.com/includes/Anatomy_of_a_Trade_FactSheet.pdf; http://www.nasdaqomx.com/transactions/trading/equities; http://www.nasdaq.com/about/MarketMechanics.stm.

[37] Bloomberg RANK function.

[38] *Cammer*, 711 F. Supp. at 1287.

[39] For additional information, *see* www.sec.gov/about/forms/forms-3.pdf.

company 1) must be subject to the Securities Exchange Act of 1934 reporting requirements for

more than one year, 2) must have filed all documents in a timely manner for the past twelve

months, and 3) must show that it has not failed to pay dividends or sinking funds nor defaulted

on debts or material leases. Eligibility to file a Form S-3 is confirmatory evidence of efficiency,

not a requirement. Interpreted in this way, the standard makes sense as an indicator of efficiency.

44.   I have found no evidence that SanDisk was not S-3 eligible throughout the Class

Period, and in fact, SanDisk filed several Form S-3's before the Class Period (on October 27,

1997; August 17, 1999; April 5, 2002; July 8, 2002; October 1, 2002; December 13, 2002; April

8, 2003; and July 16, 2003). SanDisk also filed Form S-3ASR's before the Class Period (on May

8, 2006 and February 2, 2009).[40],[41] While a Form S-3 is a registration statement for specified

transactions by certain issuers, a Form S-3ASR is a type of Form S-3, but only "well-known

seasoned issuers" are eligible to file S-3 ASRs.[42] Therefore, SanDisk meets this *Cammer*

efficiency factor, which supports the conclusion that SanDisk Common Stock traded in an

efficient market.

## F.  *CAMMER* FACTOR 5: PRICE REACTION TO NEW INFORMATION

45.   The fifth *Cammer* Factor relates to how the price of a security reacts to new,

company-specific information and states:

> … [O]ne of the most convincing ways to demonstrate [market] efficiency
> would be to illustrate, over time, a cause and effect relationship between
> company disclosures and resulting movements in stock price.[43]

---

[40] https://www.sec.gov/cgi-bin/browse-edgar?action=getcompany&CIK=0001000180&type=s-3&dateb=&owner=exclude&count=40.

[41] It is not unusual for a company to go some period of time between filing Form S-3's even if the company is S-3 eligible.

[42] https://www.sec.gov/about/forms/forms-3.pdf.

[43] *Cammer,* 711 F. Supp. 1291.

46.    Establishing a causal connection between new company-specific events and movements in the market price is convincing evidence of market efficiency. A technique often relied upon, both inside and outside of the context of litigation, to establish such a causal connection is called an "event study." An event study is a well-accepted statistical method utilized to isolate the impact of information on market prices.[44] Indeed, academics used event studies as one tool for evaluating the efficient market hypothesis in the first place. Event studies have been used for over 40 years and have appeared in hundreds if not thousands of academic articles as scientific evidence in evaluating how new information affects securities prices.[45]

47.    An event study is a technique used to measure the effect of new information on the market prices of a company's publicly traded securities. New information may include, for example, company press releases, earnings reports, SEC filings, and news reports or analyst reports. An event study is conducted by specifying a model of expected price movements conditioned on outside market factors and then testing whether the deviation from expected price movements is sufficiently large that simple random movement can be rejected as the cause.

48.    To analyze cause and effect, I performed an event study to determine whether SanDisk Common Stock reacted to earnings announcements in a manner significantly different from how the stock moved on days with no SanDisk-related news. Based on the event study I performed, which explicitly controls for market and industry factors, I find that there is a clear cause-and-effect relationship between new public information about SanDisk and the market price of SanDisk Common Stock. I now describe in further detail the event study methodology, the events I test, and the results.

---

[44] A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE, 13 (1997).

[45] John J. Binder, *The Event Study Methodology Since 1969*, 11 REV. QUANTITATIVE FIN. & ACCT., 111 (1998).

49.     A well-accepted method for performing an event study is to estimate a regression model over some period of time (an "estimation window") to observe the typical relationship between the market price of the relevant security and broad market factors.[46] I have performed such an analysis in this matter where I evaluate the relationship between SanDisk Common Stock daily returns (percentage change in price) controlling for the S&P 500 Total Return (the "Market Index") and an equal-weighted peer index, hereafter referred to as the "Peer Index."[47, 48]

50.     For each trading day analyzed, I constructed a regression model using data from the prior 120 trading days (roughly six months).[49] By using a "rolling" estimation window, it allows for the relationship between SanDisk Common Stock, industry and market factors, as well as firm-specific volatility to update over time according to the data observed over the most recent 120 trading day period. Use of a rolling model to account for changing volatility and evolving relationships among market indices is accepted in peer-reviewed literature.[50]

51.     The model indicates that there is a positive correlation between SanDisk Common Stock and the control variables. In other words, the movement of the Market Index and Peer Index helps explain the price movements of SanDisk Common Stock. For instance, choosing a

---

[46] A "regression" or "regression model" is a statistical technique for measuring the ability of one or more variables (the "independent variables") to "explain" another variable of interest (the "dependent variable"). In this case, the daily percentage change in SanDisk Common Stock (the SanDisk daily return) is the dependent variable and the contemporaneous daily returns for a market and peer index are the independent variables. For a general discussion of regression analysis, see Damodar N. Gujarati, *Basic Econometrics*, McGraw Hill, Chapters 1-3 (3rd ed. 1995).

[47] The Peer Index is an equal-weighted index of the returns of Micron Technology, Inc., Seagate Technology plc, Western Digital Corporation, Intel Corporation, and NetApp, Inc. I identified these five peers in my examination of Company filings and analyst reports issued during the Class Period. These peers are the companies that satisfy both of the following conditions: (i) mentioned as a peer by SanDisk in at least one of its 10-Ks during the Analysis Period (FY 2013 – 2015) and (ii) mentioned by more than one analyst as a comparable during the Class Period.

[48] The returns of the Peer Index are net of the S&P 500 Total Return Index.

[49] A. Craig MacKinlay, *Event Studies in Economics and Finance*, 35 J. Econ. Literature, 15 (1997): "For example, in an event study using daily data and the market model, the market model parameters could be estimated over the 120 days prior to the event."

[50] Phillip A. Braun, *Good News, Bad News Volatility, and Betas*, 50 J. Fin. 1575, 1597 (1995).

day in the Class Period purely as an example, November 21, 2014, and looking at the regression results based on the 120 days prior to that day, the estimated coefficient for the S&P 500 is 1.37 which means that a 1% rise in the S&P 500 predicts a 1.37% increase in returns for SanDisk Common Stock. The estimated coefficient for the Peer Index is 0.82, meaning that the expected return for SanDisk Common Stock is about a 0.82% increase for every 1% increase in the Peer Index over and above the return of the S&P 500. **Exhibit 5** plots the estimated coefficients for the rolling regression models for each day during the Class Period, and it demonstrates there is a consistently positive relationship between the general market, the Peer Index, and the price of SanDisk Common Stock.

52.     Another important statistic from the regression is the standard deviation of the errors, which measures the degree of imprecision in the predictions from the model. Put another way, this measure provides a metric for how much "randomness" remains in the price movement of SanDisk Common Stock after controlling for the Market Index and Peer Index. For instance, on the example date, November 21, 2014, the model predicted that absent any value relevant new firm-specific information, the price of SanDisk Common Stock would increase by 0.55% because the S&P 500 was up 0.54% and the Peer Index was down 0.23%.[51] Because of the inherent randomness observed in stock price returns, I do not expect the model to predict returns exactly. In this example, I observe an actual return of 1.34%. Thus, the "abnormal return" for this day is 0.79% (the actual return of 1.34% minus the predicted return of 0.55%). I then rely on the standard deviation of the errors from the regression model to tell if this abnormal return of 0.79% is sufficiently large that I can reject random movement as the explanation.

---

[51] The predicted return of 0.55% is found as follows: 1.37 * 0.54% (Coefficient on Market Index *times* Market Index return) + 0.82 * -0.23% (Coefficient on Peer Index Return *times* Peer Index Return) + 0.00% (constant term from regression).

53.     The test for whether randomness can be rejected is done by calculating what is known as a "t-statistic," which represents the number of standard deviations between the actual observation and the prediction. For the example date, an abnormal return of 0.79% represents 0.84 standard deviations or a t-statistic of 0.84 (abnormal return of 0.79% divided by the standard deviation of the errors of 0.0094). Using the standard assumption that, in the absence of new value relevant company-specific news, abnormal returns will be normally distributed around zero, probability theory implies that based on randomness alone, using a 95% confidence level and large sample size, the abnormal return should have a t-statistic greater than 1.96 (or less than -1.96) only 5% of the time.[52] Stating this point another way, there is a 95% confidence that the actual return will fall within 1.96 standard deviations of the predicted return unless there is some non-random explanation. Since our example has a t-statistic of 0.84, the abnormal return is not statistically significant at the 95% confidence level, and I cannot reject randomness as the cause of the abnormal price movement with greater than 95% confidence. By contrast, if on a particular day one observes an abnormal return that has a t-statistic of a magnitude greater than 1.96 (statistically significant at the 95% confidence level) and one observes new value relevant firm-specific information, one would reject randomness as the explanation with 95% confidence and infer that the new information is the cause of the stock price movement.

54.     **Exhibit 6** shows that the standard deviation of the errors varied over the Class Period. By adopting the rolling regression model, my event study explicitly adjusts for the changing firm-specific volatility.

---

[52] David I. Tabak & Frederick C. Dunbar, "Materiality and Magnitude: Event Studies in the Courtroom," *Litigation Services Handbook, The Role of the Financial Expert*, Ch. 19, (3rd ed. 2001). The financial economics literature often identifies the 90% threshold as a relevant boundary for significance as well.

55.     To analyze cause-and-effect, I examined the price response of SanDisk Common Stock to the nine earnings announcements during the Analysis Period.[53] This includes the five earnings announcements that occurred during the Class Period as well as the four quarters prior to the start of the Class Period in order to have a more robust set of observations.[54] See **Exhibit 7**.

