BORIS FELDMAN, State Bar No. 128838
KEITH E. EGGLETON, State Bar No. 159842
CATHERINE MORENO, State Bar No. 264517
MICHAEL R. PETROCELLI, State Bar No. 269460
WILSON SONSINI GOODRICH & ROSATI
Professional Corporation
650 Page Mill Road
Palo Alto, CA 94304-1050
Telephone:  (650) 493-9300
Facsimile:   (650) 565-5100
Email: boris.feldman@wsgr.com
          keggleton@wsgr.com
          cmoreno@wsgr.com
          mpetrocelli@wsgr.com

Attorneys for Defendant
SanDisk LLC, Sanjay Mehrotra,
and Judy Bruner

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: SANDISK LLC SECURITIES LITIGATION, | CASE NO.:  3:15-cv-01455-VC |
| | Honorable Vince Chhabria |
| | **DEFENDANTS' OPPOSITION TO LEAD PLAINTIFFS' MOTION FOR CLASS CERTIFICATION AND APPOINTMENT OF CLASS REPRESENTATIVES** |
| | Date:  March 29, 2018 Time: 10:00 AM Dept:  Courtroom 4, 17th Floor |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................... 1

FACTUAL AND PROCEDURAL BACKGROUND ........................................................... 3

    I.     RELEVANT BACKGROUND FACTS ................................................... 3

    II.    RELEVANT PROCEDURAL HISTORY ............................................... 4

    III.   LEAD PLAINTIFFS' MOTION TO CERTIFY A CLASS .................... 6

ARGUMENT ..................................................................................................................... 7

    I.     THE APPLICABLE LEGAL STANDARDS ........................................ 7

         A.    The Legal Standard for Confidential Witness Allegations ........................ 7

         B.    The Legal Standard for Lead Plaintiff Adequacy Under Rule 23(a) ......... 8

         C.    The Legal Standard for Lead Counsel Adequacy Under Rule 23(g) ......... 9

    II.    CLASS CERTIFICATION SHOULD BE DENIED BECAUSE OF THE INADEQUACY OF LEAD COUNSEL ................................................. 10

         A.    There are Numerous Discrepancies Between the SAC and Mr. Ober's Recorded Statements ................................................................... 10

             1.    Lead Plaintiffs Mischaracterized Mr. Ober's Statements Concerning the Size of the Internal Fusion Forecast Miss ........... 10

             2.    Lead Plaintiffs Mischaracterized Mr. Ober's Role at SanDisk ..... 12

             3.    Lead Plaintiffs Mischaracterized Mr. Ober's Statements Regarding Executive Meetings and His Contact with Mr. Mehrotra ................................................................................. 13

         B.    Other Issues Surrounding Mr. Ober's Interview ..................................... 15

             1.    Lead Counsel Appears to Have Failed to Adequately Convey to Mr. Ober that He Would Be Cited As A Confidential Witness ................................................................................... 15

             2.    Lead Plaintiffs Have Refused To Answer Whether Lead Counsel's Investigator Sought or Received Mr. Ober's Consent to Record Their Conversations, As Required By Cal. Penal Code §§ 632 and 632.7 ................................................. 16

         C.    Lead Counsel Omitted Positive Statements That Put Mr. Ober's Comments in Context .......................................................................... 18

         D.    The Discovery Documents Submitted by Lead Plaintiffs Are Not At Issue ..................................................................................................... 18

III.    CLASS CERTIFICATION SHOULD BE DENIED BECAUSE LEAD PLAINTIFFS ARE INADEQUATE................................................................19

        A.    Lead Plaintiffs Have Failed to Adequately Supervise This Action...........20

        B.    ██████████████████████████████████████.........................21

        C.    Two Lead Plaintiffs Filed Inaccurate PSLRA Certifications with the Court.................................................................................................22

IV.     LEAD PLAINTIFFS FAIL TO ESTABLISH PREDOMINANCE ....................23

V.      THE PROPOSED CLASS DEFINITION SHOULD BE NARROWED .............25

CONCLUSION .................................................................................................25

Defendants' Opposition. to Lead Plaintiffs'          -ii-
Mot. for Class Certification
Case no.:  3:15-cv-01455-VC

1

**TABLE OF AUTHORITIES**

2

**Page(s)**

3

**CASES**

4

*Applestein v. Medivation, Inc.*,
   861 F. Supp. 2d 1030 (N.D. Cal. 2012), *aff'd*, 561 F. App'x 598 (9th Cir. 2014)......................7

5

6

*Brown v. Defender Sec. Co.*,
   No. CV 12-7319-CAS, 2012 WL 5308964 (C.D. Cal. Oct. 22, 2012) ....................................17

7

*City of Livonia Emps.' Ret. Sys. v. Boeing Co.*,
   306 F.R.D. 175 (N.D. Ill. 2014) ...........................................................................................2, 8

8

9

*City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*,
   952 F. Supp. 2d 633 (S.D.N.Y. 2013)....................................................................................7, 8

10

*Comcast Corp. v. Behrend*,
   569 U.S. 27 (2013)....................................................................................................................23

11

12

*Creative Montessori Learning Ctrs. v. Ashford Gear LLC*,
   662 F.3d 913 (7th Cir. 2011).....................................................................................................10

13

14

*DSC Communc'ns Corp. v. Next Level Communc'ns*,
   929 F. Supp. 239 (E.D. Tex. 1996) ...........................................................................................22

15

*Ellis v. Costco Wholesale Corp.*,
   657 F.3d 970 (9th Cir. 2011)........................................................................................................8

16

17

*Evans v. IAC Interactive*,
   244 F.R.D. 568 (C.D. Cal. 2007) ...............................................................................................12

18

19

*Hatamian v. Advanced Micro Devices, Inc.*,
   No. 14-cv-00226-YGR, 2015 WL 511175 (N.D. Cal. Feb. 6, 2015)...........................................7

20

21

*In re BP p.l.c. Sec. Litig.*,
   No. 4:10-md-2185, 2013 WL 6388408 (S.D. Tex. Dec. 6, 2013).............................................23

22

*In re Millennial Media, Inc. Sec. Litig.*,
   No. 14 Civ. 7923 (PAE), 2015 WL 3443918 (S.D.N.Y. May 29, 2015).........................*passim*

23

24

*In re Organogenesis Sec. Litig.*,
   241 F.RD. 397, 410 (D. Mass. 2007) .........................................................................................10

25

26

*In re Quarterdeck Office Sys. Sec. Litig.*,
   No. CV 92-3970-DWW, 1993 U.S. Dist. LEXIS 19806
   (C.D. Cal. Sept. 30, 1993) ...........................................................................................................9

27

28

*Kaplan v. Pomerantz*,
   132 F.R.D. 504 (N.D. Ill. 1990) .................................................................................................13

*Kearney v. Salomon Smith Barney, Inc.*,
   39 Cal. 4th 95 (2006)......................................................................................................17

*Kight v. CashCall, Inc.*,
   200 Cal. App. 4th 1377 (2011) .......................................................................................17

*Lane v. Wells Fargo*,
   No. C 12-04026 WHA, 2013 WL 3187410 (N.D. Cal. June 21, 2013) ...........................12

*Longest v. Green Tree Servicing LLC*,
   308 F.R.D. 310 (C.D. Cal. 2015) ...................................................................................23

*Lou v. Ma Labs., Inc.*,
   No. C 12-05409 WHA, 2014 U.S. Dist. LEXIS 2665 (N.D. Cal. Jan. 8, 2014) ..............9, 18

*Luna v. Marvell Tech. Grp., Ltd.*,
   No. C 15-05447, 2017 WL 4865559 (N.D. Cal. Oct. 27, 2017) ......................................25

*Mola Dev. Corp. v. Orange Cty. Assessment Appeals Bd. No. 2*,
   80 Cal. App. 4th 309 (2000) ...........................................................................................22

*Natto Iyela Gbarabe v. Chevron Corp.*,
   No. 14-cv-00173-SI, 2017 U.S. Dist. LEXIS 35810 (N.D. Cal. Mar. 13, 2017) ............10, 18

*Radcliffe v. Experian Info. Sols. Inc.*,
   715 F.3d 1157 (9th Cir. 2013) ..........................................................................................9

*Resh v. China Agritech, Inc.*,
   857 F.3d 994 (9th Cir. 2017), *cert. granted*, 138 S. Ct. 543 (2017) ...........................19

*Roberts v. Marshalls of CA, LLC*,
   No. 13-cv-04731-MEJ, 2017 U.S. Dist. LEXIS 122672
   (N.D. Cal. Aug. 3, 2017) ...............................................................................................8, 9

*Shiring v. Tier Techs., Inc.*,
   244 F.R.D. 307 (E.D. Va. 2007) ...................................................................................20, 22

*Simpson v. Best W. Int'l, Inc.*,
   No. 3:12-cv-04672-JCS, 2012 WL 5499928 (N.D. Cal. Nov. 13, 2012)..........................17