56.     There are many academic articles and financial treatises that explain theoretically and demonstrate empirically that the release of company earnings information often (but not necessarily always) causes a significant change in investors' beliefs regarding the value of a security.[55] Also, newly released earnings reports by a company are an objective set of news to identify and test. Considering the first earnings release listed in **Exhibit 7** as an example, the Company announced positive third quarter results for the fiscal year 2013, announcing earnings per share that beat Street estimates by 21% and revenue growth of 28%.[56] In response, the market price of SanDisk Common Stock increased by 8.83%, compared to the predicted return of 1.12%. Thus, the abnormal return on October 17, 2013 was 7.72%. With a t-statistic of 6.06, this

---

[53] Two of these earnings announcements were preliminary earnings announcements (i.e., January 12, 2015 and March 26, 2015).

[54] I analyzed the broader time period of the Analysis Period because the Class Period of 124 trading days is not sufficiently long to provide enough data with which to test cause-and-effect in isolation.  By analyzing and applying the methodology described herein to the longer period of which the Class Period is a subset I am able to opine that the evidence supports a cause-and-effect relationship during the Class Period.

[55] William H. Beaver, Maureen F. McNichols & Zach Z. Wang., "The Information Content of Annual Earnings Announcements: New Insights from Intertemporal and Cross-Sectional Behavior," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research*, Vol. 6, 67-92 (1968); Robert G. May, "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Empirical Research in Accounting: Selected Studies, 1971,* supplement to the *Journal of Accounting Research*, Vol. 9, 119-163(1971); Joseph Aharony & Itzhak Swary, "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance*, Vol. 35, No. 1, 1-12 (1980).

[56] *See*, "SanDisk prospers again in 3rd quarter as mobile device makers snap up its flash-memory chips," *Associated Press,* October 16, 2013; "SNDK: Solid GM, 2014 Portfolio Tailwind With High Margin Retail+SSD, F14-15E Buyback Leverage, Raising Estimates-PT," *Sterne Agee,* October 16, 2013.

abnormal price movement is statistically significant at the 99% level, and I therefore have scientific evidence that SanDisk Common Stock reacted rapidly to this new information.

57.    Similar to this example, I analyzed the market reaction to SanDisk's other earnings announcements I identified above. In total, of the nine earnings announcements SanDisk issued during the Analysis Period, eight resulted in statistically significant price movements above the 99% confidence level.[57]

58.    **Exhibit 7** presents a summary of the earnings releases during the Analysis Period, and **Exhibits 8A–8I** depict the intraday price movements for each of these announcement dates.

59.    I then compared these results against the 16 days during the Analysis Period where I identified no SanDisk-related news from the Factiva database and when there were no analyst reports or SEC filings issued. Of these 16 days, there were no statistically significant price movements. Thus, during the Analysis Period there was a statistically significant price reaction at the 95% confidence level or greater on 88.9% of the earnings announcements, but when compared to days with no SanDisk-related news, I observed zero statistically significant reactions.[58, 59] This is powerful scientific evidence of a cause-and-effect relationship between new publicly released information concerning the Company and changes in the price of SanDisk Common Stock.

---

[57] The earnings announcement after the end of the Class Period and before the announcement of the Western Digital acquisition, the July 22, 2015 earnings announcement, is also statistically significant at the 99% confidence level. In any event, it is not unusual to have one or more earnings announcements that are not statistically significant.  This would happen, for instance, in quarters where there was not much surprise and the firm roughly met expectations, if the firm offered little change in guidance, and/or if there was a mix of both positive and negative information that netted out.

[58] This difference between 88.9% and 0% is itself statistically significant at the 95% confidence level (as well as beyond the 99% confidence level).

[59] Based on randomness alone, one would expect 5% of the no news days to be statistically significant.  The observed rate of 0% is not statistically significantly different than 5%.

60.     Furthermore, on the 16 days with no news, the average change in price of SanDisk Common Stock was 0.69% after controlling for market and industry factors, while the average change in SanDisk Common Stock on earnings announcement dates was 7.83%. In other words, the average magnitude of stock price movement on earnings announcement days was about 11.3 times higher than on no news days.[60] Again, this demonstrates that on days when important company-specific information is released to the market, the stock price moves much more than on days where there is no company-specific news. This provides further evidence of a cause-and-effect relationship between company-specific news and changes in the price of SanDisk Common Stock, and thus an efficient market.

61.     The bar charts below summarize this analysis while **Exhibit 9** gives more detail.



Percentage of Days Significant at the 95% Confidence Level

---

[60] This difference between 7.83% and 0.69% is itself statistically significant at the 95% confidence level (as well as beyond the 99% confidence level).



62.   Finally, when important company-specific news is released to the market (e.g. earnings announcements), the daily trading volume also tends to be much higher[61] than on days where there is no news. For instance, the average daily trading volume of the nine days with earnings announcements was 19.4 million. Compare this to the average daily trading volume of 3.1 million for days where there is no news in the Analysis Period.[62] The bar chart below summarizes this analysis.

---

[61] William H. Beaver, "The Information Content of Annual Earnings Announcements," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research*, Vol. 6, 69, 84 (1968).

[62] This difference between 19.4 million and 3.1 million is itself statistically significant at the 95% confidence level (as well as beyond the 99% confidence level).



**Average Daily Trading Volume**

63.    The bar charts above establish a strong cause-and-effect relationship between new, company-specific news and rapid changes in the price of SanDisk Common Stock. The earnings announcement days have a much greater percentage of significant price movements, higher daily trading volume on average, and statistically significantly larger price changes than those found on days with no news. In fact, as shown in **Exhibit 7**, all the statistically significant earnings announcements during the Class Period are associated with price movements that are significant at the 99% confidence level.

64.    In conclusion, the event study analysis and intraday charts presented in this section demonstrate a clear cause-and-effect relationship between new material news and changes in the market price of SanDisk Common Stock during the Analysis Period, and thus the Class Period.

## G.  ADDITIONAL FACTOR 1: MARKET CAPITALIZATION

65.     In *Krogman v. Sterritt*, the court noted that economic theory includes other possible relevant factors for determining whether a stock trades in an efficient market, in addition to the *Cammer* factors.[63] The *Krogman* Court held, "[m]arket capitalization, calculated as the number of shares multiplied by the prevailing share price, may be an indicator of market efficiency because there is a greater incentive for stock purchasers to invest in more highly capitalized corporations."[64] Furthermore, Thomas and Cotter find that firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following."[65] Therefore, market capitalization is another quantifiable measure that is likely correlated with efficiency.

66.     SanDisk Common Stock had higher market capitalization than the majority of NYSE and NASDAQ stocks during the Class Period, thus suggesting this factor is supportive of efficiency. There were between 201 million and 240 million shares of SanDisk Common Stock outstanding throughout the Class Period.[66]

67.     Based on the market price, the market capitalization for SanDisk Common Stock averaged $16.8 billion during the Class Period. **Exhibit 10** shows SanDisk's market capitalization over the Class Period. **Exhibit 11** shows that during the Class Period, SanDisk Common Stock market capitalization ranged from the 91st to 95th percentile of the combined NYSE and NASDAQ markets for the applicable quarters during the Class Period.[67] In other

---

[63] *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001) ("*Krogman*"). The factors identified by the *Krogman* Court are 1) market capitalization, 2) size of float of common stock, and 3) bid-ask spread.

[64] *Krogman*, 202 F.R.D. at 478.

[65] Randall S. Thomas & James F. Cotter, *Measuring Securities Market Efficiency in the Regulatory Setting*. 63 LAW & CONTEMP. PROBS. 117 (2000).

[66] S&P Capital IQ.

[67] Bloomberg.

words, over the Class Period, SanDisk Common Stock had a higher market capitalization than at least 91% of the firms on the combined NYSE and NASDAQ.

68.    Given that the market capitalization for SanDisk Common Stock was consistently large relative to other publicly traded companies, this factor is supportive of market efficiency for SanDisk Common Stock.

### H.  ADDITIONAL FACTOR 2: THE BID-ASK SPREAD

69.    The *Krogman* court's last additional efficiency factor considered the bid-ask spread for a security, saying, "[a] large bid-ask spread is indicative of an inefficient market, because it suggests that the stock is too expensive to trade."[68] The bid-ask spread is an important indicator of the degree to which a market is developed. The bid-ask spread represents a measure of the cost to transact in a market. Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price. Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price. In addition, the wider the bid-ask spread, the more costly it is to arbitrage away small inefficiencies. Thus, the narrower the bid-ask spread, the greater indication of an efficient market.

70.    I analyzed bid-ask spreads for SanDisk Common Stock during the Class Period. **Exhibit 12** shows that during this period, the time-weighted average percentage bid-ask spread for SanDisk Common Stock in each month was between 0.018% and 0.033%. This is well below the average and median bid-ask spread of a random sample of 100 other common stocks trading on the NYSE and NASDAQ in December 2014 (the full month during the Class Period when

---

[68] *Krogman*, 202 F.R.D. at 478.

SanDisk had the largest percentage bid-ask spread).[69],[70] **Exhibit 12** demonstrates that SanDisk Common Stock had a monthly average bid-ask spread of 0.030% in December 2014, while a randomly selected group of 100 other common stocks on the NYSE and NASDAQ had an average bid-ask spread of 0.76%.[71] Accordingly, SanDisk Common Stock bid-ask spread was low during the Class Period, and this factor further supports market efficiency for SanDisk Common Stock.

## I.  ADDITIONAL FACTOR 3: INSTITUTIONAL OWNERSHIP

71.    Institutional investors are considered to be sophisticated and well-informed with access to most publicly available information for the stocks that they own. These investors include mutual funds, pension funds, investment banks, and other types of large financial institutions that have substantial resources to analyze the securities they purchase for their portfolios. As **Exhibit 13** shows, 1,115 institutions reported owning SanDisk Common Stock during the Class Period, holding, on average, 89.9% of public float. This substantial level of institutional ownership of SanDisk Common Stock during the Class Period coupled with the high trading volume further supports a conclusion of market efficiency.

---

[69] Quote data for SanDisk and other publicly traded stocks were obtained from the TICK database. *See* https://tickapi.tickdata.com/.

[70] I constructed a random sample because I am not aware of any exchange-wide reporting of average or median bid-ask spreads. Determining the average bid-ask spread for the entire market would be a very costly and data intensive process, therefore I adopted a random sampling methodology. I determined the constituents of the NYSE and NASDAQ for December 2014 and then randomly generated a list of 100 common stock securities. I then calculated the time-weighted average monthly bid-ask spread for December 2014.