*Simpson v. Vantage Hosp. Grp., Inc.*,
   No. 12-cv-04814-YGR, 2012 WL 6025772 (N.D. Cal. Dec. 04, 2012) ...........................17

*Stuart v. RadioShack Corp.*,
   No. C-07-4499 EMC, 2009 U.S. Dist. LEXIS 12337 (N.D. Cal. Feb. 5, 2009).............9

*Varela v. Indus. Prof'l & Tech. Workers*,
   No. CV 08-1012 SVW, 2009 U.S. Dist. LEXIS 134813
   (C.D. Cal. Oct. 28, 2009) ...............................................................................................9, 12

*Victorino v. FCA US LLC*,
    No. 16cv1617-GPC(JLB), 2017 U.S. Dist. LEXIS 116327
    (S.D. Cal. July 25, 2017) ........................................................................................9

*Wal-Mart Stores, Inc. v. Dukes*,
    564 U.S. 338 (2011) ........................................................................................8, 19

*White v. Experian Info. Sols.*,
    993 F. Supp. 2d 1154 (C.D. Cal. 2014), *aff'd sub nom. Radcliffe v. Hernandez*,
    818 F.3d 537 (9th Cir. 2016) ...................................................................................9

*Williams Corp. v. Kaiser Sand & Gravel Co.*,
    146 F.R.D. 185 (N.D. Cal. 1992) .......................................................................8, 21

*Wrighten v. Metro. Hosps., Inc.*,
    726 F.2d 1346 (9th Cir. 1984) ...............................................................................9

*Zinser v. Accufix Research Inst., Inc.*,
    253 F.3d 1180 (9th Cir. 2001) ...............................................................................8

*Zucco Partners, LLC v. Digimarc Corp.*,
    552 F.3d 981 (9th Cir. 2009) ............................................................................7, 13

**STATUTES**

15 U.S.C. § 78u-4(a)(2) ....................................................................................22, 23

Cal. Penal Code § 632 ..........................................................................................2, 16

Cal. Penal Code § 632.7 .......................................................................................2, 16

**RULES**

Fed. R. Civ. P. 23 ..................................................................................... *passim*

**MISCELLANEOUS**

S. Rep. No. 104-98 (1995) ...........................................................................................22

**PRELIMINARY STATEMENT**

The Court should deny Lead Plaintiffs' motion for class certification for several reasons. *First*, the Court should deny class certification on grounds of adequacy because Lead Plaintiffs survived the motion to dismiss by mischaracterizing statements made by Confidential Witness 5 ("CW 5"). Before adding statements attributed to CW 5 in the Second Amended Complaint ("SAC"), two prior versions failed to survive motions to dismiss. Indeed, this Court relied on these new statements attributed to CW 5 in denying Defendants' motion to dismiss the SAC, in what the Court described as a "close question." Dkt. No. 184 at 1 (the "Order").

Lead Counsel's investigator recorded his interviews with CW 5, Robert Ober, in which he made those alleged statements. Defendants have now obtained those audio recordings, along with transcripts of those interviews prepared by Lead Counsel, and memos prepared by their investigator. Those audio recordings reveal multiple discrepancies between CW 5's actual statements to Lead Counsel's investigator and what Lead Plaintiff (through Lead Counsel) inaccurately presented to the Court as "fact" in the SAC. Moreover, these discrepancies go to the heart of the CW allegations cited by this Court in its Order. They call into question whether Mr. Ober had firsthand knowledge, or was even in a position to know, the facts attributed to him. To take one example, the recordings show that Mr. Ober stated that he did not know the size of Fusion's miss against internal forecasts. Only when he was pressed did he say he "would guess it was like half or two thirds." This "guess" was translated as an "estimate" in the investigator's memos. Then it was presented as a factual "statement" by CW 5 in the SAC. And, as Lead Plaintiffs have now been forced to admit, this assertion is false: Fusion missed its internal forecast by only a fraction of what CW 5 speculated.

Whether these errors were intentional, or the result of carelessness, Lead Plaintiffs and their counsel should not have made them. When presenting confidential witness allegations, plaintiffs' counsel have a duty to "check, and double-check" that the statements are accurate. *See, e.g.*, *In re Millennial Media, Inc. Sec. Litig.*, No. 14 Civ. 7923 (PAE), 2015 WL 3443918, at *12 (S.D.N.Y. May 29, 2015). This is particularly important in securities class action lawsuits, because confidential witness allegations often form the core of such complaints.

1   Here, there is no evidence that Lead Counsel ever spoke directly to Mr. Ober; much less

2   did counsel show him the SAC before it was filed.  Courts have criticized such practices, and

3   have imposed sanctions in similar circumstances.  *See, e.g.*, *City of Livonia Emps.' Ret. Sys. v.*

4   *Boeing Co.*, 306 F.R.D. 175, 181 (N.D. Ill. 2014).  Indeed, Mr. Ober did not understand that he

5   was going to be cited as a confidential witness, and felt "used" once he learned the purpose of

6   the interviews.  Courts, witnesses, and the putative class "have the right to expect better of

7   counsel."  *Millennial Media*, 2015 WL 3443918, at *14.

8   This is particularly troubling given Lead Plaintiffs' failure to produce any evidence that

9   their investigator sought or received Mr. Ober's consent before tape recording their phone calls,

10  as required by sections 632 and 632.7 of the California Penal Code.  Mr. Ober could not recall

11  whether he was asked for, or gave, his consent, but said if he had known the true reason for Lead

12  Counsel's investigator's calls to him, it is "unlikely" he would have consented.  When served

13  with an interrogatory seeking confirmation whether Mr. Ober's consent was sought or received,

14  Lead Plaintiffs (through Lead Counsel) objected and declined to answer.  Their silence on this

15  point speaks volumes.  Because Lead Plaintiffs and their counsel have mischaracterized CW 5's

16  statements and potentially violated the California Penal Code to overcome the PSLRA's pleading

17  hurdles, they are inadequate and should not be granted class certification.

18  *Second*, this Court should deny class certification because Lead Plaintiffs have failed to

19  adequately supervise this action.  Contrary to their representations to the Court, none of the five

20  Lead Plaintiffs appear to have exercised any "joint decision making" or "actively monitor[ed] the

21  activities of counsel."  Dkt. No. 22-8 at 5.  Rather, they appear to have surrendered substantive

22  decision making to their counsel, ████████████████████████████████████████████

23  ████████   When deposed, none of Lead Plaintiffs' designated representatives could point to any

24  decision (other than the decision to sue or seek lead plaintiff status) that they had made in

25  connection with this lawsuit.  Lead Plaintiffs' carelessness is further exemplified by the fact that

26  two of them filed inaccurate PSLRA certifications with the Court concerning their trading of

27  SanDisk stock.  When confronted with these errors at deposition, the designated representatives

28  from both of these Lead Plaintiffs claimed they had relied on counsel in preparing the

DEFENDANTS' OPPOSITION. TO LEAD PLAINTIFFS'          -2-
MOT. FOR CLASS CERTIFICATION
CASE NO.: 3:15-CV-01455-VC

1  certifications, and had not personally checked the certifications.  This indifference to their duties

2  to the putative class renders them inadequate under Fed. R. Civ. P. 23(a).

3       *Third*, this Court should deny class certification because Lead Plaintiffs have failed to

4  demonstrate that damages will be available on a classwide basis, as required by Fed. R. Civ. P.

5  23(b).  The expert report cited in Lead Plaintiffs' motion devotes all but one of its 74 pages to

6  demonstrating market efficiency.  The report, however, does not adequately address the

7  availability of classwide damages, instead stating in conclusory fashion that "it is clear" that the

8  out-of-pocket methodology will apply.  Lead Plaintiffs' expert could not clearly articulate what

9  theory or theories of liability Lead Plaintiffs were proceeding under, and admitted that he had not

10  performed any analysis of whether and how confounding factors, such as changing inflation over

11  time, will affect classwide damages.  This is insufficient to carry Lead Plaintiffs' burden, and

12  provides an independent reason this Court should deny class certification.

13       *Finally*, Lead Plaintiffs' class definition should be modified to specifically exclude

14  shareholders who sold all their SanDisk stock before the first alleged corrective disclosure on

15  March 26, 2015, or who bought their shares after the first alleged corrective disclosure and sold

16  all their shares before the second alleged corrective disclosure on April 15, 2015.  Such

17  stockholders will be unable to show any damages.  Indeed, one of the Lead Plaintiffs, Pavers and

18  Road Builders' Annuity Fund, fits this description and should be excluded from the class.

19  **FACTUAL AND PROCEDURAL BACKGROUND**

20  **I.**      **RELEVANT BACKGROUND FACTS**

21       During the relevant period, SanDisk was a leading supplier of data storage in consumer

22  electronics and provided memory products for both retail and commercial customers.  ¶¶ 24-

23  29;  Ex. 1 at 4. [1]  These customers included "enterprise" companies with large storage needs in

24  cloud computing, social networking, e-commerce, and related industries.  ¶¶ 27-28, 32; Ex. 1 at

25

26  _____

27     [1] "¶" references are to the Second Amended Complaint.  Dkt. No. 148.  Exhibits ("Ex.")
herein are attached to the Declaration of Michael Petrocelli In Support of Defendants'

28  Opposition to Motion for Class Certification.

4.  One of SanDisk's major product categories for enterprise customers was solid-state drives ("SSDs").  ¶ 3; Ex. 1 at 4-6.