[71] The time-weighted average bid-ask spread was calculated by taking the average of the spread during trading hours on the primary exchange of each security, weighted by the amount of time each quote prevails in the market. That is, I take the weighted average quote, with the weight being the number of seconds between that quote and the next quote that occurs. Spread is calculated as the difference between the bid price and ask price divided by the midpoint of the bid-ask spread. I calculated the National Best Bid and Offer using the data filtering procedures described in Roger D. Huang & Hans R. Stoll, *Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE*, 41 J. FIN. ECON. 313 (1996).

## J.   ADDITIONAL FACTOR 4: AUTOCORRELATION

72.   If previous price movements of a security have the ability to predict future price movements, then it is said to be "autocorrelated." Autocorrelation is relevant to efficiency because if the autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it means that past price movements are not fully reflected in the current price, which would suggest market inefficiency.

73.   Autocorrelation may occur from time to time for random reasons or due to the pattern of firm-specific news. Efficiency would only be violated, however, if the autocorrelation were large enough and persistent enough that a trader could consistently earn riskless profits over time.[72]

74.   A well-accepted methodology to test for the existence of autocorrelation is to run a regression analysis that tests whether, on average, the abnormal return from the previous day has a statistically significant effect on the abnormal return today.[73] If the previous day's abnormal return has no statistically significant predictive power, then there is no evidence of autocorrelation.

75.   **Exhibit 14** displays the autocorrelation coefficient for SanDisk Common Stock using the abnormal returns from the event study model described above. The coefficient for the Class Period is not statistically different than zero, meaning there is no evidence of autocorrelation.[74] This result is thus inconsistent with the notion that an investor could consistently predict abnormal movements and earn arbitrage profits. Therefore, this factor also

---

[72] Doron Avramov, Tarun Chordia & Amit Goyal, *Liquidity and Autocorrelations in Individual Stock Returns*, 61 J. FIN. 2365, 2367-68 (2006); Michael C. Jensen, *Some Anomalous Evidence Regarding Market Efficiency*, 6 J. FIN. ECON. 95-101 (1978).

[73] William H. Greene, *Econometric Analysis*, Prentice Hall, Sixth Edition, 2008, Chapter 19, p. 644.

[74] I also find no evidence of statistically significant autocorrelation during the Analysis Period.

supports the conclusion that SanDisk Common Stock traded in an efficient market throughout the Class Period.

## K.  ADDITIONAL FACTOR 5: OPTIONS

76.    In addition to the factors analyzed above, there was also considerable option trading in SanDisk Common Stock during the Class Period.[75] Academic articles have demonstrated that options written on existing assets can improve efficiency by permitting an expansion of the contingencies that are covered by the market.[76] Empirical analysis has shown that option listings are associated with a decrease in bid-ask spread and increase in quoted depth, trading volume, trading frequency, and transaction size – an overall improvement of the market quality of the underlying stocks.[77] Thus, this factor also supports that SanDisk common stock traded in an efficient market throughout the Class Period.

## VIII. DAMAGES

77.    Although I have not been asked to calculate class-wide damages in this action, which I understand will be subject to further discovery, it is clear that damages in this matter can be calculated using a methodology common to the class. Indeed, the standard and well-settled formula for assessing damages for each class member under Section 10(b) is the "out-of-pocket" method which measures damages as the artificial inflation per share at the time of purchase less the artificial inflation at the time of sale (or, if the share is not sold before full revelation of the

---

[75] For instance, according to Bloomberg, there were 933,031 SanDisk Common Stock put contracts and 1,195,079 SanDisk Common Stock call contracts that traded during the Class Period.

[76] Stephen A. Ross, *Options and Efficiency*, 90 Q. J. ECON. 75 (1976).

[77] Raman Kumar, Atulya Sarin & Kuldeep Shastri, The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis, 53 J. FIN. 717 (1998).

fraud, the artificial inflation at the time of purchase, subject to the PSLRA's "90-day lookback" provision, a formulaic limit on damages that also can be applied class-wide).[78]

78.     The methodology and evidence for establishing the artificial inflation per share in the market price on each day during the Class Period is also common to the class and can be measured class-wide. In particular, as is standard procedure in Section 10(b) cases, the most common methodology to quantify artificial inflation is to perform an event study that measures price reactions to disclosures that revealed the relevant truth concealed by the alleged material omissions and/or misrepresentations. This analysis, and the evidence supporting it, would be common to the class. Damages for any individual class member could then be calculated formulaically based upon information collected in the claims process (i.e., the investor's purchase and sale history for the security, which is routinely available from brokerage statements and/or other documents that provide evidence of securities transactions). Accordingly, although I have not been asked to calculate class-wide damages, based on my expertise and experience in dozens of similar matters and understanding the nature of the claims in this case, I conclude that damages in this action are subject to a well-settled, common methodology that can be applied to the class as a whole.

## IX.   CONCLUSION

79.     In sum, every factor analyzed supports my opinion that SanDisk Common Stock traded in an efficient market during the Class Period. Furthermore, class-wide damages in this matter can be calculated using a common methodology.

---

[78] Specifically, the PSLRA states: "…in any private action arising under this title in which the plaintiff seeks to establish damages by reference to the market price of a security, the award of damages to the plaintiff shall not exceed the difference between the purchase or sale price paid or received, as appropriate, by the plaintiff for the subject security and the mean trading price of that security during the 90-day period beginning on the date on which the information correcting the misstatement or omission that is the basis for the action is disseminated to the market." *See*, Private Securities Litigation Reform Act of 1995, dated December 22, 1995, 737, 748-49.

80.   I declare under penalty of perjury under the laws of the United States of America
that the foregoing is true and correct.


Executed on January 19, 2018

Chad Coffman

**Exhibit 1**

## Summary of Efficiency Factors for SanDisk Corporation

| Factor | Summary of Factor | SanDisk |
|---|---|---|
| Average Weekly Trading Volume Cammer I | "Turnover measured by average weekly trading of 2% or more of the outstanding shares would justify a strong presumption that the market for a security is an efficient one; 1% would justify a substantial presumption." | • The average weekly trading volume of 10.02%, as a percentage of shares outstanding, exceeds the standard of 2% that courts have suggested would justify a strong presumption of an efficient market (Note: 21.7 million shares traded weekly on average during the Class Period). |
| Analyst Coverage Cammer II | "…it would be persuasive to allege a significant number of securities analysts followed and reported on a company's stock during the class period. The existence of such analysts would imply, for example, the [auditor] reports were closely reviewed by investment professionals, who would in turn make buy/sell recommendations to client investors." | • During the Class Period at least 26 securities analysts issued 133 analyst reports which implies that important information relevant to trading SanDisk Common Stock was widely communicated to the market. |
| Market Makers Cammer III | "For over the counter markets without volume reporting, the number of market makers is probably the best single criterion. Ten market makers for a security would justify a substantial presumption that the market for the security is an efficient one; five market makers would justify a more modest presumption." | • Because SanDisk's shares were exchange-traded on the NASDAQ during the Class Period, not over the counter, this factor is satisfied. According to Bloomberg, throughout the Class Period, there were at least 128 market makers for SanDisk Common Stock. |
| SEC Form S-3 Eligibility Cammer IV | "It would be helpful to allege the Company was entitled to file an S-3 Registration Statement in connection with public offerings or, if ineligible, such ineligibility was only because of timing factors rather than because the minimum stock requirements set forth in the instructions to Form S-3 were not met. Again, it is the number of shares traded and value of shares outstanding that involve the facts which imply efficiency." | • SanDisk filed Form S-3's before the Class Period (i.e. October 27, 1997; August 17, 1999; April 5, 2002; July 8, 2002; October 1, 2002; December 13, 2002; April 8, 2003; and July 16, 2003). SanDisk also filed Form S-3ASR's before the Class Period (on May 8, 2006 and February 2, 2009). I have found no evidence to believe that SanDisk was not S-3 eligible throughout the Class Period, thus satisfying this factor. |
| Price Reaction to New Information Cammer V | "…one of the most convincing ways to demonstrate [market] efficiency would be to illustrate, over time, a cause and effect relationship between company disclosures and resulting movements in stock price." | • The event study demonstrates a clear cause and effect relationship. A statistical test shows a significant contemporaneous relationship between new firm-specific news and significant changes in the market price for SanDisk Common Stock.. |
| Market Capitalization | Firms with a larger market capitalization tend to have "larger institutional ownership and tend to be listed on the New York Stock Exchange with a greater analyst following." | • As of 9/30/2014 and 6/30/2015, SanDisk's market capitalization was $21.96 billion and $12.11 billion, respectively, which is at least the 91st percentile of all NYSE and NASDAQ stocks. SanDisk Common Stock therefore easily meets this criterion. |
| Bid-Ask Spread | The bid-ask spread represents a measure of the cost to transact in a market.  Narrow bid-ask spreads indicate less uncertainty regarding valuation and that reasonably sized trades will not substantially impact the market price.  Wider bid-ask spreads indicate greater liquidity costs and less ability to trade without moving the market price. | • During the Class Period, the average percentage bid-ask spread for SanDisk Common Stock in each month ranged from 0.018% to 0.033%. SanDisk's average percentage bid-ask spread was well below the mean and median bid-ask spread of a random sample of 100 other common stocks trading on the NASDAQ and NYSE in December 2014 (the full month when SanDisk had the largest bid-ask spread). This supports a finding of efficiency. |
| Institutional Holdings | Institutional investors are considered to be sophisticated, well-informed investors with access to most publicly available information for the stocks that they own. | • 1,115 institutions held, on average, 89.9% of the public float throughout the Class Period which further supports the finding that SanDisk Common Stock traded in an efficient market. |
| Autocorrelation | If autocorrelation is persistent and sufficiently large that a trader could profit from taking advantage of the autocorrelation, it suggests market inefficiency because past price movements are not fully reflected in the current price. | • There was no evidence of statistically significant autocorrelation, which means that there was no systematic opportunity for a trader to profit from trading SanDisk Common Stock based solely on its past price movements. This supports a finding of efficiency. |
| Options | Empirical analysis has shown that option listings are associated with a decrease in bid-ask spread and increase in quoted depth, trading volume, trading frequency, and transaction size – an overall improvement of the market quality of the underlying stocks. | • There were 933,031 SanDisk Common Stock put contracts and 1,195,079 SanDisk Common Stock call contracts that traded during the Class Period. SanDisk Common Stock therefore easily meets this criterion. |

**Exhibit 2**
**SanDisk Common Stock Price & Volume**
**10/16/2014 - 4/30/2015**



Sources: Complaint and S&P Capital IQ.