As demand for Enterprise SSD products increased, SanDisk acquired certain companies to expand its capabilities in the area.  Ex. 2 at 14.  These acquisitions included Pliant in 2011, SMART Storage in 2013, and Fusion-io on July 23, 2014.  *See* ¶ 4; Exs. 3-5.  Each of these companies specialized in Enterprise SSD products with different interface technologies serving different performance and price segments of the market.  *See* ¶ 39; Ex. 2 at 14; *see also* Exs. 3-5.  The goal of these acquisitions was to have a portfolio of enterprise SSD products to serve customers at various price points and performance ranges.  ¶ 40; Ex. 2 at 14.

On March 26, 2015, SanDisk announced "certain product qualification delays, lower than expected sales of enterprise products and lower pricing in some areas of the business," and on April 15, 2015, SanDisk announced lower than expected results for the first quarter of 2015.  Exs. 2, 6; ¶ 9.  This putative class action lawsuit was filed on March 30, 2015.  Dkt. No. 1.

Lead Plaintiffs allege that CEO Sanjay Mehrotra and CFO Judy Bruner made false or misleading statements during conference calls and presentations with analysts and investors on October 16, 2014, November 10, 2014, January 21, 2015, February 11, 2015, and March 3, 2015. ¶¶ 75-107.  Specifically, they contend Defendants misled investors about SanDisk's progress in integrating Fusion-io, the breadth of SanDisk's Enterprise SSD portfolio, and predictions of future results, including a projection of $1 billion in Enterprise SSD revenue in 2015.  *Id.*

## II.   RELEVANT PROCEDURAL HISTORY

The Court dismissed two prior iterations of the complaint for failure to plead scienter. Dkt. Nos. 104, 143.  In its first dismissal, the Court invited interested plaintiffs to file a motion to reconsider its order appointing lead plaintiffs, noting then-lead plaintiffs may not have had the largest financial interest in the relief sought by the class.  Dkt. No. 104 at 8.  The Court granted a motion to reconsider that order on February 22, 2016, and appointed City of Bristol Pension Fund; City of Milford, Connecticut Pension & Retirement Board; Pavers and Road Builders Pension, Annuity, and Welfare Funds; the City of Newport New Employees' Retirement Fund;

1   and Massachusetts Laborers' Pension Fund (collectively, the "Institutional Investor Group") as

2   Lead Plaintiffs, and approved Scott + Scott LLP as their choice of Lead Counsel.  Dkt. No. 119.[2]

3         Lead Plaintiffs filed a First Amended Complaint ("FAC") on March 23, 2016.  Dkt. No.

4   129.  The Court granted Defendants' motion to dismiss the FAC.  Dkt. No. 143.  Lead Plaintiffs

5   then filed a Second Amended Complaint ("SAC") on July 15, 2016.  Dkt. No. 148.  Although the

6   SAC challenged the same statements as those alleged in the prior complaint, it added allegations

7   from two additional Confidential Witnesses ("CWs"): CW 5 and CW 6.

8         Defendants moved to dismiss the SAC.  In connection with their motion, Defendants

9   submitted a declaration from CW 5, Robert Ober.  Dkt. No. 151.  In it, Mr. Ober stated that the

10  SAC did not accurately reflect his statements to Lead Plaintiffs' investigator.  *Id.*  While the

11  Court concluded that it could not consider Mr. Ober's declaration at the motion to dismiss stage,

12  it noted that initial discovery could be focused on whether the SAC accurately portrayed CW 5's

13  statements.  Dkt. No. 171 at 4.  Defendants refiled their motion to dismiss the SAC without Mr.

14  Ober's declaration.  Dkt. No. 174.  The Court denied the motion on June 22, 2017, citing the

15  statements attributed to Mr. Ober in the SAC.  Dkt. No. 184 at 3-4 ("[p]rimarily because of

16  CW5, the operative complaint does indeed create the necessary inference" of scienter).

17        Following this Court's entry of a scheduling order, Defendants served discovery requests

18  concerning Lead Plaintiffs' interactions with Mr. Ober.  Lead Plaintiffs produced the audio

19  recordings and transcripts of their investigator's telephone conversations with Mr. Ober, as well

20  as memoranda of his interviews with Mr. Ober.  Lead Plaintiffs also produced memoranda of

21  their investigator's interviews with the other confidential witnesses cited in the SAC.

22  Defendants produced the memorandum of their interview and email correspondence with Mr.

23  Ober.[3]  On January 17, 2018, Mr. Ober was deposed by both parties.  In addition, on January 10,

24

---

25      [2] While Scott + Scott LLP is Lead Counsel, the law firms of Labaton Sucharow LLP, and

26  Cohen Milstein Sellers & Toll LLP are also counsel to members of the Institutional Investor Group, and "additional counsel" to the putative class.  Dkt. No. 109.

27      [3] Defendants did not record any of their conversations with Mr. Ober, and had no substantive

28  contact with any of the other CWs cited in the SAC.

2018, Defendants served Lead Plaintiffs with follow up interrogatories concerning whether Lead Counsel's investigator sought or obtained consent to record his calls with Mr. Ober in June and July 2016.  On February 9, 2018, Lead Plaintiffs objected and declined to answer the interrogatories substantively.  Ex. 7.

### III.    LEAD PLAINTIFFS' MOTION TO CERTIFY A CLASS

Lead Plaintiffs now move to certify a class consisting of "all persons and entities who purchased or otherwise acquired SanDisk's publicly traded common stock during the period from October 16, 2014 through April 15, 2015 (inclusive), and were damaged thereby," pursuant to Fed. R. Civ. P. 23(a).  Lead Plaintiffs' Notice of Motion and Motion for Class Certification and Appointment of Class Representatives, Dkt. No. 209 ("Pl. Br.") at 9.  Lead Plaintiffs also claim they meet Fed. R. Civ. P. 23(b)(3)'s predominance requirement, and submit the expert report of Chad Coffman, CFA in connection therewith.  Dkt. No. 210-2.

At this time, Defendants do not contest that this action meets the numerosity, commonality, and typicality prongs of Rule 23(a).  Defendants dispute, however, that either Lead Plaintiffs or Lead Counsel are adequate under Rules 23(a) and 23(g).  Defendants also dispute that Lead Plaintiffs have carried their burden of showing that damages are available on a classwide basis, as required by Rule 23(b)(3).  Defendants further dispute that Lead Plaintiffs' proposed class definition is appropriate.

1

## ARGUMENT

2

**I.**      **THE APPLICABLE LEGAL STANDARDS**

3

     **A. The Legal Standard for Confidential Witness Allegations**

4           Complaints in securities class action lawsuits center on the allegations of confidential

5     witnesses.  This is because the Private Securities Litigation Reform Act of 1995 ("PSLRA")

6     implemented strict pleading standards which require that plaintiffs plead facts with particularity

7     that give rise to a strong inference of scienter before the plaintiff can obtain discovery.  *See, e.g.*,

8     *City of Pontiac Gen. Emps.' Ret. Sys. v. Lockheed Martin Corp.*, 952 F. Supp. 2d 633, 638

9     (S.D.N.Y. 2013) ("[T]he PSLRA and decisions like *Tellabs* have led plaintiffs' counsel to rely

10     heavily on private inquiries of confidential witnesses . . . .").

11           Under the PSLRA, a "complaint relying on statements from confidential witnesses must

12     'provide[] sufficient detail about a confidential witness'[s] position . . . to provide a basis for

13     attributing the facts reported by that witness to the witness'[s] personal knowledge.'"  *Applestein*

14     *v. Medivation, Inc.*, 861 F. Supp. 2d 1030, 1036 (N.D. Cal. 2012) (some alterations in original)

15     (quoting *Zucco Partners, LLC v. Digimarc Corp.*, 552 F.3d 981, 995 (9th Cir. 2009)), *aff'd*, 561

16     F. App'x 598 (9th Cir. 2014).  In examining confidential witness statements, the court must look

17     at the "level of detail provided by the confidential sources, the corroborative nature of the other

18     facts alleged . . . , the coherence and plausibility of the allegations, the number of sources, the

19     reliability of the sources, and similar indicia."  *Applestein*, 861 F. Supp. 2d at 1036-37 (quoting

20     *Zucco*, 552 F.3d at 995).