**Exhibit 3**
**SanDisk Common Stock Average Weekly Trading Volume**
**as a Percentage of Shares Outstanding**
**10/16/2014 - 4/15/2015**



Source: S&P Capital IQ.
Note: Average weekly trading volume is calculated by analyzing each five consecutive trading days (rather than calendar weeks) starting with the first day of the Class Period on October 16, 2013 through April 15, 2015. The last week consists of four trading days (i.e., 4/10/2015, 4/13/2015, 4/14/2015, and 4/15/2015 ), and therefore, the average of the daily trading volume on these four days is multiplied by five to get a comparable measure for the average weekly trading volume as a percentage of shares outstanding.

**Exhibit 4**
**Summary of Securities Analyst Reports Issued for SanDisk**

| | Analyst Name | Reports Issued During the Class Period: 10/16/2014 - 4/15/2015 |
|---|---|---|
| [1] | TREFIS | 15 |
| [2] | RBC CAPITAL MARKETS | 14 |
| [3] | SUMMIT REDSTONE PARTNERS | 8 |
| [4] | COWEN AND COMPANY | 7 |
| [5] | DEUTSCHE BANK RESEARCH | 7 |
| [6] | MORGAN STANLEY | 7 |
| [7] | SUSQUEHANNA FINANCIAL GROUP LLLP | 7 |
| [8] | LADENBURG, THALMANN & CO. INC. | 6 |
| [9] | STERNE, AGEE & LEACH, INC. | 6 |
| [10] | BMO CAPITAL MARKETS | 5 |
| [11] | CREDIT SUISSE | 5 |
| [12] | FBN SECURITIES | 5 |
| [13] | JEFFERIES | 5 |
| [14] | WEDBUSH SECURITIES INC | 5 |
| [15] | EVERCORE ISI | 4 |
| [16] | PIPER JAFFRAY | 4 |
| [17] | UBS RESEARCH | 4 |
| [18] | JPMORGAN | 3 |
| [19] | MACQUARIE RESEARCH | 3 |
| [20] | BNP PARIBAS GROUP | 2 |
| [21] | BTIG | 2 |
| [22] | BUYSELLSIGNALS RESEARCH | 2 |
| [23] | CFRA RESEARCH | 2 |
| [24] | DIRECTORS DEALS LTD. | 2 |
| [25] | KEYBANC CAPITAL MARKETS | 2 |
| [26] | OPPENHEIMER AND CO | 1 |
| | **Total** | **133** |

Source: Investext.
Note: Many analyst reports are not available through third party data providers (e.g. Investext); therefore, this almost certainly understates the total amount of analyst coverage.



**Exhibit 5**
**Coefficients from Rolling Event Study Regression for SanDisk**
**10/16/2013 - 4/15/2015**

Note: The results are based on a rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and a Peer Index. The Peer Index is an equal-weighted index using the returns of the five companies that satisfy both of the following conditions: (i) mentioned as a peer by SanDisk in at least one of its 10-Ks during the Analysis Period (10-K FY 2013 - 2015) and (ii) mentioned by more than one analyst as a comparable during the Class Period. The returns of the Peer Index are net of the S&P 500 Total Return Index. Earnings announcements and the alleged corrective disclosure dates have been removed from estimation.

**Exhibit 6**
**Standard Deviation of the Errors for Rolling Event Study**
**Regression for SanDisk Common Stock**
**10/16/2013 - 4/15/2015**



Note: The results are based on a rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and a Peer Index. The Peer Index is an equal-weighted index using the returns of the five companies that satisfy both of the following conditions: (i) mentioned as a peer by SanDisk in at least one of its 10-Ks during the Analysis Period (10-K FY 2013 - 2015) and (ii) mentioned by more than one analyst as a comparable during the Class Period. The returns of the Peer Index are net of the S&P 500 Total Return Index. Earnings announcements and the alleged corrective disclosure dates have been removed from estimation.

**Exhibit 7**
**Event Study Analysis of SanDisk Earnings Announcements**

| # | Date | Time | Market Date | Event | Headline | Closing Price | Raw Return | Abnormal Return | Abnormal Dollar Change | t-Stat | P-Value | Sig Level |
|---|------|------|-------------|-------|----------|---------------|------------|-----------------|------------------------|--------|---------|-----------|
| | | | | | | | | Rolling Regression Model (120-day window) | | | | |
| 1 | 10/16/2013 | 4:36 PM | 10/17/2013 | Q3 2013 Earnings | SanDisk Announces Third Quarter Results *Source - Business Wire* | $68.50 | 8.83% | 7.72% | $4.86 | 6.06 | 0.00 | *** |
| 2 | 1/22/2014 | 4:05 PM | 1/23/2014 | Q4 2013 Earnings | SanDisk Announces Fourth Quarter and Fiscal 2013 Results *Source - Business Wire* | $72.02 | -0.24% | 0.55% | $0.40 | 0.51 | 0.61 | |
| 3 | 4/16/2014 | 4:05 PM | 4/17/2014 | Q1 2014 Earnings | SanDisk Announces First Quarter 2014 Results *Source - Business Wire* | $82.99 | 9.41% | 8.64% | $6.55 | 7.75 | 0.00 | *** |
| 4 | 7/16/2014 | 4:05 PM | 7/17/2014 | Q2 2014 Earnings | SanDisk Announces Second Quarter 2014 Results *Source - Business Wire* | $93.21 | -13.56% | -11.47% | -$12.36 | -11.32 | 0.00 | *** |
| 5 | 10/16/2014 | 4:05 PM | 10/17/2014 | Q3 2014 Earnings | SanDisk Announces Third Quarter 2014 Results *Source - Business Wire* | $82.80 | -2.94% | -4.82% | -$4.11 | -5.02 | 0.00 | *** |
| 6 | 1/12/2015 | 8:00 AM | 1/12/2015 | Pre Q4 2014 Earnings | SanDisk Provides Business Update and Sets January 21 to Discuss Fourth Quarter Financial Results *Source - Business Wire* | $83.57 | -13.88% | -11.57% | -$11.22 | -11.91 | 0.00 | *** |
| 7 | 1/21/2015 | 4:05 PM | 1/22/2015 | Q4 2014 Earnings | SanDisk Announces Fourth Quarter and Fiscal 2014 Results *Source - Business Wire* | $78.90 | -1.91% | -3.22% | -$2.59 | -3.23 | 0.00 | *** |
| 8 | 3/26/2015 | 3:45 AM | 3/26/2015 | Pre Q1 2015 Earnings | SanDisk Provides Business Update *Source - Business Wire* | $66.20 | -18.45% | -18.31% | -$14.86 | -14.70 | 0.00 | *** |
| 9 | 4/15/2015 | 4:05 PM | 4/16/2015 | Q1 2015 Earnings | SanDisk Announces First Quarter 2015 Results *Source - Business Wire* | $67.91 | -4.51% | -4.16% | -$2.96 | -3.20 | 0.00 | *** |

Sources: S&P Capital IQ and Factiva.
Notes:
(1) The results are based on a rolling regression of the previous 120 trading days. The regression model controls for a broad market index (S&P 500 Total Return Index) and a Peer Index. The Peer Index is an equal-weighted index using the returns of the five companies that satisfy both of the following conditions: (i) mentioned as a peer by SanDisk in at least one of its 10-Ks during the Analysis Period (10-K FY 2013 - 2015) and (ii) mentioned by more than one analyst as a comparable during the Class Period. The returns of the Peer Index are net of the S&P 500 Total Return Index. Earnings announcements and the alleged corrective disclosure dates have been removed from estimation.
(2) "***" Denotes statistical significance at the 99% confidence level or greater.



**Exhibit 8A**
**SanDisk Common Stock Intraday Price and Volume**
**10/17/2013**

| Return | Abn. Return | t-Stat |
|--------|-------------|--------|
| 8.83%  | 7.72%       | 6.06   |

10/17/2013
9:30 am - $64.93
**NASDAQ Open**

10/17/2013
4:00 pm - $68.50
**NASDAQ Close**

10/16/2013 4:36 PM
SanDisk releases
earnings for Q3 2013.

10/16/2013
4:00 pm - $62.94
**NASDAQ Close**

Source: TICK Data.



**Exhibit 8B**
**SanDisk Common Stock Intraday Price and Volume**
**1/23/2014**

Source: TICK Data.



**Exhibit 8C**
**SanDisk Common Stock Intraday Price and Volume**
**4/17/2014**

| Return | Abn. Return | t-Stat |
|--------|-------------|--------|
| 9.41% | 8.64% | 7.75 |

4/17/2014
4:00 pm - $82.99
**NASDAQ Close**

4/17/2014
9:30 am - $81.94
**NASDAQ Open**

4/16/2014
4:00 pm - $75.85
**NASDAQ Close**

4/16/2014 4:05 PM
SanDisk releases
earnings for Q1 2014.

Source: TICK Data.



**Exhibit 8D**
**SanDisk Common Stock Intraday Price and Volume**
**7/17/2014**

Source: TICK Data.



**Exhibit 8E**
**SanDisk Common Stock Intraday Price and Volume**
**10/17/2014**

| Return | Abn. Return | t-Stat |
|--------|-------------|--------|
| -2.94 % | -4.82% | -5.02 |

10/16/2014
4:00 pm - $85.31
**NASDAQ Close**

10/16/2014 4:05 PM
SanDisk releases
earnings for Q3 2014.

10/17/2014
9:30 am - $85.21
**NASDAQ Open**

10/17/2014
4:00 pm - $82.80
**NASDAQ Close**

Source: TICK Data.



**Exhibit 8F**
**SanDisk Common Stock Intraday Price and Volume**
**1/12/2015**

Source: TICK Data.



**Exhibit 8G**
**SanDisk Common Stock Intraday Price and Volume**
**1/22/2015**

Source: TICK Data.