21           The use of confidential witnesses, however, is fraught with potential problems, as courts

22     have recognized.  *See, e.g.*, *Lockheed*, 952 F. Supp. 2d at 635 (to provide the level of detail

23     mandated by the PSLRA, plaintiffs' counsel often "undertake surreptitious pre-pleading

24     investigations designed to obtain 'dirt' from dissatisfied corporate employees"); *Hatamian v.*

25     *Advanced Micro Devices, Inc.*, No. 14-cv-00226-YGR, 2015 WL 511175, at *3 (N.D. Cal. Feb.

26     6, 2015) (denying motion to strike but noting "serious questions" raised by recanting

27

28

declaration).  This process can lead to "CWs [being] lured . . . into stating as 'facts' what [are] often mere surmises." *Lockheed*, 952 F. Supp. 2d at 637.[4]

Given the importance of confidential witness allegations, and these inherent dangers, counsel must scrupulously verify the statements attributed to these witnesses.  *See Millennial Media*, 2015 WL 3443918, at *12:

> It is *de rigeur* for counsel, before quoting a document (*e.g.*, a Form 10-K, a press release, an email, or a corporate memorandum) in a putative securities class action Complaint—or any court filing—to check, and double-check, that the document was quoted precisely right. Particularly given the salience of CWs to such complaints, counsel should use comparable rigor to confirm with the CW the accuracy of quotations to be attributed to him.

Where a court discovers that plaintiffs' counsel have been less-than-accurate in depicting a confidential witness' statements, it can impose sanctions.  *See City of Livonia*, 306 F.R.D. at 181.

**B.  The Legal Standard for Lead Plaintiff Adequacy Under Rule 23(a)**

When considering whether to certify a class, district courts "must perform 'a rigorous analysis'" to ensure the requirements of Federal Rule of Civil Procedure 23(a) are satisfied.  *Ellis v. Costco Wholesale Corp.*, 657 F.3d 970, 980 (9th Cir. 2011) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350-51 (2011)).  The "party seeking class certification . . . bears the burden of demonstrating that she has met each of the four requirements of Rule 23(a)."  *Zinser v. Accufix Research Inst., Inc.*, 253 F.3d 1180, 1186 (9th Cir. 2001).  .

Class certification is properly denied where the representatives' lack of knowledge or participation renders them "unable or unwilling to protect the interests of the class against the possibly competing interests of the attorneys."  *Williams Corp. v. Kaiser Sand & Gravel Co.*, 146 F.R.D. 185, 187 (N.D. Cal. 1992) (citation omitted).  Rule 23(a)(4)'s requirement "is rooted in due-process concerns—'absent class members must be afforded adequate representation before entry of a judgment which binds them.'"  *Roberts v. Marshalls of CA, LLC*, No. 13-cv-04731-

---

[4] It can also lead to CW's denying statements they actually made "when their indiscretions [are] revealed." *Lockheed*, 952 F. Supp. 2d at 637.

MEJ, 2017 U.S. Dist. LEXIS 122672, at *29 (N.D. Cal. Aug. 3, 2017) (quoting *Radcliffe v. Experian Info. Sols. Inc.*, 715 F.3d 1157, 1165 (9th Cir. 2013)).

Courts have found that plaintiffs fail to meet their burden under Rule 23(a)(4) when they rely excessively on counsel and fail to actively supervise the case. *See, e.g.*, *In re Quarterdeck Office Sys. Sec. Litig.*, No. CV 92-3970-DWW (GHKX), 1993 U.S. Dist. LEXIS 19806, at *17 (C.D. Cal. Sept. 30, 1993) (denying class certification where plaintiffs "relied on investigations by counsel to support their claims"); *see also Stuart v. RadioShack Corp.*, No. C-07-4499 EMC, 2009 U.S. Dist. LEXIS 12337, at *31 (N.D. Cal. Feb. 5, 2009) (collecting cases for the proposition that a representative is inadequate where "there appears to be simply blind reliance on class counsel").

**C.  The Legal Standard for Lead Counsel Adequacy Under Rule 23(g)**

Rule 23(g)(2) imposes an adequacy requirement on class counsel.  "[A]dequacy of counsel is a valid and relevant basis for denying a motion for class certification" in the Ninth Circuit.  *Varela v. Indus. Prof'l & Tech. Workers*, No. CV 08-1012 SVW (RZx), 2009 U.S. Dist. LEXIS 134813, at *7 (C.D. Cal. Oct. 28, 2009) (citing *Wrighten v. Metro. Hosps., Inc.*, 726 F.2d 1346, 1352 (9th Cir. 1984)). "Plaintiffs' failure to show adequacy of counsel under Rule 23(g) is effectively a failure to meet the adequate representation requirement of Rule 23(a)(4) for class certification." *Id.*

A court may deny class certification whenever counsel's actions "jeopardize[] the court's ability to reach a just and proper outcome in the case." *Victorino v. FCA US LLC*, No. 16cv1617-GPC(JLB), 2017 U.S. Dist. LEXIS 116327, at *13 (S.D. Cal. July 25, 2017) (quoting *White v. Experian Info. Sols.*, 993 F. Supp. 2d 1154, 1171 (C.D. Cal. 2014), *aff'd sub nom. Radcliffe v. Hernandez*, 818 F.3d 537 (9th Cir. 2016)).  Courts find this threshold inquiry so important that anything "pertinent to counsel's ability to fairly and adequately represent the interests of the class" must be considered.  *Lou v. Ma Labs., Inc.*, No. C 12-05409 WHA, 2014 U.S. Dist. LEXIS 2665, at *4 (N.D. Cal. Jan. 8, 2014) (quoting Fed. R. Civ. P. 23(g)(1)(B)).

## II.    CLASS CERTIFICATION SHOULD BE DENIED BECAUSE OF THE INADEQUACY OF LEAD COUNSEL

When Defendants first presented discrepancies between the SAC and Mr. Ober's statements, the Court determined that it could not consider them in the context of a motion to dismiss.[5]  But the existence of several of those discrepancies has since been confirmed, and new ones revealed, through the audio recordings of Lead Counsel's investigator, Alex Vargas.[6] These discrepancies are not on trivial matters, but on topics pivotal to the Court's decision on the motion to dismiss.  And although Lead Counsel has been on notice of these issues for months, they have made no attempt to correct the mischaracterizations to this Court.

Under these circumstances, Lead Counsel is inadequate, and this Court should decline to certify the proposed class.  *See Natto Iyela Gbarabe v. Chevron Corp.*, No. 14-cv-00173-SI, 2017 U.S. Dist. LEXIS 35810, at *106 (N.D. Cal. Mar. 13, 2017) (denying class certification where the "manner in which plaintiff's counsel ha[d] litigated th[e] action [led] the Court to conclude that they should not be appointed as class counsel"); *Creative Montessori Learning Ctrs. v. Ashford Gear LLC*, 662 F.3d 913, 918 (7th Cir. 2011) (remanding with instructions to consider decertifying class); *In re Organogenesis Sec. Litig.*, 241 F.R.D. 397, 410 (D. Mass. 2007) (denying class certification).

### A.    There are Numerous Discrepancies Between the SAC and Mr. Ober's Recorded Statements

#### 1.    Lead Plaintiffs Mischaracterized Mr. Ober's Statements Concerning the Size of the Internal Fusion Forecast Miss

Paragraph 53 of the SAC claims that CW 5 "stated" that "SanDisk's actual PCIe sales for 4Q 2014 badly missed the Company's internal sales forecast for that period, coming in between 34%-50% low."  The audio recordings, however, reveal that Mr. Ober did not make that statement in such unequivocal terms.

---

[5] The Court also noted that it would have been a "nuclear option" for Defendants to bring a Rule 11 motion at that stage.  Dkt. No. 170 at 47.

[6] Mr. Vargas interviewed Mr. Ober twice, on June 15, 2016 and July 12, 2016.  The transcripts of those interviews (prepared by Lead Counsel) are attached hereto as Exs. 8 and 9. The audio recordings are also included as Exs. 10 and 11.

To start with, Mr. Ober had no role in forecasting, which he made clear during his interviews with Lead Plaintiffs' investigator, Mr. Vargas.  Ex. 8 at ALL0000074 (Q:  What about actual discussion of budgets or P&L or financial forecasting for the PCIe, Fusion-io component of SanDisk's Enterprise sales?  A:  Personally, no.  I didn't even get involved in that."); *id.* at ALL0000083 ("I certainly got to see the tracking numbers and definitely after the forecasts had been nailed I got to see them, but you know definitely technologists like me not involved in the forecasting").[7]  Indeed, Mr. Vargas acknowledged that Mr. Ober did not have any role with forecasting.  Ex. 8 at ALL0000082 ("And again, I know that's not your area").