**Exhibit 8H**
**SanDisk Common Stock Intraday Price and Volume**
**3/26/2015**



Source: TICK Data.



**Exhibit 8I**
**SanDisk Common Stock Intraday Price and Volume**
**4/16/2015**

Source: TICK Data.

**Exhibit 9**

**Comparison of Statistical Significance and Abnormal Returns**
**for SanDisk Earnings Announcements**
**vs. Days with No News during the Analysis Period**

| Statistic | Earnings Announcements | Days with No News, Analyst Reports, or SEC Filings |
|---|---|---|
| N [1] | 9 | 16 |
| Significant Days at 95% Confidence Level | 8 | 0 |
| % Significant Days at 95% Confidence Level [2] | 88.89% | 0.00% |
| Average Absolute Abnormal Return [3] | 7.83% | 0.69% |
| Average Volume (Millions) [4] | 19.4 | 3.1 |

Notes:
(1) Results are based on the Analysis Period. The last earnings release included in this analysis window was after market hours on April 15, 2015 and thus, I included the date of the market reaction for this earnings announcement, April 16, 2015. For the purposes of this analysis, I selected the 16 days with no news. Days with no news were days that had zero news articles via the Factiva database, and no analyst reports or SEC filings were issued.
(2) 88.89% rate of statistical significance is statistically significantly different than 0.00% at the 99% confidence level.
(3) 7.83% absolute return is statistically significantly different than 0.69% based on a t-test for difference of means at the 99% confidence level.
(4) The difference between 19.4 million and 3.1 million is statistically significant at the 99% confidence level.

**Exhibit 10**
**SanDisk Common Stock Market Capitalization**
**10/16/2014 - 4/30/2015**



Sources: Complaint and S&P Capital IQ.

**Exhibit 11**
**SanDisk Common Stock**
**Market Capitalization Rankings**

| Last trading day of: | Market Capitalization (billions) | Percentile Rank on NYSE & NASDAQ |
|---|---|---|
| Q3 2014 | $21.96 | 95% |
| Q4 2014 | $21.62 | 94% |
| Q1 2015 | $13.55 | 91% |
| Q2 2015 | $12.11 | 91% |

Source: Bloomberg and S&P Capital IQ.

**Exhibit 12**
**SanDisk Common Stock Average Monthly Bid-Ask Percentage Spread**
**10/16/2014 - 4/15/2015**



Source: Thomson Reuters Eikon and TICK Data.
Note: October 2014 and April 2015 data are limited to the Class Period.

**Exhibit 13**
**SanDisk Common Stock Shares Outstanding, Insider Holdings, and Institutional Holdings**

| Date | Shares Outstanding (in 000s) | Total Institutions Owning Stock | Insider Holdings (in 000s) | Short Interest (in 000s) | Public Float (in 000s) | Insider Holdings % of Shares Outstanding | Total Institutional Holdings (in 000s) | Institutional Holdings % of Shares Outstanding | Institutional Holdings % of Public Float[1] |
|---|---|---|---|---|---|---|---|---|---|
| [1] | [2] | [3] | [4] | [5] | [6] = [2] + [5] - [4] | [7] = [4] / [2] | [8] | [9] = [8] / [2] | [10] = [8] / [6] |
| 9/30/2014 | 224,229 | 832 | 441 | 17,107 | 240,895 | 0.20% | 215,615 | 96.16% | 89.51% |
| 12/31/2014 | 220,649 | 870 | 422 | 15,783 | 236,010 | 0.19% | 213,219 | 96.63% | 90.34% |
| 3/31/2015 | 213,014 | 783 | 470 | 16,324 | 228,867 | 0.22% | 207,673 | 97.49% | 90.74% |
| 6/30/2015 | 207,919 | 733 | 479 | 14,867 | 222,307 | 0.23% | 197,474 | 94.98% | 88.83% |
| **Total Institutions over Class Period:** | **1,115** | | | | **Average:** | **0.21%** | | **96.31%** | **89.85%** |

Sources: S&P Capital IQ and SEC filings.

**Exhibit 14**
**SanDisk Common Stock**
**Test for Autocorrelation During the Class Period[1]**

| Quarter | Coefficient on Previous Day's Abnormal Return[2] | t-Statistic |
|---|---|---|
| Q4 2014 | -0.07 | -0.47 |
| Q1 2015 | 0.05 | 0.37 |
| Q2 2015 | -0.47 | -1.61 |
| **Class Period[3]** | **-0.03** | **-0.31** |

Source: S&P Capital IQ.
Notes:
(1) The autocorrelation period runs from October 16, 2014 to April 16, 2015.
(2) For each quarter I perform a regression with the abnormal return from the event study as the dependent variable and the previous day's abnormal return as the independent variable. Earnings announcements and the alleged corrective disclosure dates have been removed from estimation.
(3) I also find no evidence of statistically significant autocorrelation during the Analysis Period.

# Appendix A
# Documents Considered

## Court Documents

- Second Amended Consolidated Class Action Complaint for Violations of the Federal Securities Laws filed July 15, 2016, in UNION ASSET MANAGEMENT HOLDING AG, et al., vs. SANDISK CORPORATION, et al., Case No. 15-cv-01455-VC.
- Plaintiffs' Memorandum of Points and Authorities in Opposition to Defendant's Motion to Dismiss Second Amended Consolidated Class Action Complaint filed February 13, 2017, in UNION ASSET MANAGEMENT HOLDING AG, et al., vs. SANDISK CORPORATION, et al., Case No. 3:15-cv-01455-VC.
- Order Denying Motion to Dismiss Second Amended Complaint filed June 22, 2017, in UNION ASSET MANAGEMENT HOLDING AG, et al., vs. SANDISK CORPORATION, et al., Case No. 15-cv-01455-VC.

## Court Decisions and Securities Law

- *Basic, Inc. v. Levinson*, 485 U.S. 224 (1988).
- Bromberg & Lowenfels, 4 *Securities Fraud and Commodities Fraud*, § 8.6. (Aug. 1988).
- *Cammer, et al., v. Bruce M. Bloom, et al.*, 711 F. Supp. 1264 (D.N.J. 1989).
- *Halliburton Co., et al., v. Erica P. John Fund, Inc.*, 134 S. Ct. 2398 (2014).
- *Krogman v. Sterritt*, 202 F.R.D. 467 (N.D. Tex. 2001).
- Private Securities Litigation Reform Act of 1995, dated December 22, 1995.

## SEC Filings

- SanDisk SEC Form 10-K filings submitted during the Class Period (and Analysis Period).
- SanDisk SEC Form 10-Q filings submitted quarterly during the Class Period (and Analysis Period).
- SanDisk SEC Form 8-K Current reports submitted during the Class Period (and Analysis Period).
- SanDisk SEC Form S-3's filed on October 27, 1997; August 17, 1999; April 5, 2002; July 8, 2002; October 1, 2002; December 13, 2002; April 8, 2003; and July 16, 2003.
- SanDisk SEC Form S-3ASR's filed on May 8, 2006 and February 2, 2009.

## Security Data

- Historical data for SanDisk common stock, Micron Technology, Inc. common stock, Seagate Technology plc common stock, Western Digital Corporation common stock, Intel Corporation common stock, NetApp, Inc. common stock, and the S&P 500 Total Return Index were obtained from S&P Capital IQ.

- Trade and quote data for SanDisk common stock during the Class Period and one hundred randomly selected companies trading on the New York Stock Exchange and NASDAQ for December 2014 were obtained from Tick Data, *see* https://tickapi.tickdata.com/. Companies trading on the New York Stock Exchange and NASDAQ for December 2014 were identified using Thomson Reuters Eikon.
- Institutional and insider holdings data was obtained from S&P Capital IQ.
- SanDisk common stock options data was obtained from Bloomberg.
- SanDisk common stock market makers data was obtained from Bloomberg, using the RANK function.
- SanDisk common stock market capitalization percentiles were obtained from Bloomberg.
- Turnover velocity data for NYSE and NASDAQ were obtained from the World Federation of Exchanges, *see* https://www.world-exchanges.org/home/index.php/statistics/monthly-reports.

## SanDisk News

- SanDisk news headlines and select articles downloaded from Factiva for the Class Period (and Analysis Period). The Factiva search for news over the Class Period resulted in 924 unique articles (and 2,211 articles over the Analysis Period). News articles were obtained by executing a search via Factiva for "All Sources" with the company field "SanDisk Corporation" or keyword field "SanDisk Corp" for the period "October 16, 2014 – April 16, 2015" ("October 16, 2013 – April 16, 2015"). The last earnings release included in the Class Period was after market hours on April 15, 2015. Thus, I have included April 16, 2015 in my search for news articles. Duplicate articles have been removed by a proprietary function accessible in Factiva's search builder. News articles supplied by Factiva included, but were not limited to:
  - o "SanDisk prospers again in 3rd quarter as mobile device makers snap up its flash-memory chips," *Associated Press,* October 16, 2013.
  - o "Western Digital Announces Acquisition Of SanDisk," *PR Newswire,* October 21, 2015, 7:30 AM ET.
- SanDisk earnings conference call and investor call transcripts during the Class Period (and Analysis Period).
- SanDisk earnings, pre-announcement, and guidance update press releases during the Class Period (and Analysis Period).

## SanDisk Analyst Reports

- SanDisk analyst reports supplied by Investext via Thomson Reuters for the period of October 16, 2013 – April 16, 2015, including but not limited to:
  - o "SNDK: Solid GM, 2014 Portfolio Tailwind With High Margin Retail+SSD, F14-15E Buyback Leverage, Raising Estimates-PT," *Sterne Agee,* October 16, 2013.