Mr. Vargas nonetheless pressed Mr. Ober about the size of the alleged miss against the internal forecast for Fusion PCIe SSDs.  Mr. Ober at first declined to give a number, saying only he thought it was "substantial."  *Id*.  Mr. Vargas pressed again, at which point Mr. Ober said "Yea, I mean, ***I don't know, I would guess*** it was like half or two thirds [of the forecast amount]."  *Id.* (emphasis added).[8]  But in the SAC, Lead Plaintiff presented Mr. Ober's "guess" (after reiterating that he didn't know), as a "statement" of fact.  In any event, as Lead Plaintiffs have subsequently admitted, the assertion is false: SanDisk's actual 4Q 2014 revenue for its Fusion PCIe SSDs did not miss its internal forecast by 34-50%.  Pl. Br. at 5.  In fact, the miss was much more modest, at approximately 17%.  *Id*.  (comparing actual "4Q 2014 revenue of approximately $70M" with "SanDisk's target of at least $85M").

The effect of Lead Plaintiffs' mischaracterization was significant. This Court cited the alleged internal Fusion miss as the "most important[]" reason for denying the motion to dismiss. Dkt. No. 184 (Order) at 2-3 ("Most importantly, SanDisk missed its Q4 2014 internal sales forecast for the Fusion-io product (a PCIe-based SSDI) by a wide margin, with sales coming in 34% to 50% lower than projected").  In assessing whether counsel is adequate, courts have given

---

[7] Mr. Ober reiterated this during his deposition, noting that he had no role in forecasting, never sat in on any pricing meetings, and never sat in on any forecasting meetings.  Ex. 12 at 27:17-28:11.

[8] In the memorandum of Mr. Vargas' interview, this exchange was characterized as an "estimate[]."  Ex. 13 at ALL0000125.

1    special weight to whether the mischaracterizations were pivotal to plaintiffs' case. *See Evans v.*

2    *IAC Interactive*, 244 F.R.D. 568, 579 (C.D. Cal. 2007) ("Plaintiffs' Motion relies heavily on

3    those declarations, which magnifies the deleterious effect of the conduct."). This "stretching of

4    the truth" is reason enough, on its own, for this Court to deny class certification. *See Varela*,

5    2009 U.S. Dist. LEXIS 134813, at *7; *see also Lane v. Wells Fargo*, No. C 12-04026 WHA,

6    2013 WL 3187410, at *14 (N.D. Cal. June 21, 2013) (conditioning class certification on opening

7    applications for new lead counsel where existing lead counsel had made errors in its statements

8    to the court).

9                 **2. Lead Plaintiffs Mischaracterized Mr. Ober's Role at SanDisk**

10         Paragraph 43 of the SAC claims that Mr. Ober "oversaw the development of legacy

11    Fusion-io products, mainly PCIe SSDs." This is false. Dkt. No. 151 ¶ 9; Ex. 12 at 23:3-6.

12    Moreover, the audio recordings and transcripts of Mr. Vargas's interviews with Mr. Ober

13    provide no basis for Lead Plaintiffs to have made this assertion in the SAC. To the contrary, Mr.

14    Ober explained to Mr. Vargas that his role was as a "technologist" – someone who was tasked

15    with "figur[ing] out what was going to happen in two years, three years, four years, and start

16    setting the stage for the product for those things." Ex. 8 at ALL0000070. Nowhere in the

17    recorded conversation did Mr. Ober state that he was responsible for the development of the

18    Fusion-io product. In fact, Mr. Ober told Mr. Vargas that he was an "individual contributor" --

19    meaning he had no one reporting to him. *Id.* at ALL000071 (Q: Did you have a larger or small

20    team that would have worked under – directly underneath you? A: No, I was an individual

21    contributor."). Moreover, Lead Counsel knew that Mr. Ober had only been employed at Fusion

22    for approximately two months when it was acquired by SanDisk. Ex. 13 at ALL0000124.

23    Rather than merely relying on Mr. Vargas' inaccurate memo,[9] these facts should have led Lead

24    _____

25        [9] Mr. Vargas' memo of this conversation states that Mr. Ober was responsible for the oversight of the Fusion-io product. Ex. 13 at ALL0000124. It seems likely this was sloppy
26    drafting by Mr. Vargas, which Lead Counsel preparing the SAC incorporated into the pleading. However, as described above, there were several reasons Lead Counsel should have doubted the
27    memo's characterization of Mr. Ober's role. Under the circumstances, Lead Counsel should have made further inquiries to verify the nature of Mr. Ober's job. *See Millennial Media*, 2015
28    WL 3443918, at *6 ("As the affidavits of counsel and the CWs reveal, plaintiffs' counsel did not attempt to confirm with any of the 11 CWs the quotes attributed to them. Instead, the quotes

(continued...)

Counsel to question whether Mr. Ober was truly the individual responsible for "overseeing the development of the legacy Fusion-io product." *See Millennial Media*, 2015 WL 3443918, at *11 (Discrepancies between CW's statements and the pleadings "could have been avoided had counsel sought to confirm with these witnesses the facts and quotations that counsel proposed to attribute to them. The necessary refinements could have been made to ensure that quotes were used accurately; that information was presented in proper context; and that opinions, assumptions, hearsay, and speculation were not commingled and confused with representations of facts acquired firsthand by a percipient witness.").

Again, Lead Counsel's mischaracterization of Mr. Ober's role was important. This Court took particular notice of Mr. Ober's alleged role at SanDisk in deciding to deny the motion to dismiss. *See* Dkt. No. 184 at 3 ("This is according to CW5, ***who oversaw the development of Fusion-io products*** . . . ." (emphasis added)). Rightfully so; the law imposes a requirement that confidential witnesses have a basis in fact for what they are saying. *Zucco*, 552 F.3d at 1015. The record now demonstrates, however, that Lead Plaintiffs and Counsel overstated Mr. Ober's role, possibly in an effort to bolster his perceived importance to the Court. *See Kaplan v. Pomerantz*, 132 F.R.D. 504, 510-11 (N.D. Ill. 1990) (granting motion for decertification in part because "plaintiff's counsel was at least a silent accomplice in, and at most encouraged, plaintiff's false [deposition] testimony").

### 3. Lead Plaintiffs Mischaracterized Mr. Ober's Statements Regarding Executive Meetings and His Contact with Mr. Mehrotra

In their attempt to plead scienter in the SAC, Lead Plaintiffs assert that CW 5 described two types of meetings: an enterprise-focused meeting and a business head meeting. ¶ 44. The SAC also attributes to CW 5 the statement that Mr. Mehrotra attended both such meetings, and

---

(...continued from previous page)
used in the FAC were drawn from an investigator's memo summarizing an earlier phone interview of the CW. The CWs were not given an opportunity to verify, or refute, that these quotes were accurate or presented in fair context." (footnote omitted)).

1   that Ms. Bruner attended the "business head" meeting.  *Id.*[10]  Although the recordings show that

2   Mr. Ober described in general terms his "secondhand" knowledge of these meetings to Mr.

3   Vargas, he did not tell Mr. Vargas that Mr. Mehrotra attended enterprise meetings.[11]

4          Moreover, the audio recordings show that Mr. Ober had no firsthand knowledge of when

5   or how Mr. Mehrotra or Ms. Bruner would have learned of Fusion's performance.  When asked

6   if he could "recall any specific . . . emails or in person meetings . . . where [issues with Fusion's

7   performance] would have come to light", Mr. Ober replied "No, no, not really. . . . I was not an

8   insider . . . so I wasn't that aware of what was going on in that transitory period. . . . it's kind of

9   blurry.  Sorry."  Ex. 8 at ALL0000084.  Moreover, Mr. Ober told Mr. Vargas any information

10  he had was "completely second hand."  Ex. 9 at ALL0000089.[12]

11          In addition, Lead Plaintiffs asserted in the SAC that CW 5 had direct meetings with Mr.

12  Mehrotra, including "regarding the overhaul of enterprise to improve the sales model."  ¶¶ 43,

13  51.  Lead Plaintiffs will likely point to several exchanges in which Mr. Ober responds to

14  questions posed by Mr. Vargas about "one-on-one meetings with Mehrotra."  Ex. 8; Ex. 9 at

15  ALL0000092, ALL0000093, ALL0000095, ALL0000099.  However, the recording reflects that

16  Mr. Ober was talking about Sumit Sadana, SanDisk's Chief Strategy Officer, not Mr. Mehrotra.

17  Ex. 9 at ALL0000099 ("So we didn't have any agendas, really, but it's actually important to

18

19          [10] Mr. Ober denied this statement in his declaration, stating that "I have no knowledge about
    'business heads meetings,' and I did not attend any, if they occurred."  Mr. Ober also noted that

20  Mr. Mehrotra did not attend the enterprise staff meetings held by John Scaramuzzo.  Dkt. No.
    151 ¶ 12.

21
           [11] In fact, Mr. Ober listed the people he thought attended the enterprise meeting, and Mr.