**Academic Articles**

- Aharony, J., and Swary, I., "Quarterly Dividend and Earnings Announcements and Stockholders' Returns: An Empirical Analysis," *The Journal of Finance*, Vol. 35, No. 1, March 1980.
- Amihud, Y., et al., *Liquidity and Asset Prices*, 1 FOUND. & TRENDS FIN. 269 (2005).
- Avramov, D., et al., *Liquidity and Autocorrelations in Individual Stock Returns*, 61 J. FIN. (2006).
- Barber, B., et al., *The Fraud-on-the-Market Theory and the Indicators of Common Stocks' Efficiency*, 19 J. CORP. L. 285 (1994).
- Beaver, W., "The Information Content of Annual Earnings Announcements," *Empirical Research in Accounting: Selected Studies, 1968,* supplement to the *Journal of Accounting Research*, Vol. 6, 1968.
- Binder, J., *The Event Study Methodology Since 1969*, 11 REV. QUANTITATIVE FIN. & ACCT. (1998).
- Braun, P., et al., *Good News, Bad News Volatility, and Betas*, 50 J. FIN. 1575 (1995).
- Fabozzi, F., Modigliani, F., Jones, F., *Foundations of Financial Markets and Institutions*, Prentice Hall, Fourth Edition, 2010.
- Fama, E., *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. FIN. 383 (1970).
- Greene, W., *Econometric Analysis*, Prentice Hall, Sixth Edition, 2008.
- Gujarati, D., *Basic Econometrics*, Third Edition, McGraw Hill, 1995.
- Huang, R., and Stoll, H., *Dealer versus auction markets: A paired comparison of execution costs on NASDAQ and the NYSE*, 41 J. FIN. ECON. 313 (1996).
- Jensen, M., *Some Anomalous Evidence Regarding Market Efficiency*, 6 J. FIN. ECON. 95 (1978).
- Kumar, R., et al., *The Impact of Options Trading on the Market Quality of the Underlying Security: An Empirical Analysis*, 53 J. FIN. 717 (1998).
- MacKinlay, A., *Event Studies in Economics and Finance*, 35 J. ECON. LITERATURE (1997).
- May, R., "The Influence of Quarterly Earnings Announcements on Investor Decisions as Reflected in Common Stock Price Changes," *Empirical Research in Accounting: Selected Studies, 1971,* supplement to the *Journal of Accounting Research*, Vol. 9, 1971.
- Ross, S., *Options and Efficiency*, 90 Q. J. ECON. 75 (1976).
- Sharpe, W., Alexander, G., and Bailey, J., *Investments*, Prentice Hall, Fifth Edition, 1995.
- Tabak, D., and Dunbar, F., "Materiality and Magnitude: Event Studies in the Courtroom," Ch. 19, *Litigation Services Handbook, The Role of the Financial Expert*, Third Edition, 2001.
- Thomas, R., and Cotter, J., *Measuring Securities Market Efficiency in the Regulatory Setting*, 63 LAW & CONTEMP. PROBS. 105 (2000).

**<u>Other</u>**

- http://www.sec.gov/answers/mktmaker.htm.
- http://wallstreet.cch.com/LCM/Sections/
- https://www.nyse.com/market-model/overview#dmms-2.
- https://www.nyse.com/market-model/dmm-case-studies.
- https://www.nyse.com/publicdocs/nyse/listing/fact_sheet_dmm.pdf.
- http://www.nasdaq.com/includes/Anatomy_of_a_Trade_FactSheet.pdf
- http://www.nasdaqomx.com/transactions/trading/equities
- http://www.nasdaq.com/about/MarketMechanics.stm
- http://www.rss-specifications.com/.
- http://www.rss-specifications.com/what-is-rss.html.
- SEC Form S-3 eligibility information from www.sec.gov/about/forms/forms-3.pdf.

APPENDIX B

CHAD W. COFFMAN, MPP, CFA

Global Economics Group, LLC
140 South Dearborn Street, Suite 1000
Chicago, IL 60603
Office:       (312) 470-6500
Mobile:       (815) 382-0092
Email:        ccoffman@globaleconomicsgroup.com

## EMPLOYMENT:

### Global Economics Group, LLC
President (2008 - Current)

Global Economics Group specializes in the application of economics, finance, statistics, and valuation principles to questions that arise in a variety of contexts, including litigation and policy matters throughout the world. With offices in Chicago, Boston, and New York, Principals of Global Economics Group have extensive experience in high-profile securities, antitrust, labor, and intellectual property matters.

### Market Platform Dynamics, LLC
Chief Financial Officer & Chief Operating Officer (2010 – Current)

Market Platform Dynamics is a management consulting firm that specializes in assisting platform-based companies profit from industry disruption caused by the introduction of new technologies, new business models and/or new competitive threats.  MPD's experts include economists, econometricians, product development specialists, strategic marketers and recognized thought leaders who apply cutting-edge research to the practical problems of building and running a profitable business.

### Chicago Partners, LLC
Principal (2007 – 2008)
Vice President (2003 – 2007)
Director (2000 – 2003)
Senior Associate (1999 – 2000)
Associate (1997 – 1999)
Research Analyst (1995 – 1997)

## EDUCATION:

**CFA**     Chartered Financial Analyst, 2003

**M.P.P.**  University of Chicago, 1997

Masters of Public Policy, with a focus in economics including coursework in Finance, Labor Economics, Econometrics, and Regulation

**B.A.**   Knox College, 1995
Economics, Magna Cum Laude
Graduated with College Honors for Paper entitled "Increasing Efficiency in Water Supply Pricing:  Using Galesburg, Illinois as a Case Study"
Dean's List Every Term
Phi Beta Kappa

## PROFESSIONAL EXPERIENCE:

<u>Securities, Valuation, and Market Manipulation Cases:</u>

- Testifying Expert in numerous high-profile class action securities matters including, but not limited to:

    o  In Re: <u>Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation</u>.  Parties settled for $2.4 billion in which I served as Plaintiffs' damages and loss causation expert.
    o  In Re: <u>Schering-Plough Corporation/ Enhance Securities Litigation</u>. Parties settled for $473 million in which I served as Plaintiffs' damages and loss causation expert.
    o  In Re: <u>REFCO Inc. Securities Litigation</u>. Parties settled for $367 million in which I served as Plaintiffs' damages and loss causation expert.
    o  In Re: <u>Computer Sciences Corporation Securities Litigation</u>. Parties settled for $98 million in which I served as Plaintiffs' damages and loss causation expert.
    o  Full list of testimonial experience is provided below

- Engaged several dozen times as a neutral expert by prominent mediators to evaluate economic analyses of other experts.

- Expert consultant for the American Stock Exchange (AMEX) where I evaluated issues related to multiple listing of options.  Performed econometric analysis of various measures of option spread using tens of millions of trades.

- Performed detailed audit of CDO valuation models employed by a banking institution to satisfy regulators – non-litigation matter.

- Played significant role in highly-publicized internal accounting investigations of two Fortune 500 companies.  One led to restatement of previously issued financial statements and both involved SEC investigations.

**Testimony:**

- Testifying expert in the matter of <u>Kuo, Steven Wu v. Xceedium Inc, Supreme Court of New York, County of New York, Index No. 06-100836</u>.  Filed report re: the fair value of Mr. Kuo's shares.  Case settled at trial.

- Testifying expert in the matter of <u>Pallas, Dennis H. v. BPRS/Chestnut Venture Limited Partnership and Gerald Nudo, Circuit Court of Cook County, Illinois, County Department, Chancery Division</u>.  Filed report re: fair value of Pallas shares.  Report: July 9, 2008. Deposition August 6, 2008. Court Testimony February 11, 2009.

- Testifying expert in <u>Washington Mutual Securities Litigation, United States District Court, Western District of Washington, at Seattle, No. 2:08-md-1919 MJP, Lead Case No. C08-387 MJP</u>.  Filed declaration August 5, 2008 re: Plaintiffs' loss causation theory.  Filed expert report April 30, 2010.  Filed expert rebuttal report August 4, 2010.  Filed declaration re: Plan of Allocation September 25, 2009**.**

- Testifying expert in <u>DVI Securities Litigation, Case No. 2:03-CV-05336-LDD, United States District Court for the Eastern District of Pennsylvania</u>. Filed expert report October 1, 2008 re: damages. Filed expert rebuttal report December 17, 2008. Deposition January 27, 2009. Filed expert rebuttal report June 24, 2013.

- Testifying expert in <u>Syratech Corporation v. Lifetime Brands, Inc. and Syratech Acquisition Corporation, Supreme Court of the State of New York, Index No. 603568/2007</u>. Filed expert report October 31, 2008.

- Expert declaration in <u>Jacksonville Police and Fire Pension Fund, et al. v. AIG, Inc., et al., No. 08-CV-4772-LTS; James Connolly, et al. v. AIG, Inc., et al., No. 08-CV-5072-LTS; Maine Public Employees Retirement System, et al. v. AIG, Inc., et al., No. 08-CV-5464-LTS; and Ontario Teachers' Pension Plan Board, et al. v. AIG, Inc., et al., No. 08-CV-5560-LTS, United States District Court, Southern District of New York</u>. Filed declaration February 18, 2009.

- Expert declaration in <u>Connetics Securities Litigation, Case No. C 07-02940 SI, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report March 16, 2009.  Filed declaration re: Plan of Allocation September 9, 2009**.**

- Testifying expert in <u>Boston Scientific Securities Litigation, Master File No. 1:05-cv-11934 (DPW), United States District Court District of Massachusetts</u>.  Filed expert report August 6, 2009. Deposition October 6, 2009.

- Expert declaration in <u>Louisiana Sheriffs' Pension and Relief Fund, et al. v. Merrill Lynch & Co, Inc., et al., Case Number 08-cv-09063, United States District Court, Southern District of New York</u>. Filed declaration re: Plan of Allocation October, 2009.

- Testifying expert in <u>Henry J. Wojtunik v. Joseph P. Kealy, John F. Kealy, Jerry A. Kleven, Richard J. Seminoff, John P. Stephen, C. James Jensen, John P. Morbeck, Terry W. Beiriger, and Anthony T. Baumann</u>. Filed expert report January 25, 2010.

- Testifying expert in <u>REFCO Inc. Securities Litigation, Case No. 05 Civ. 8626 (GEL), United States District Court for the Southern District of New York</u>. Filed expert report February 2, 2010. Filed expert rebuttal report March 12, 2010. Deposition March 26, 2010.

- Expert declaration in <u>New Century Securities Litigation, Case No. 07-cv-00931-DDP, United States District Court Central District of California</u>. Filed declaration March 11, 2010.