22  Mehrotra was not included.  *See* Ex. 9 at ALL0000087 ("Sumit [Sadana,] . . . Ravi
    [Swaminathan] and Scaramuzzo, and maybe a couple of other people, you know, financial and

23  you know and BizOps kind of thing.").  While some of Mr. Vargas' later questions implicitly
    assumed that Mr. Mehrotra attended the meetings.  Mr. Ober did not state that to him.

24
           [12] In response to similar questions, Mr. Ober repeatedly said that he could not describe

25  whether or how Mr. Mehrotra or Ms. Bruner would have been apprised of Fusion's performance.
    *See* Ex. 8 at ALL000084 (Q:  "And it was at that time that you think that all of this was coming

26  to light internally?"  A:  "Oh man, it was a crazy period.  I can't remember which happened
    exactly when or when the transitions were.");  *id.* at ALL0000083 (Q:  "But at what point does

27  this finally get escalated by Scaramuzzo or others to the level of Sumit or Sanjay . . . ?"  A:  "I
    can't remember – sometime in November is kind of sticking in my head, but I mean part of it

28  was complicated too . . . .").

know that I knew **Sumit** before I went to SanDisk." (emphasis added)).  A later exchange during the same interview confirms that Mr. Ober could not have been talking about Mr. Mehrotra when he discussed the "overhaul of enterprise."  Mr. Vargas asked Mr. Ober "is it safe to say, then, Mehrotra and/or Bruner were chiefly involved in really taking up those changes internally?"  Mr. Ober answered "They were probably involved.  I can't tell you how deeply involved they were. I don't know."  *Id.* at ALL0000102.  At a minimum, these exchanges inject uncertainty into whether Mr. Ober was referring to Mr. Mehrotra when he answered Mr. Vargas' questions about "one-on-one" meetings.

In any event, Lead Plaintiffs should not have presented such assertions as fact to the Court in the SAC, when there were ample reasons to doubt their accuracy, or at the very least should have conducted a further inquiry to clarify the facts before including them in a pleading. *Millennial Media*, 2015 WL 3443918, at *7.

**B.  Other Issues Surrounding Mr. Ober's Interview**

**1.  Lead Counsel Appears to Have Failed to Adequately Convey to Mr. Ober that He Would Be Cited As A Confidential Witness**

Although the first few minutes of Mr. Vargas' calls with Mr. Ober were apparently not recorded, Mr. Ober testified that he did not understand that he would be used as a confidential witness in a lawsuit against SanDisk, Mr. Mehrotra and Ms. Bruner.  Ex. 12 at 114:3-8 ("Q: [T]he first time you learned you were going to be used as a confidential witness was when you heard it from [a SanDisk employee on behalf of Defendants] in . . . . late July; is that right? A: That's correct").[13]  Mr. Ober thought he was answering "factual questions" when he spoke with Mr. Vargas.  As he testified: "I believe I spent a fair bit of time clarifying that a lot of the things that happened were the normal actions in this industry.  They are very typical.  I deal with these

---

[13] Mr. Vargas' memos generally contain the same introductory language, stating that Mr. Vargas told the witnesses that he was an investigator for Scott + Scott, working on behalf of "plaintiffs – a class of SNDK shareholders – in order to gather facts in connection with a securities fraud lawsuit naming as defendants SNDK and certain SNDK executives."  Exs. 13-17.  The memos do not reflect that Mr. Vargas told the individuals he was interviewing they would be cited as confidential witnesses in a complaint.

1   problems every day.  I do them currently in – I currently work for the number one company on

2   the NASDAQ last year, and we have these kinds of problems every day." Ex. 12 at 114:21-

3   115:2.[14]

4          Moreover, Mr. Ober testified that he never saw a draft of the SAC and never had an

5   opportunity to object to or correct the statements attributed to him, before it was filed.  Ex. 12 at

6   16:14-17.  As Mr. Ober explained at his deposition, now that he understands the true intent of

7   Lead Counsel's interview, he "feel[s he] was used." *Id.* at 115:8-12; *see Millennial Media*, 2015

8   WL 3443918, at *14 (criticizing counsel for failing to inform a witness that he would be used as

9   a CW and noting "The Court, the public, and above all such witnesses have the right to expect

10  better of counsel").  The disconnect between the SAC's characterization of Mr. Ober's

11  statements and his intent when making them was revealed when Defendants' counsel asked Mr.

12  Ober whether he believed anyone at SanDisk had committed fraud (a question to which Lead

13  Plaintiffs' counsel objected).  Mr. Ober answered, flatly, "No." Ex. 12 at 115: 3-6.

14      **2.   Lead Plaintiffs Have Refused To Answer Whether Lead Counsel's
             Investigator Sought or Received Mr. Ober's Consent to Record Their**
15           **Conversations, As Required By Cal. Penal Code §§ 632 and 632.7**

16         In addition, Lead Counsel has refused to answer whether they complied with California

17  criminal law, which requires the consent of both parties before recording a conversation on a

18  cellular phone.  *See* Cal. Penal Code §§ 632, 632.7.[15][16]  This provision applies not only to third

19  _____

20  [14] ███████████████████████████████████████████████████
    ██████████████████████████████████████████████████████
21  ██ .

22      [15] "A person who, intentionally and without the consent of all parties to a confidential
        communication, uses an electronic amplifying or recording device to eavesdrops upon or record
23      the confidential communication, . . . shall be punished by a fine not exceeding two thousand five
        hundred dollars ($2,500) per violation, or imprisonment in a county jail not exceeding one year
24      . . . ." Cal. Penal Code § 632(a).

25      [16] "Every person who, without the consent of all parties to a communication, intercepts or
        receives and intentionally records, or assists in the interception or reception and intentional
26      recordation of, a communication transmitted between two cellular radio telephones, a cellular
        radio telephone and a landline telephone, two cordless telephones, a cordless telephone and a
27      landline telephone, or a cordless telephone and a cellular radio telephone, shall be punished by a
        fine not exceeding two thousand five hundred dollars ($2,500), or by imprisonment in a county
28      jail not exceeding one year . . . ." Cal. Penal Code § 632.7(a).

1   parties "intercepting" a call, but to the participants on the call, irrespective of whether the person

2   recording the conversation is located out of state.  *Simpson v. Vantage Hosp. Grp., Inc.*, No. 12-

3   cv-04814-YGR, 2012 WL 6025772, at *5-6 (N.D. Cal. Dec. 04, 2012); *Simpson v. Best W. Int'l,*

4   *Inc.*, No. 3:12-cv-04672-JCS, 2012 WL 5499928, at *6-9 (N.D. Cal. Nov. 13, 2012); *Brown v.*

5   *Defender Sec. Co.*, No. CV 12-7319-CAS (PJWx), 2012 WL 5308964, at *4-5 (C.D. Cal. Oct.

6   22, 2012); *Kearney v. Salomon Smith Barney, Inc.*, 39 Cal. 4th 95 (2006); *Kight v. CashCall,*

7   *Inc.*, 200 Cal. App. 4th 1377, 1393 (2011).

8           Both times he contacted Mr. Ober, Lead Counsel's investigator reached him on his

9   cellular phone.  Ex. 12 at 11:15-17.  Lead Plaintiffs' memoranda lack any reference to seeking or

10  obtaining Mr. Ober's consent to record the calls.  Exs. 13, 19.  Moreover, Mr. Ober cannot recall

11  being asked for his consent, and believes that had he known the reason for the call, "it is

12  unlikely" he would have given it.  Ex. 12 at 113:21-114:1.

13          Defendants served interrogatories on Lead Plaintiffs seeking a direct answer to this

14  question.  Ex. 20 (asking whether Mr. Vargas sought Mr. Ober's consent to record, whether such

15  consent was given, and the reason the beginning of the interviews were not recorded).  Lead

16  Plaintiffs, through their counsel, refused to answer, claiming such information was not in their

17  possession, was "irrelevant," "protected by the work-product and attorney-client privileges" and

18  that the interrogatories were "harassing."  Ex. 7 at 2.[17]

19          Lead Plaintiffs' refusal to answer these interrogatories speaks volumes.  Certainly any

20  communication with a third party such as Mr. Ober about obtaining consent to record the calls

21

22          [17] The interrogatory responses also claim that Defendants' attempt to obtain this information
23  violates the non-waiver agreement the parties entered into in connection with their exchange of
    communications with Mr. Ober and the other CWs.  Ex. 7 at 4.  This objection is meritless.  As
24  the parties' non-waiver agreement states, the production of the audio recordings and memoranda
    does not give "additional grounds" to seek further materials from either party, "*although any*
25  *such grounds that may exist apart from the production of the Subject Materials shall remain*
    *unaffected by this Agreement.*"  Ex. 21 at 2 (emphasis added).  Defendants have ample
26  independent grounds to ask whether Mr. Ober's consent to record was sought or obtained; they
    did not need to reference anything in the audio recordings or memoranda in order to serve their
27  interrogatories.  Indeed, it was this Court that first inquired about the existence of the audio
    recordings, and Lead Plaintiffs' counsel who first volunteered that portions of the exchange were
28  not recorded.  Dkt. No. 170 at 59-60.