- Testifying expert in <u>Louisiana Municipal Police Employees' Retirement System, et al. v. Tilman J. Fertitta, Steven L. Scheinthal, Kenneth Brimmer, Michael S. Chadwick, Michael Richmond, Joe Max Taylor, Fertitta Holdings, Inc., Fertitta Acquisition Co., Richard Liem, Fertitta Group, Inc. and Fertitta Merger Co, C.A. No. 4339-VCL, Court of Chancery of the State of Delaware</u>. Filed expert report April 23, 2010.

- Testifying expert in <u>Edward E. Graham and William C. Nordlund, individually and d/b/a Silver King Capital Management v. Eton Park Capital Management, L.P., Eton Park Associates, L.P. and Eton Park Fund, L.P. Case No. 1:07-CV-8375-GBD, Circuit Court of Shelby County, Alabama</u>. Filed expert rebuttal report July 8, 2010.  Deposition September 1, 2010. Filed supplemental expert rebuttal report August 22, 2011.

- Testifying expert in <u>Moody's Corporation Securities Litigation. Case No. 1:07-CV-8375-GBD), United States District Court for the Southern District of New York</u>.  Filed expert rebuttal report August 23, 2010. Deposition October 7, 2010. Filed rebuttal reply report November 5, 2010. Filed expert report May 25, 2012.

- Testifying expert in <u>Minneapolis Firefighters' Relief Association v. Medtronic, Inc., et al. Civil No. 08-6324 (PAM/AJB), United States District Court, District of Minnesota</u>. Filed expert report January 14, 2011.

- Testifying expert in <u>Schering-Plough Corporation/ENHANCE Securities Litigation Case No.2:08-cv-00397 (DMC) (JAD), United States District Court, District of New Jersey</u>. Filed declaration February 7, 2011. Filed expert report September 15, 2011. Filed expert rebuttal report October 28, 2011. Filed declaration January 30, 2012. Deposition November 15, 2011 and November 29, 2011.

- Testifying expert in <u>Fannie Mae 2008 Securities Litigation, Master File No. 08 Civ. 7831 (PAC), United States District Court for the Southern District of New York</u>. Filed expert report July 18, 2011.

- Testifying expert in <u>Bank of America Corp. Securities, Derivative, and Employee Retirement Income Security Act (ERISA) Litigation, Master File No. 09 MDL 2058 (PKC), United States District Court for the Southern District of New York</u>.  Filed expert report August 29, 2011. Filed expert rebuttal report September 26, 2011. Filed expert report March 16, 2012. Filed expert rebuttal report April 9, 2012. Filed expert rebuttal report April 29, 2012. Deposition October 14, 2011 and May 24, 2012.

- Testifying expert in <u>Toyota Motor Corporation Securities Litigation, Case No. 10-922 DSF (AJWx), United States District Court, Central District of California</u>. Filed expert report February

17, 2012. Deposition March 28, 2012. Filed expert rebuttal report August 2, 2012. Filed declaration re: Plan of Allocation January 28, 2013.

- Testifying expert in <u>The West Virginia Investment Management Board and the West Virginia Consolidated Public Retirement Board v. The Variable Annuity Life Insurance Company, Civil No. 09-C-2104, Circuit Court of Kanawha County, West Virginia</u>. Filed expert report June 1, 2012. Depositions June 19, 2013 and December 11, 2015.

- Testifying expert in <u>Aracruz Celulose S.A. Securities Litigation, Case No. 08-23317-CIV-LENARD, United States District Court, Southern District of Florida</u>. Filed expert report July 20, 2012. Deposition September 14, 2012. Filed expert rebuttal report October 29, 2012. Filed declaration re: Plan of Allocation May 20, 2013.

- Testifying expert in <u>In Re Computer Sciences Corporation Securities Litigation, CIV. A. No. 1:11-cv-610-TSE-IDD, United States District Court for the Eastern District of Virginia, Alexandria Division</u>. Filed expert report November 9, 2012. Filed supplemental report February 18, 2013. Filed expert rebuttal report March 25, 2013. Deposition March 27, 2013. Filed declaration re: Plan of Allocation August 7, 2013.

- Testifying expert in <u>In Re Weatherford International Securities Litigation, Case 1:11-cv-01646-LAK, United States District Court for the Southern District of New York</u>. Filed declaration July 1, 2011. Filed expert report April 1, 2013. Deposition April 26, 2013.

- Testifying expert in <u>In Re: Regions Morgan Keegan Closed-End Fund Litigation, Case 2:07-cv-02830-SHM-dkv, United States District Court for the Western District of Tennessee, Western Division</u>. Court testimony April 12, 2013.

- Testifying expert in <u>City of Roseville Employees' Retirement System and Southeastern Pennsylvania Transportation Authority, derivatively on behalf of Oracle Corporation, Plaintiff, v. Lawrence J. Ellison, Jeffrey S. Berg, H. Raymond Bingham, Michael J. Boskin, Safra A. Catz, Bruce R. Chizen, George H. Conrades, Hector Garcia-Molina, Donald L. Lucas, and Naomi O. Seligman, Defendants, and Oracle Corporation, Nominal Defendant, C.A. No. 6900-CS, Court of Chancery of the State of Delaware</u>. Filed expert report May 13, 2013. Filed expert rebuttal report June 21, 2013. Deposition July 17, 2013.

- Testifying expert in <u>In Re BP plc Securities Litigation, No. 4:10-md-02185, Honorable Keith P. Ellison, United States District Court for the Southern District of Texas, Houston Division</u>. Filed expert report June 14, 2013. Deposition July 25, 2013. Filed expert rebuttal report October 7, 2013. Filed declaration re: Plaintiff accounting losses November 17, 2013. Filed expert report January 6, 2014. Deposition January 22, 2014. Filed expert rebuttal report March 12, 2014. Filed expert report March 17, 2014. Hearing testimony April 21, 2014. Deposition June 3, 2014. Filed declaration re: damages June 3, 2014.

- Testifying expert in <u>In Re Celestica Inc. Securities Litigation, Civil Action No. 07-CV-00312-GBD, United States District Court for the Southern District of New York</u>. Filed expert report June 14, 2013. Filed expert rebuttal report September 10, 2013. Deposition September 24, 2013.

- Testifying expert in <u>In Re Dendreon Corporation Class Action Litigation, Master Docket No. C11-01291JLR, United States District Court for the Western District of Washington at Seattle</u>. Filed declaration re: Plan of Allocation June 14, 2013.

- Testifying expert in <u>In Re Hill v. State Street Corporation, Master Docket No. 09-cv12146-GAO, United States District Court for the District of Massachusetts</u>. Filed expert report October 28, 2013.

- Testifying expert in <u>In Re BNP Paribas Mortgage Corporation and BNP Paribas v. Bank of America, N.A., Master Docket No. 09-cv-9783-RWS, United States District Court for the Southern District of New York</u>. Filed expert report November 25, 2013. Filed expert rebuttal report March 17, 2014. Deposition June 26-27, 2014.

- Testifying expert in <u>Stan Better and YRC Investors Group v. YRC Worldwide Inc., William D. Zollars, Michael Smid, Timothy A. Wicks and Stephen L. Bruffet, Civil Action No. 11-2072-KHV, United States District Court for the District of Kansas</u>. Filed declaration re: Plan of Allocation February 5, 2014. Filed expert report May 29, 2015. Filed expert report February 5, 2016. Filed expert rebuttal report March 27, 2016.

- Testifying expert in <u>The Archdiocese of Milwaukee Supporting Fund v. Halliburton Company, et al., Civil Action No. 3:02-CV-1152-M, United States District Court for the Northern District of Texas, Dallas Division</u>. Filed expert rebuttal report October 30, 2014. Deposition November 11, 2014. Hearing testimony December 1, 2014. Filed expert report March 11, 2016. Filed expert rebuttal report May 13, 2016. Deposition June 10, 2016. Hearing testimony re: Plan of Allocation July 31, 2017.

- Testifying expert in <u>In Re HP Securities Litigation, Master File No. 3:12-cv-05980-CRB, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report November 4, 2014. Deposition December 3, 2014. Filed expert rebuttal report January 26, 2015.

- Testifying expert in <u>In Re MGM Mirage Securities, No. 2:09-cv-01558-GMN-VCF, United States District Court for the District of Nevada</u>. Filed expert report November 12, 2014. Deposition January 6, 2015.  Filed expert rebuttal report April 2, 2015.

- Testifying expert in <u>Adam S. Levy v. Thomas Gutierrez, Richard J. Gaynor, Raja Bal, J. Michal Conaway, Kathleen A. Cote, Ernest L. Godshalk, Matthew E. Massengill, Mary Petrovich, Robert E. Switz, Noel G. Watson, Thomas Wroe, Jr., Morgan Stanley & Co. LLC, Goldman, Sachs & Co., and Canaccord Genuity Inc., No. 1:14-cv-00443-JL, United States District Court for the District of New Hampshire</u>. Filed declaration January 7, 2015.

- Testifying expert in <u>In Re Nu Skin Enterprises, Inc., Securities Litigation, Master File No. 2:14-cv-00033-DB, United States District Court for the District of Utah, Central Division</u>. Filed expert report June 26, 2015. Deposition August 17, 2015.

- Testifying expert in <u>In Re Intuitive Surgical Securities Litigation, Master File No. 5:13-cv-01920-EJD, United States District Court for the Northern District of California</u>. Filed expert report September 1, 2015. Filed expert rebuttal report November 16, 2015. Filed expert report November 8, 2016. Filed expert report February 8, 2017. Deposition December 12, 2017.

- Testifying expert in <u>Babak Hatamian, et al., v. Advanced Micro Devices, Inc., et al., No. 4:14-cv-00226-YGR, United States District Court for the Northern District of California, San Francisco Division</u>. Filed expert report September 4, 2015. Filed expert rebuttal report December 7, 2015. Filed expert report November 18, 2016. Filed expert rebuttal report January 17, 2017. Filed declaration March 6, 2017. Deposition March 7, 2017.

- Testifying expert in <u>In Re NII Holdings, Inc. Securities Litigation, No. 1:14-cv-00227-LMB-JFA, United States District Court for the Eastern District of Virginia, Alexandria Division</u>. Filed expert report September 11, 2015. Deposition September 17, 2015. Filed expert rebuttal report October 28, 2015. Filed expert report January 8, 2016.