1    cannot be privileged or protected by work product.  If Lead Counsel had obtained consent, it is

2    hard to imagine a reason they would refuse to say so.  The only conclusion that can reasonably

3    be drawn from their objection is that they did not seek or obtain consent, in violation of

4    California's Penal Code.  A violation of California's Penal Code undeniably bears on the

5    adequacy of Lead Counsel under Rule 23(g).  *Lou*, 2014 U.S. Dist. LEXIS 2665, at *4 (anything

6    "pertinent to counsel's ability to fairly and adequately represent the interests of the class" must

7    be considered); *Natto*, 2017 U.S. Dist. LEXIS 35810, at *106 (denying class certification due to

8    the "manner in which plaintiff's counsel ha[d] litigated th[e] action.").

9    **C.  Lead Counsel Omitted Positive Statements That Put Mr. Ober's Comments in
10           Context**

11       The transcripts reveal that Lead Counsel cherry-picked statements to include in the SAC,

12   while excluding other statements that put Mr. Ober's comments in context.  While this may not,

13   on its own, be improper, it does bear upon the totality of the handling of this matter, and should

14   be considered among the factors relevant to adequacy.

15       Twice, Mr. Ober told Mr. Vargas that he believed SanDisk's missed guidance was the

16   result of "bad timing" or "misunderstanding" rather than any wrongdoing.  *See* Ex. 9 at

17   ALL0000105; Ex. 8 at ALL0000085.  Moreover, as Mr. Ober explained to Mr. Vargas (and as

18   he reconfirmed at his deposition) Fusion came back with strong performance in the last three

19   quarters of 2015.  Ex. 8 at ALL0000085 ("[J]ust before I left we were having unbelievable blow

20   out quarters, you know record quarters, with the Fusion-io product, because those big customers

21   had come back really strong."); Ex. 12 at 33:3-8 ("[T]he orders were extraordinarily strong.")

22   Indeed, Fusion was a major contributor to the company's success for 2015, as described in

23   Company's published remarks summarizing its performance.  Ex. 22 at 4 ("Revenue from our

24   Fusion-io [product] reached a post-acquisition record in the fourth quarter, with increased sales

25   to both hyperscale and OEM customers").

26   **D.  The Discovery Documents Submitted by Lead Plaintiffs Are Not At Issue**

27       Lead Plaintiffs' opening brief omits any discussion of the issues surrounding CW 5,

28   despite the fact that these issues have been on the forefront in the litigation for months and a

1   focus of Defendants' discovery requests and efforts.[18]  Instead, Lead Plaintiffs loaded up their

2   brief with documents they obtained in discovery after the motion to dismiss was denied.  *See,*

3   *e.g.*, Pl. Br. at 4-9.

4        Those documents are irrelevant on this motion.  Lead Plaintiffs presumably submitted

5   them to meet their burden on the issues of commonality and typicality under Rule 23(a).  *Dukes*,

6   564 U.S. at 351.  However, as noted above, Defendants are not at this time challenging those

7   requirements of Rule 23(a).  Defendants' opposition is to the elements of adequacy of Lead

8   Plaintiffs and Counsel and predominance on the issue of damages.  *See infra* at 23-25.

9        It should also be noted that Lead Plaintiffs only have those documents because the Court

10  denied Defendants' motion to dismiss.  The PSLRA sets a high pleading bar for plaintiffs to

11  survive a motion to dismiss.  The purpose of these requirements is to ensure that cases are based

12  on well pled, specific facts, prior to any discovery.  Here, Defendants had prevailed twice on

13  motions to dismiss when the Court granted Lead Plaintiffs leave to file the SAC.  The

14  centerpiece of the SAC was the addition of CW 5.  The Court recognized as much when it stated

15  that it was "primarily because of CW5" that it was denying Defendants' motion to dismiss.  Dkt.

16  No. 184 at 4.  Lead Plaintiffs may never have gotten past the pleading stage on this "close

17  question" of a case had they not mischaracterized CW 5's statements and his role.[19]

18  **III.    CLASS CERTIFICATION SHOULD BE DENIED BECAUSE LEAD**
           **PLAINTIFFS ARE INADEQUATE**
19

20       In addition to the issues described in Section II, *supra*, there are additional, independent

21  reasons this Court should deny class certification.  Specifically, depositions of the Lead Plaintiffs

22

23

24  ───────────────
         [18] Defendants may therefore seek leave to file a sur-reply.

25
         [19] To the extent the Court is concerned that denial of class certification because of Lead
26  Counsel's actions will prejudice plaintiffs, the five plaintiffs who comprise the Institutional
    Investor Group are free to pursue their claims on an individual basis with their chosen counsel.
27  In addition, under *Resh v. China Agritech, Inc.*, 857 F.3d 994 (9th Cir. 2017), *cert. granted*, 138
    S. Ct. 543 (2017), it is likely that the statute of limitations for absent class members has been
28  tolled during the pendency of this putative class action.

1   show that they have failed to discharge their duty of supervision and have filed inaccurate

2   PSLRA certifications with the Court

3   **A. Lead Plaintiffs Have Failed to Adequately Supervise This Action**

4   Rule 23(a)(4) requires that Lead Plaintiffs actively supervise the lawsuit.  A plaintiff

5   cannot merely hand the keys to its counsel, and abdicate its responsibility to participate in and

6   direct the prosecution of the putative class' claims.  *Shiring v. Tier Techs., Inc.*, 244 F.R.D. 307,

7   315 (E.D. Va. 2007) ("[I]n the securities fraud context the adequacy inquiry must be particularly

8   searching. This is so because the PSLRA was 'intended to empower investors so that they, not

9   their lawyers, control securities litigation . . . .'" (citation omitted)).

10   When they were appointed Lead Plaintiffs, the members of the Institutional Investor

11   Group filed a declaration promising to uphold these duties.  In it, they committed to "exercise

12   joint decision-making and work together in this action to actively monitor the activities of

13   counsel."  Dkt. No. 22-8 at 5.  The Institutional Investor Group also assured the Court that it

14   would "establish procedures" for "communicating regularly among ourselves and with counsel."

15   *Id.* at 5-6.  These "procedures" were to include "regular review and discuss[ion] of case filings

16   with counsel through joint conference calls as well as other measures that will ensure that the

17   work counsel performs is non-duplicative and in the best interests of the proposed class."  *Id.*

18   Lead Plaintiffs have not followed through on these promises.  For example, there has not

19   been a single call or communication among the members of the Institutional Investor Group

20   since they were appointed Lead Plaintiffs.  Ex. 23 at 129:7-131:13; Ex. 24 at 113:16-20; Ex. 25

21   at 164:3-168:21; Ex. 26 at 125:9-126:24; Ex. 27 at 121:7-122:20.  None of the Lead Plaintiffs'

22   representatives could point to a single decision they had made in this litigation, other than the

23   decision to sue or seek lead plaintiff status in this action.  Ex. 23 at 162:17-22; Ex. 24 at 119:17-

24   24; Ex. 25 at 161:25-162:4; Ex. 26 at 128:25-129:4; Ex. 27 at 127:14-21.  Indeed, in response to

25   more than a dozen questions, the answer from Lead Plaintiffs' representatives was that they

26   entrusted decisions or deferred investigation to their counsel and did not personally follow up.[20]

27

28   [20] *See* Ex. 23 at 40:12-41:4, 151:18-152:7; Ex. 24 at 88:9-89:1, 90:4-91:10, 105:17-21,
111:4-24; Ex. 25 at 123:5-9, 152:15-22, 160:6-161:24; Ex. 26 at 56:8-15, 122:16-123:5; Ex. 27

(continued...)

1   Moreover, the representatives for several Lead Plaintiffs testified that they have done

2   nothing to monitor the costs accruing in this action.  *See* ███████████████████████████████

3   ███████████████████████████████████████████████████████████████████████████; Ex.

4   25 at 172:11-20 ("Q: Has Pavers kept an eye on any of the costs? . . . I am talking about travel

5   costs, copying, things other than the strict attorneys' fees?  A:  No."); Ex. 23 at 162:9-16.

6   ███████████████████████████████████████████████████████████████████

7   ███████████████████████████████████████████████████████████████████████

8   ██████████████████████████████████  While this Court will be the ultimate

9   arbiter of the costs and fees recoverable by counsel, Lead Plaintiffs' failure to take any steps to

10  monitor those expenses militates against a finding of adequacy.  *Williams*, 146 F.R.D. at 187

11  (citation omitted) (noting the duty to protect the interests of the class against the "possibly

12  competing interests of the attorneys." (citation omitted)).