- Testifying expert in <u>In Re Barrick Gold Securities Litigation, No. 1:13-cv-03851-SAS, United States District Court for the Southern District of New York</u>. Filed expert report September 15, 2015.

- Expert declaration in <u>In Re Tower Group International, Ltd. Securities Litigation, Master Docket No. 1:13-cv-5852-AT, United States District Court, Southern District of New York</u>. Filed declaration re: Plan of Allocation October 6, 2015.

- Testifying expert in <u>Beaver County Employees' Retirement Fund et al. v. Tile Shop Holdings Inc. et al., No. 0:14-cv-00786-ADM-TNL, United States District Court for the District of Minnesota</u>. Filed expert report December 1, 2015. Deposition March 15, 2016. Filed expert report July 1, 2016. Deposition July 26, 2016.

- Testifying expert in <u>In Re Barclays Bank PLC Securities Litigation, Civil Action No. 1:09-cv-01989-PAC, United States District Court for the Southern District of New York</u>. Filed expert report December 15, 2015. Filed expert rebuttal report February 2, 2016. Filed rebuttal reply expert report March 18, 2016. Deposition April 21, 2016.

- Testifying expert in <u>In Re Petrobras Securities Litigation, Civil Action No. 15-cv-03733-JSR, 15-cv-07615-JSR, 15-cv-6618-JSR, 15-cv-02192-JSR, United States District Court for the Southern District of New York</u>. Filed expert report May 6, 2016. Filed expert report May 27, 2016. Filed expert reply report June 17, 2016. Deposition June 24, 2016.

- Testifying expert in <u>Zubair Patel, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. L-3 Communications Holdings, Inc., et al., Defendants, No. 1:14-cv-06038-VEC, United States District Court for the Southern District of New York.</u> Filed expert report June 30, 2016. Deposition July 20, 2016. Filed expert rebuttal report August 26, 2016.

- Testifying expert in <u>Leonard Howard, Individually and on Behalf of All Others Similarly Situated, Plaintiff, vs. Liquidity Services, Inc., et al., Defendants, No. 1:14-cv-01183-BAH, United States District Court for the District of Columbia.</u> Filed expert report September 2, 2016.

- Testifying expert in <u>James Quinn, Derivatively on Behalf of Nominal Defendant Apple REIT Ten, Inc., Plaintiff, v. Glade M. Knight, Justin Knight, Kent W. Colton, R. Garnett Hall, Jr., David J. Adams, Anthony F. Keating III, David Buckley, Kristian Gathright, David McKenney, Bryan Peery, and Apple Hospitality REIT, Inc., Defendants, and Apple REIT Ten, Inc., Nominal Defendant, No. 3:16-cv-610, United States District Court for the Eastern District of Virginia, Richmond Division.</u> Filed expert report October 14, 2016. Deposition October 20, 2016.

- Testifying expert in <u>Dr. Joseph F. Kasper, et al., Plaintiff, v. AAC Holdings, Inc., et al., Defendants, No. 3:15-cv-00923, United States District Court for the Middle District of Tennessee, Nashville Division.</u> Filed expert report October 18, 2016. Deposition November 29, 2016. Filed expert rebuttal report February 10, 2017. Filed expert report December 4, 2017.

- Testifying expert in <u>KBC Asset Management NV, et al., Plaintiff, v. 3D Systems Corporation, Abraham N. Reichental, Damon J. Gregoire, and Ted Hull, Defendants, No. 15-cv-02393-MGL, United States District Court for the District of South Carolina, Rock Hill Division.</u> Filed expert report October 31, 2016. Deposition January 5, 2017. Filed expert report April 21, 2017.

- Testifying expert in <u>Arkansas Teacher Retirement System, et al., Plaintiff, v. Virtus Investment Partners, Inc., Defendants, No. 15-cv-1249-WHP, United States District Court for the Southern District of New York.</u> Filed expert report November 7, 2016. Filed expert rebuttal report February 17, 2017. Deposition February 28, 2017. Filed expert report June 16, 2017. Filed expert rebuttal report July 26, 2017. Deposition August 9, 2017. Filed declaration re: prior reports December 4, 2017.

- Testifying expert in <u>Laborers Pension Trust Fund – Detroit, Individually and on Behalf of All Others Similarly Situated, Plaintiffs, vs. Conn's, Inc., et al., Defendants, No. 4:14-cv-00548 (KPE), United States District Court for the Southern District of Texas, Houston Division.</u> Filed expert report November 10, 2016. Deposition December 9, 2016. Filed expert rebuttal report March 27, 2017.

- Testifying expert in <u>Glen Hartsock, individually and on behalf of all others similarly situated Plaintiff, v. Spectrum Pharmaceuticals, Inc., and Rajesh C. Shrotriya, Defendants, No. 16-cv-02279-RFB-GWF and Olutayo Ayeni, individually and on behalf of all others similarly situated Plaintiff, v. Spectrum Pharmaceuticals, Inc., Rajesh C. Shrotriya, Kurt A. Gustafson, Joseph Turgeon, and Lee Allen, Defendants, No. 16-cv-02649-KJD-VCF, United States District Court for the District of Nevada.</u> Filed declaration re: damages December 8, 2016.

- Testifying expert in <u>In Re: ARIAD Pharmaceuticals, Inc. Securities Litigation, No. 1:13-cv-12544 (WGY), United States District Court District of Massachusetts.</u> Filed expert report March 6, 2017.

- Testifying expert in <u>Washtenaw County Employees' Retirement System, individually and on behalf of all others similarly situated, Plaintiff, v. Walgreen Co., Gregory D. Wasson, and Wade</u>

Miquelon, Defendants, No. 15-cv-3187, United States District Court for the Northern District of Illinois. Filed expert report April 21, 2017. Deposition June 15, 2017. Filed expert rebuttal report September 15, 2017.

- Testifying expert in Lou Baker, individually and on behalf of all others similarly situated, Plaintiff, v. SeaWorld Entertainment, Inc., James Atchison, James M. Heaney, Marc Swanson, and The Blackstone Group L.P., Defendants, No. 3:14-cv-02129-MMA-KSC, United States District Court for the Southern District of California. Filed expert rebuttal report May 19, 2017. Deposition July 20, 2017. Filed expert report September 14, 2017.

- Testifying expert in Benjamin Gross, individually and on behalf of all others similarly situated, Plaintiff, v. GFI Group, Inc., Colin Heffron, and Michael Gooch, Defendants, No. 3:14-cv-09438-WHP, United States District Court for the Southern District of New York. Filed expert report May 30, 2017. Filed expert report August 7, 2017. Filed expert rebuttal report August 28, 2017. Deposition September 27, 2017.

- Testifying expert in Murray Rubinstein, Jeffrey F. St. Clair, William McWade, Harjot Dev and Vikas Shah, individually and on behalf of all others similarly situated, Plaintiffs, v. Richard Gonzalez and Abbvie Inc., Defendants, No. 14-cv-9465, United States District Court for the Northern District of Illinois, Eastern Division. Filed expert report December 21, 2017.

Experience in Labor Economics and Discrimination-Related Cases:

- Expert consultant for Cargill in class action race discrimination matter in which class certification was defeated.

- Expert consultant for 3M in class action age discrimination matter.

- Expert consultant for Wal-Mart in class action race discrimination matter.

- Expert consultant on various other significant confidential labor economics matters in which there were class action allegations related to race, age and gender.

- Expert consultant for large insurance company related to litigation and potential regulation resulting from the use of credit scores in the insurance underwriting process.

**Testimony:**

- Testifying expert in Shirley Cohens v. William Henderson, Postmaster General, C.A 1:00CV-1834 (TFH) United States Postal Service. United States District Court for the District of Columbia.– Filed report re: lost wages and benefits.

- Testifying expert in Richard Akins v. NCR Corporation.  Before the American Arbitration Association – Filed report re: lost wages.

- Testifying expert in <u>Maureen Moriarty v. Dyson, Inc., Case No. 09 CV 2777, United States District Court for the Northern District of Illinois, Eastern Division</u>. Filed expert report October 12, 2011. Deposition November 10, 2011.

<u>Selected Experience in Antitrust, General Damages, and Other Matters:</u>

- Expert consultant in high-profile antitrust matters in the computer and credit card industries.

- Expert consultant for plaintiffs in re: Brand Name Drugs Litigation.  Responsible for managing, maintaining and analyzing data totaling over one billion records in one of the largest antitrust cases ever filed in the Federal Courts.

- Served as neutral expert for mediator (Judge Daniel Weinstein) in allocating a settlement in an antitrust matter.

- Expert consultant in Seminole County and Martin County absentee ballot litigation during disputed presidential election of 2000.

- Expert consultant for sub-prime lending institution to determine effect of alternative loan amortization and late fee policies on over 20,000 customers of a sub-prime lending institution. Case settled favorably at trial immediately after the testifying expert presented an analysis I developed showing fundamental flaws in opposing experts calculations.

**TEACHING EXPERIENCE:**

> Knox College, Teaching Assistant - Statistics, (1995)
> Knox College, Tutor in Mathematics, (1992 - 1993)

**PUBLICATIONS:**

> Coffman, Chad and Mary Gregson, "Railroad Construction and Land Value."  *Journal of Real Estate and Finance*, 16:2, pp. 191-204 (1998).

> Coffman, Chad, Tara O'Neil, and Brian Starr, Ed. Richard D. Kahlenberg, "An Empirical Analysis of the Impact of Legacy Preferences on Alumni Giving at Top Universities," *Affirmative Action for the Rich: Legacy Preferences in College Admissions*; pp. 101-121 (2010).

**PROFESSIONAL AFFILIATIONS:**

> Associate Member CFA Society of Chicago
> Associate Member CFA Institute
> Phi Beta Kappa

**AWARDS:**

    1994  Ford Fellowship Recipient for Summer Research.
    1993  Arnold Prize for Best Research Proposal.
    1995  Knox College Economics Department Award.


**PERSONAL ACTIVITIES:**

- Pro bono consulting for Cook County State's Attorney's Office.
- Pro bono consulting for Cook County Health & Hospitals System – Developed method for hospital to assess real-time patient level costs to assist in improving care for Cook County residents and prepare for implementation of Affordable Care Act.
- Pro bono consulting for Chicago Park District to analyze economic impact of park district assets and assist in developing strategic framework for decision-making.