13  ██████████████████████████████████████

14  ██████████████████████████████████████████

15  ████████████████████████████████████████████████

16  ████████████████████████████████████████████████

17  ██████████████████████████████████████████

18  ███████████████████████████████ ████████████████████

19  ████████████████████████████████████████████████

20

21  _____

(...continued from previous page)

at 95:9-96:19, 115:12-117:23 ██████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████

26  21

27  ██████████████████████████████████████████████████████

28  ███████████████████

1 ████████████████████████████████████

2 ████████████████████████████████████

3 ████████████████████████████████ *See, e.g.*, *Mola Dev. Corp.*

4 *v. Orange Cty. Assessment Appeals Bd. No. 2*, 80 Cal. App. 4th 309, 320 (2000) (noting that an

5 indemnity represents an "important intangible" comprising a portion of a contract's

6 consideration); *DSC Communc'ns Corp. v. Next Level Communc'ns*, 929 F. Supp. 239, 246-47

7 (E.D. Tex. 1996) (factoring the value of an indemnity into the calculation of damages).

8 ████████████████████████████████████

9 ████████████████████████████████████

10 ████████ *See* S. Rep. No. 104-98, at 6 (1995) (appointment of lead plaintiff procedures are

11 "intend[ed] to empower investors so that they, not their lawyers, control securities litigation.").

12 Not only do these arrangements diminish the incentives of these two Lead Plaintiffs to actively

13 monitor this litigation, they are the antithesis of what the drafters of the PSLRA intended when

14 they decided to put shareholders, not their lawyers, in the driver's seat.

15 **C.  Two Lead Plaintiffs Filed Inaccurate PSLRA Certifications with the Court**

16 When a person or entity applies to be a lead plaintiff, the PSLRA requires that they file a

17 certification with the court setting forth all their purchases and sales in the security at issue. 15

18 U.S.C. § 78u-4(a)(2)(a).  This certification is required to establish plaintiffs' standing and

19 provides information about whether plaintiffs' pattern of purchases and sales subjects them to

20 unique defenses or other issues that differentiate them from other members of the class.

21 In this case, two of the five Lead Plaintiffs (Newport News and Pavers), filed inaccurate

22 PSLRA certifications with this Court. ████████████████████

23 ████████████████████████████████████

24 ████████████████████ Ex. 25 at 114:11-22, 119:25-123:17.

25 This "indifference to the PSLRA's certification requirements" is a factor to be considered in

26 determining adequacy.  *Shiring*, 244 F.R.D. at 317 (finding plaintiff inadequate based, in part, on

27 failure to file accurate PSLRA certifications).

28

1    In addition, over a month after being apprised of these errors neither of these Lead

2    Plaintiffs has filed a corrected certification with the Court.  While counsel for Pavers and

3    Newport News have sent Defendants letters purporting to correct the errors in their certifications

4    (Exs. 32, 33), these letters were never filed with the Court.  It is the Court, not Defendants, who

5    is entrusted with judging the adequacy of Lead Plaintiffs' PSLRA certifications.  *See* 15 U.S.C. §

6    78u-4(a)(2)(a) (noting that the certification is to be "filed" with the Court).  Such errors

7    undermine Lead Plaintiffs' assertions regarding the level of supervisory attention (or lack

8    thereof) that Lead Plaintiffs have demonstrated thus far.

9    **IV.    LEAD PLAINTIFFS FAIL TO ESTABLISH PREDOMINANCE**

10    Lead Plaintiffs acknowledge that they must satisfy the requirements of Fed. R. Civ. P.

11    23(b)(3) by showing that common questions of class wide damages predominate.  Pl. Br. at 21.

12    To satisfy this requirement, plaintiffs must show that "damages are capable of measurement on a

13    classwide basis" in the sense that the whole class suffered damages traceable to the same course

14    of conduct underlying the plaintiffs' legal theory.  *See Comcast Corp. v. Behrend*, 569 U.S. 27,

15    34 (2013).  While plaintiffs need not show that there will be no need for individualized damages

16    calculations, they must show that their model for determining classwide damages actually

17    measures damages resulting from the class's asserted theory of injury.  *See In re BP p.l.c. Sec.*

18    *Litig.*, No. 4:10-md-2185, 2013 WL 6388408, at *16-17 (S.D. Tex. Dec. 6, 2013).  This

19    requirement must be satisfied by "evidentiary proof"; it is not enough to simply state that

20    calculation of damages will be a "mechanical task."  *Longest v. Green Tree Servicing LLC*, 308

21    F.R.D. 310, 333 (C.D. Cal. 2015) (emphasis omitted); *BP*, 2013 WL 6388408, at *17 ("Plaintiffs

22    cannot avoid this hard look by refusing to provide the specifics of their proposed

23    methodology.").

24    Here, Lead Plaintiffs barely give this requirement lip service.  While Lead Plaintiffs have

25    submitted a report by Chad Coffman to support their motion for class certification, 73 of the 74

26    pages in that report are devoted to establishing that SanDisk stock traded in an efficient market –

27    a fact that Defendants do not dispute.  Mr. Coffman – who is not a Ph.D., as Lead Plaintiffs

28

claim[22] – devotes less than a page to the question of whether damages are available on a classwide basis.

Mr. Coffman states that "it is clear" (to him, at least) that damages will be calculable using the "out of pocket" method of damages, but when asked, he was unclear about which theory or theories of liability Lead Plaintiffs were proceeding under.  Ex. 34 at 80:23-82:13 (noting that materialization of a previously undisclosed risk "might be one of their claims" and stating that "my opinion about classwide damages is based on" out of pocket damages and "how that fits in with materialization of the risk . . . I'm not sure."), 86:18-87:5 (stating he was "not sure" if Lead Plaintiffs were proceeding on a price maintenance theory).[23]  Moreover, Mr. Coffman's report provides no explanation of how he will perform his analysis, or adjust for various complicating factors present in this case.  Pl. Br. Ex. O at 35.

Lead Plaintiffs state that "out-of-pocket damages in securities fraud cases are 'the difference between the price paid [for stock] and the 'value' of the stock when bought.'"  Pl. Br. at 21.  Therefore, if the alleged inflation of SanDisk stock changes throughout the class period, the measure of damages will change alongside it.  Despite acknowledging this, (Ex. 34 at 98:9-14) Mr. Coffman had no answer for how he would go about calculating changing inflation over the class period.  In short, Mr. Coffman has done no analysis to show how his model will calculate inflation changes – despite the centrality of this issue to Lead Plaintiffs' own definition of the appropriate measure of damages.[24]  Lead Plaintiffs' burden of proof means something more than a conclusory statement that "it is clear" that a particular method will apply.  Accordingly, the Court should find that Lead Plaintiffs fail to demonstrate predominance under Rule 23(b)(3).

---

[22] Pl. Br. at 16; Ex. 34 at 19:20-20:3.

[23] While Mr. Coffman claimed that a materialization of risk theory would not affect his calculation of damages (Ex. 34 at 82:2) the fact that he did not know what theory of damages Lead Plaintiffs are asserting only emphasizes the short shrift he has given this element of Rule 23(b)(3).

[24] Mr. Coffman attempted to minimize the effect of this failure by stating that his method would still work classwide, even if inflation were variable over the class period.  Ex. 34 at 104:1-6.  This does not change the fact that Mr. Coffman acknowledges that his model does not provide a method to calculate what Lead Plaintiffs themselves argue is required, and he has not performed any analysis to verify it can be done in this case.

1

### V.      THE PROPOSED CLASS DEFINITION SHOULD BE NARROWED

2    Lead Plaintiffs move to certify a class consisting of "all persons and entities who

3   purchased or otherwise acquired SanDisk's publicly traded common stock during the period

4   from October 16, 2014 through April 15, 2015 (inclusive), and were damaged thereby." Pl. Br.

5   at 9.  In a recent analogous case, the court excluded stockholders who sold all their shares prior

6   to the first alleged corrective disclosure, since such stockholders would be unable to prove any

7   damages.  *Luna v. Marvell Tech. Grp., Ltd.*, No. C 15-05447, 2017 WL 4865559, at *8 (N.D.

8   Cal. Oct. 27, 2017).  Here, not only would stockholders selling all their shares before the first

9   alleged corrective disclosure on March 26, 2015 be unable to prove damages, so would

10   stockholders buying after the first alleged corrective disclosure and selling before the second one

11   (April 15, 2015).  If the Court were to certify a class, those stockholders should be excluded.[25]

12

### CONCLUSION

13    For each of the foregoing reasons, this Court should deny Lead Plaintiffs' motion for

14   class certification.

15   Dated:  February 19, 2018                    WILSON SONSINI GOODRICH & ROSATI
                                                  Professional Corporation
16

17

18                                                By: /s/ Boris Feldman
                                                          Boris Feldman
19
                                                  Attorneys for Defendants
20

21

22

23

24

25

26

---

27    [25] Indeed, Pavers and Road Builders' Annuity Fund purchased their shares on November 20, 2014 and sold all of them on January 22, 2015, before the first alleged corrective disclosure.  Ex. 32.  They should therefore be excluded from the class.

28