DEBORAH CLARK-WEINTRAUB (*pro hac vice*)
MAX R. SCHWARTZ (*pro hac vice*)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
Email: dweintraub@scott-scott.com
          mschwartz@scott-scott.com

*Attorneys for Class Representatives and the Class*

[Additional counsel on signature page.]

## UNITED STATES DISTRICT COURT
### NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| IN RE: SANDISK LLC SECURITIES LITIGATION | Case No. 3:15-cv-01455-VC |
| | Hon. Vince Chhabria |
| | **CLASS REPRESENTATIVES' UNOPPOSED NOTICE OF MOTION AND MOTION FOR PRELIMINARY APPROVAL OF CLASS ACTION SETTLEMENT, APPROVAL OF FORM AND MANNER OF NOTICE, AND TO SET DATE FOR HEARING ON FINAL APPROVAL OF SETTLEMENT; MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF** |

# TABLE OF CONTENTS

NOTICE OF MOTION AND MOTION ..................................................................... 1

STATEMENT OF ISSUES TO BE DECIDED ......................................................... 1

MEMORANDUM OF POINTS AND AUTHORITIES ............................................. 1

I.      PRELIMINARY STATEMENT ................................................. 1

II.     BACKGROUND ......................................................................... 2

    A.   The Class' Claims Against Defendants ..................................... 2

    B.   Procedural History .................................................................... 3

    C.   The Settlement ........................................................................... 4

        1.   The Settlement Occurred After Two Mediations and Additional Assistance from a Well-Respected Mediator.............. 4

        2.   The Material Settlement Consideration ......................... 5

III.    ARGUMENT ............................................................................... 6

    A.   The Settlement Merits Preliminary Approval ........................... 6

        1.   Governing Standard ....................................................... 6

        2.   The Settlement Is the Result of Arm's-Length Negotiations Assisted by an Experienced Mediator ..................... 6

        3.   The *Hanlon* Factors Support Approval ......................... 7

            a.   The Amount Offered in Settlement Is Substantial ............ 7

            b.   The Strength of Class Representatives' Case Balanced Against the Substantial Risks of Continued Litigation ........ 10

            c.   The Complexity, Expense, and Likely Duration of Continued Litigation ........ 15

            d.   Fact and Expert Discovery Are Complete and the Action Is at an Advanced Stage ........ 17

            e.   The View of Experienced Counsel ................................. 17

            f.   The Risk of Maintaining Class Action Status Through Trial ........ 17

        4.   The Rule 23(e)(2) Factors Support Approval ............................. 18

            a.   Class Representatives and Class Counsel Have Adequately Represented the Class................................... 18

b.      The Settlement Was Negotiated at Arm's-Length........... 19

c.      The Relief Provided Is Adequate, Taking into Account the Costs, Risks, and Delay of Trial and Appeal, as Well as Other Factors...................................... 19

d.      The Settlement Treats Class Members Equitably Relative to Each Other ...................................................... 21

B.      The Class Has Been Certified and the Settlement Specifically Applies to that Class ...................................................................... 21

C.      The Court Previously Approved the Notice Plan for Class Certification and Should Approve the Similar Plan for Disseminating the Settlement Notice and the Form of Notice ............... 22

D.      The Proposed Schedule of Events........................................................... 24

IV.      CONCLUSION............................................................................................. 25

UNOPPOSED NOTICE OF MOTION & MOTION FOR PRELIMINARILY APPROVAL OF SETTLEMENT; MEMORANDUM IN SUPPORT
CASE NO. 3:15-CV-01455-VC

ii

1

## **TABLE OF AUTHORITIES**

2

PAGE(S)

3

CASES

4

*In re Amgen, Inc. Sec. Litig.,*
  No. CV 7-2536 PSG, 2016 WL 10571773 (C.D. Cal. Oct. 25, 2016)................................. 16

5

*In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.,*
  No. MDL 1500, 2006 WL 903236 (S.D.N.Y. Apr. 6, 2006)....................................... 15

6

7

*In re Biolase, Inc. Sec. Litig.,*
  No. SAC 13-1300-JLS, 2015 WL 12720318 (C.D. Cal. Oct. 13, 2015) ...................... 9

8

*Brown v. China Integrated Energy Inc.,*
  No. CV 11-02559 BRO, 2015 WL 12720322 (C.D. Cal. Feb. 17, 2015)..................... 18

9

10

*Chun-Hoon v. McKee Foods Corp.,*
  716 F. Supp. 2d 848 (N.D. Cal. 2010) ........................................................ 6

11

*Churchill Village, L.L.C. v. Gen. Elec.,*
  361 F.3d 566 (9th Cir. 2004) ............................................................. 7, 18

12

13

*City of Providence v. Aeropostale, Inc.,*
  No. 11 Civ. 7132(CM)(GWG), 2014 WL 1883494 (S.D.N.Y. May 9, 2014)..................... 14

14

*Cotter v. Lyft, Inc.,*
  193 F. Supp. 3d 1030 (N.D. Cal. 2016) ........................................................ 6

15

16

*In re CV Therapeutics, Inc., Sec. Litig.,*
  No. C 03-3709 SI, 2007 WL 1033478 (N.D. Cal. Apr. 4, 2007)............................. 20

17

*Daubert v. Merrell Dow Pharms. Inc.,*
  509 U.S. 579 (1993) ................................................................... 13

18

19

*Destefano v. Zynga, Inc.,*
  No. 12-cv-04007-JSC, 2016 WL 537946 (N.D. Cal. Feb. 11, 2016) ......................... 20

20

*Dura Pharms., Inc. v. Broudo,*
  544 U.S. 336 (2005)................................................................... 13

21

22

*Hanlon v. Chrsyler Corp.,*
  150 F.3d 1011 (9th Cir. 1998) ..........................................................*passim*

23

*In re Heritage Bond Litig.,*
  No. 02-ML-1475 DT, 2005 WL 1594403 (C.D. Cal. June 10, 2005) ....................... 6, 19, 20

24

25

*Int'l Bhd. of Elec. Workers Local 697 Pension Fund. v. Int'l Game Tech., Inc.,*
  No. 3:09-cv-00419-MMD-WGC, 2012 WL 5199742
  (D. Nev. Oct. 19, 2012)................................................................. 9

26

27

*Jaffe Pension Plan v. Household Int'l., Inc.,*
  No. 1:02-cv-05893 (N.D. Ill.) ........................................................... 16

28

*Knapp v Art.com, Inc.*,
   283 F. Supp. 3d 823 (N.D. Cal. 2017) ............................................................. 10

*In re LinkedIn User Privacy Litig.*,
   309 F.R.D. 573 (N.D. Cal. 2015) ..................................................................... 15

*McPhail v. First Command Fin. Planning, Inc.*,
   No. 05cv179-IEG-JMA, 2009 WL 839841 (S.D. Cal. Mar. 30, 2009) .................. 9

*In re Mercury Interactive Corp. Sec. Litig.*,
   618 F.3d 988 (9th Cir. 2010) ........................................................................... 24

*Nat'l Rural Telecomms. Coop. v. DIRECTV, Inc.*,
   221 F.R.D. 523 (C.D. Cal. 2004) ..................................................................... 17

*Officers for Justice v. Civ. Serv. Comm'n of City & Cty. of S.F.*,
   688 F.2d 615 (9th Cir. 1982) ............................................................................. 7

*In re Oracle Sec. Litig.*,
   No. C-90-0931-VRW, 1994 WL 502054 (N.D. Cal. June 18, 1994) ................... 19

*In re Portal Software, Inc. Sec. Litig.*,
   No.C-03-5138 VRW, 2007 WL 1991529 (N.D. Cal. June 30, 2007) ............ 6, 23

*In re Quality Sys., Inc. Sec. Litig.*,
   865 F.3d 1130 (9th Cir. 2017) ........................................................................... 11

*Satchell v. Fed. Express Corp.*,
   No. C03-2659 SI, 2007 WL 1114010 (N.D. Cal. Apr. 13, 2007) ......................... 6

*Schueneman v. Arena Pharms., Inc.*,
   840 F.3d 698 (9th Cir. 2016) ........................................................................... 12

*Shapiro v. JPMorgan Chase & Co.*,
   No. 11 Civ. 8331(CM)(MHD), 2014 WL 1224666 (S.D.N.Y. Mar. 24, 2014) ........ 8

*In re Syncor ERISA Litig.*,
   516 F.3d 1095 (9th Cir. 2008) ........................................................................... 6

*Todd v. STAAR Surgical Co.*,
   No. CV 14-5263 MMF, 2017 WL 4877417 (C.D. Cal. Oct. 24, 2017) ................. 17

*Torrisi v Tucson Elec. Power Co.*,
   8 F.3d 1370 (9th Cir. 1993) ........................................................................... 7, 15

*In re Vivendi Universal, S.A. Sec. Litig.*,
   No. 1:02-cv-05571 (S.D.N.Y.) ........................................................................... 16

*Wren v. RGIS Inventory Specialists*,
   No. C-06-05778 JCS, 2011 WL 1230826 (N.D. Cal. Apr. 1, 2011) ..................... 7

**STATUTES, RULES & REGULATIONS**

FEDERAL RULES OF CIVIL PROCEDURE
   Rule 23(c)(2)(B)............................................................................................... 22

1

Rule 23(e)(1) .................................................................................................... 6
Rule 23(e)(2) .................................................................................................... 6

2

Rule 23(e)(2)(C)(ii) ........................................................................................ 19
Rule 23(e)(2)(C)(iii) ...................................................................................... 20

3

Rule 23(e)(2)(C)(iv) ...................................................................................... 20
Rule 23(e)(3) .................................................................................................. 20

4

**OTHER AUTHORITIES**

5

Laarni T. Bulan, et al., *Securities Class Action Settlements – 2018 Review and Analysis*,
    CORNERSTONE RES. (2018) ...................................................................... 8, 10

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

1

**NOTICE OF MOTION AND MOTION**

2

TO: ALL PARTIES AND COUNSEL OF RECORD:

3

PLEASE TAKE NOTICE that on May 16, 2019 at 10:00 a.m., or at such other time as

4 may be set, in Courtroom 4 of the United States District Court for the Northern District of

5 California, located at 450 Golden Gate Avenue, San Francisco, California 94102, the Class

6 Representatives,[1] on behalf of the certified Class, will and hereby do move for an order granting

7 preliminary approval of the proposed Settlement of this class action, including the proposed Plan

8 of Allocation, directing Class Notice, scheduling the events that will lead up to a Final Settlement

9 Hearing, and for such other relief as the Court may grant.

10

**STATEMENT OF ISSUES TO BE DECIDED**

11

1.      Whether the proposed $50 million cash Settlement of this Action should be

12 preliminarily approved under Rule 23(e) of the Federal Rules of Civil Procedure ("FRCP") and

13 *Cotter v. Lyft, Inc.*, 193 F. Supp. 3d 1030, 1035-37 (N.D. Cal. 2016)?

14

2.      Whether the proposed form of Settlement Notice and notice plan, including the

15 methods of disseminating and responding thereto, are the best practicable under FRCP

16 23(c)(2)(B) and (e)(1)?

17

3.      Whether the Court should accept and set the proposed schedule of events leading

18 up to a Final Settlement Hearing on the proposed Settlement?

19

**MEMORANDUM OF POINTS AND AUTHORITIES**

20

**I.      PRELIMINARY STATEMENT**

21

After three years of hard-fought litigation, Class Representatives have agreed, subject to

22 the Court's approval, to settle all claims asserted in this Action in exchange for a cash payment

23 of $50,000,000.  The Settlement is embodied in the Stipulation.  As explained more fully herein,

24 Class Representatives and Class Counsel respectfully submit that the Settlement is an excellent

25 recovery for the Class and warrants preliminary approval.

26

27

28

[1]      Unless otherwise defined herein, all capitalized terms have the same meaning as given to them in the Stipulation and Agreement of Settlement (the "Stipulation"), dated May 6, 2019 and filed herewith as Ex. 1 to the Declaration of Max R. Schwartz ("Schwartz Decl.").

The proposed Settlement represents a significant recovery given the Class' maximum recoverable damages and risks of continued litigation, as well as compared to other recent securities class action settlements.  It was achieved through arm's-length negotiations with the assistance of an experienced mediator at a stage in the proceedings – during summary judgment briefing and weeks before trial – when Class Representatives and Class Counsel were well-informed regarding the merits of and defenses to the claims.

Class Representatives also propose direct notice to the Class in the manner customarily utilized in securities class action cases – direct mailing and publication – and that Epiq Class Action & Claims Solutions, Inc. ("Epiq"), a well-qualified Claims Administrator, be appointed to administer the Settlement.  Finally, Class Representatives request that the Court set a date for a hearing on Final approval of the Settlement and related matters that will allow for the prompt conclusion of this Action and distribution of Settlement proceeds, while providing sufficient time for Class Members to receive Notice and present any objection or request exclusion.

## II.   BACKGROUND

### A.   The Class' Claims Against Defendants

The Class has argued and alleged that during the Class Period (October 16, 2014, through and including April 15, 2015), Defendants misled investors concerning the breadth and quality of SanDisk's enterprise products and its success in integrating its most recent enterprise acquisition, Fusion-io.  Specifically, the Class has argued and alleged that by the start of the Class Period, contrary to Defendants' positive statements, SanDisk's enterprise business, including Fusion-io, was beset with performance issues.  Although Defendants had touted SanDisk's acquisition of Fusion-io as the reason the Company would achieve $1 billion in enterprise revenue in 2015, a year ahead of schedule, the Class has argued and alleged that Fusion-io had badly missed the Company's internal sales forecasts in 4Q2014 and performed even worse in 1Q2015.  Fusion-io's misses stemmed from a number of issues, including, as argued and alleged, the high cost of its products, especially compared to cheaper alternatives, and an ineffective sales organization.  Beyond Fusion-io, the Class has argued and alleged that SanDisk's "legacy" enterprise business

UNOPPOSED NOTICE OF MOTION & MOTION FOR PRELIMINARILY APPROVAL OF SETTLEMENT; MEMORANDUM IN SUPPORT   CASE NO. 3:15-CV-01455-VC

2

(consisting of prior enterprise acquisitions Pliant and SMART Storage) was also performing poorly, due to badly designed and outdated products and qualification delays that were adversely impacting its enterprise products across the board and negatively impacting sales, even as Defendants told the market that SanDisk had an industry-leading enterprise portfolio that was experiencing strong demand signals.  The Class has argued and alleged that Defendants were aware of the foregoing issues through their participation in regularly scheduled meetings of the enterprise business unit and of SanDisk's senior executive team and that, in touting SanDisk's enterprise business, without disclosing the significant problems described above, Defendants made false and misleading statements that damaged SanDisk investors during the Class Period.

### B.      Procedural History

The proposed Settlement comes after three years of hard-fought litigation, with the Parties preparing for a rapidly approaching trial.  This Action was first filed on March 20, 2015, and the Court appointed the Lead Plaintiffs on February 22, 2016.  ECF Nos. 1, 119.[2]  Lead Plaintiffs filed two complaints, and engaged in several rounds of briefing related to Defendants' motions to dismiss, and by order dated June 22, 2017, the Court sustained the SAC.  *E.g.*, ECF No. 184.

Fact discovery began on August 14, 2017, and, including responses to contention interrogatories and certain other matters, concluded approximately 13 months later on September 12, 2018.  ECF Nos. 194, 240.  Lead Plaintiffs produced over 200 documents, and Defendants deposed each of the five Lead Plaintiffs between January 1, 2018, and January 16, 2018.  In turn, Defendants produced 161,725 documents (nearly 920,390 pages).  Plaintiffs' Counsel deposed 11 former SanDisk employees.  In addition, Lead Plaintiffs moved for Class Certification on January 19, 2018, and the briefing on that motion ran through early April 2018.  *E.g.*, ECF No. 209.

Lead Plaintiffs served their opening expert report on August 30, 2018, and expert discovery ran through November 15, 2018.  ECF Nos. 237, 250.  Lead Plaintiffs' loss causation and damages expert, Chad Coffman ("Coffman"), submitted an opening expert report, as well as

---

[2]      Another group of plaintiffs had initially been appointed lead, but withdrew following the Court's guidance. *See* ECF No. 104.

1    a rebuttal report, and was deposed by Defendants (bringing the total number of depositions

2    Plaintiffs' Counsel defended to seven, as Defendants also deposed Coffman in connection with

3    class certification).  Similarly, Defendants' loss causation and damages expert, Daniel R. Fischel

4    ("Fischel"), submitted a report and was deposed by Plaintiffs' Counsel (bringing the total number

5    of depositions Plaintiffs' Counsel took to 12).  While expert discovery was ongoing, on September

6    4, 2018, the Court issued an order certifying the Class.  ECF No. 242.  It then issued another

7    order, on December 13, 2018, approving notice of the certification to Class Members ("Class

8    Notice").  ECF No. 242.  The Class Notice was disseminated consistent with the approved notice

9    plan, beginning on January 9, 2019, and the response of the Class was overwhelmingly positive

10   – only six individuals requested exclusion.[3]  ECF No. 269.

11        Defendants moved for Summary Judgment and to exclude Lead Plaintiffs' expert on

12   January 17, 2019.  ECF No. 258.  Lead Plaintiffs responded to those motions and moved to

13   exclude Defendants' expert on February 28, 2019.  ECF No. 264.

14        Shortly after Lead Plaintiffs' filings, on March 8, 2019, the Parties reached a

15   Memorandum of Understanding ("MOU") to settle this Action (as described immediately below).

16   At the time, trial was scheduled to begin in less than three months on May 28, 2019.  ECF No.

17   237; *see* ECF No. 252.

18        **C.    The Settlement**

19            **1.    The Settlement Occurred After Two Mediations and Additional
                      Assistance from a Well-Respected Mediator**

20        The Parties retained a former federal judge, the Honorable Layn Phillips (Ret.) ("Judge

21   Phillips"), as their mediator.  Judge Phillips has substantial experience mediating securities cases,

22   among others, and led the arm's-length negotiations here.

23        The mediation process unfolded over four-and-a-half months, as the initial attempts to

24   resolve the case were unsuccessful.  After fact discovery had concluded, the Parties had served

25   their expert reports, the Class had been certified, and the Parties prepared mediation briefs and

26

27   _____

28   [3]      Five requests for exclusion were received prior to March 2018 by Epiq, which disseminated the Class
     Notice.  ECF No. 269.  A sixth exclusion request was postmarked in February 2019, but not received until April
     2019.  The Parties do not object to the sixth request for exclusion from the Class.

attended a full-day mediation with Judge Phillips on October 29, 2018.  With the Parties unable to reach a resolution, litigation continued, the expert depositions occurred, the Class Notice was disseminated, and Defendants moved for summary judgment and to exclude Lead Plaintiffs' expert.  During that time, Judge Phillips facilitated additional negotiations between the Parties, but they also did not yield a resolution.  After Lead Plaintiffs filed their brief opposing summary judgment and the exclusion of their expert, as well as seeking exclusion of Defendants' expert, the Parties held another full-day mediation on March 8, 2019.  At the conclusion of that session, the Parties entered into a MOU to resolve the case, as set forth in the proposed Settlement.

### 2.     The Material Settlement Consideration

The material consideration Defendants are providing to resolve the Action is a $50 million, non-recourse, cash payment to the Class certified by the Court.  Stipulation ¶¶1(hh), 5, 25.  That is a substantial recovery in its own right, relative to similar cases, and is fair, reasonable, and adequate under the factors that the Ninth Circuit and Federal Rules of Civil Procedure use to evaluate class action settlements.  *Infra* at §III.A.

In exchange for that payment, the Class is providing Defendants with a release, pursuant to the Court's rules ("Released Claims").  Specifically, the Released Claims only encompass those that **both**:

> (a) arise out of, are based on, or relate in any way to any of the allegations, acts, transactions, facts, events, matters, occurrences, representations, or omissions involved that are set forth, alleged, or referred to in the Action, or which could have been alleged in the Action; and
>
> (b) arise out of, are based on, or relate to the purchase or acquisition of any SanDisk common stock.

Stipulation ¶¶1(bb), 3.  The language quoted immediately above ensures that Class Members are only releasing claims that are based on the identical factual predicate as the securities fraud claims at issue here.  *See* Standing Order for Civil Cases at 11.

Additional elements of the proposed Settlement, in particular the Plan of Allocation and Settlement Notice, are discussed below (*infra* at 19, 22-25).

1

III.     ARGUMENT

2

    A.     **The Settlement Merits Preliminary Approval**

3

        1.     **Governing Standard**

4

"[T]here is a strong judicial policy that favors settlements, particularly where complex

5

class action litigation is concerned." *E.g.*, *In re Syncor ERISA Litig.*, 516 F.3d 1095, 1101 (9th

6

Cir. 2008).[4]  In implementing that policy, courts should assess whether a proposed settlement is

7

"fair, reasonable, and adequate" and should permit notice when that standard is "likely" to be

8

satisfied.  FRCP 23(e)(1)-(2).  Although that assessment is made over two phases, preliminary

9

and final approval, this Court "review[s] class action settlements just as carefully at the initial

10

stage" as it does "at the final stage."  *Cotter*, 193 F. Supp. 3d at 1035-37.

11

Thus, at preliminary approval, this Court assesses the "settlement taken as a whole" under

12

the factors set forth in *Hanlon v. Chrsyler Corp.*, 150 F.3d 1011, 1026 (9th Cir. 1998), and the

13

related factors under Rule 23(e)(2).  *Cotter*, 193 F. Supp. 3d at 1035.  Each of those factors is set

14

forth and discussed in detail below.

15

Additionally, while "settlement approval that takes place prior to formal class certification

16

requires a higher standard of fairness[,]" due to the "dangers of collusion," that higher standard

17

does not apply here because the Class has already been certified.  *Hanlon*, 150 F.3d at 1026.

18

        2.     **The Settlement Is the Result of Arm's-Length Negotiations Assisted by an Experienced Mediator**

19

20

When a proposed settlement is the "product of arms-length negotiations[,]" a presumption

21

that it is fair and reasonable attaches to it, particularly where it occurs after meaningful discovery.

22

*In re Portal Software, Inc. Sec. Litig.*, No.C-03-5138 VRW, 2007 WL 1991529, at *6 (N.D. Cal.

23

June 30, 2007); *see also In re Heritage Bond Litig.*, No. 02-ML-1475 DT, 2005 WL 1594403, at

24

*9 (C.D. Cal. June 10, 2005).   Further, settlements reached with "[t]he assistance of an

25

experienced mediator" are generally deemed fair and non-collusive.  *Satchell v. Fed. Express*

26

*Corp.*, No. C03-2659 SI, 2007 WL 1114010, at *4 (N.D. Cal. Apr. 13, 2007); *Chun-Hoon v.*

27

*McKee Foods Corp.*, 716 F. Supp. 2d 848, 852 (N.D. Cal. 2010).

28

---

[4]      Unless otherwise noted, all emphasis is added and internal quotations and citations are omitted.

The proposed Settlement is the product of extensive arm's-length negotiations between highly experienced and capable counsel, pursuant to a formal mediation process overseen by a well-respected mediator with expertise in securities class actions. *Supra* at §II.C.1. With fact discovery complete, and the experts' reports served prior to the first full-day mediation session, and summary judgment largely briefed prior to the second full-day mediation session, the Parties were well informed about the strengths and weaknesses of the claims. The negotiations were hard-fought and focused on such complex and highly disputed issues, such as Defendants' scienter, the Parties' damages reports, and the difficulties in proving and defending the case at trial. These circumstances therefore confirm that the Settlement is non-collusive and create a presumption that it is fair and reasonable.

### 3. The *Hanlon* Factors Support Approval

The *Hanlon* factors used to evaluate settlements are non-exclusive and need not all be shown. *Churchill Village, L.L.C. v. Gen. Elec.*, 361 F.3d 566, 576 n.7 (9th Cir. 2004). "The relative degree of importance to be attached to any particular factor will depend upon and be dictated by the nature of the claim(s) advanced, the type(s) of relief sought, and the unique facts and circumstances presented by each individual case." *Officers for Justice v. Civ. Serv. Comm'n of City & Cty. of S.F.*, 688 F.2d 615, 624 (9th Cir. 1982); *see Torrisi v Tucson Elec. Power Co.*, 8 F.3d 1370, 1376 (9th Cir. 1993). These factors strongly support approval of the proposed Settlement.[5]

### a. The Amount Offered in Settlement Is Substantial

A settlement agreement "normally embodies a compromise; in exchange for the saving of cost and elimination of risk, the parties each give up something they might have won had they proceeded with litigation." *Officers for Justice*, 688 F. 2d at 624. Thus, in evaluating the amount offered in settlement, courts consider how that amount compares to the amount the class could

---

[5] This analysis does not include two of the *Hanlon* factors that are not relevant factors for or against the Settlement under the present circumstances. It does not include a discussion of the "presence of a governmental participant" because there was no such participant. *See Wren v. RGIS Inventory Specialists*, No. C-06-05778 JCS, 2011 WL 1230826, at *10 (N.D. Cal. Apr. 1, 2011) (that factor was inapplicable to the *Hanlon* analysis where no government entity was involved in the case). Similarly, it does not include a discussion of the reaction of the Class because that factor is applicable at final approval after dissemination of the settlement notice, which has not yet occurred here.

1    potentially recover at trial, taking into account the risks, delay, and expense of doing so.  *See id.*;

2    *Shapiro v. JPMorgan Chase & Co.*, No. 11 Civ. 8331(CM)(MHD), 2014 WL 1224666, at *11

3    (S.D.N.Y. Mar. 24, 2014) (amount of settlement is evaluated "not in comparison with the possible

4    recovery in the best of all possible worlds, but rather in light of the strengths and weaknesses of

5    plaintiffs' case").

6          After three years of hard-fought litigation, Class Representatives and Class Counsel have

7    succeeded in obtaining a substantial recovery for the Class of $50,000,000 in cash.  No portion

8    of the Settlement Amount will revert to Defendants.

9          Class Representatives and Class Counsel respectfully submit that this is an outstanding

10   result, in both percentage and absolute terms, particularly when compared to other securities fraud

11   class action settlements.  Based on the analysis of Class Representatives' loss causation and

12   damages expert, Coffman, the maximum potential damages for the Class after disaggregation and

13   netting were approximately $361 million.[6]  Schwartz Decl., Ex. 2 ¶28 (Declaration of Chad

14   Coffman Regarding Plaintiffs' Calculation of Damages ("Coffman Decl.")).  If accepted, specific

15   criticisms of Coffman's methodology proffered by Defendants' expert, Fischel, would have

16   reduced the amount of Class-wide damages to $85 million or less.  *Id.* ¶33.  Based on these figures,

17   the $50 million Settlement represents a recovery of approximately 14%-58% of the Class'

18   maximum recoverable damages.  That is a considerably larger recovery as a percentage of

19   damages than in most securities class action cases.  Cornerstone Research estimates that from

20   2009-2018, the median percentage of "simplified tiered damages" that all securities class actions

21   recovered was a far lower percentage than the recovery here, namely about 5%.  Schwartz Decl.,

22   Ex. 5 at 6 (Laarni T. Bulan, et al., *Securities Class Action Settlements – 2018 Review and Analysis*,

23   CORNERSTONE RES. (2018) (the "2018 Cornerstone Report")).[7]

24   _____

25   [6]      The term "disaggregation," as used here, means disaggregating the portion of a stock price movement in
     response to information that was allegedly wrongfully withheld from the portion of that movement, which responded
26   to other information.  Additionally, the term "netting," as used here, means netting any investor gains due to artificial
     inflation against any of the investor's losses due to artificial inflation.

27   [7]      According to the 2018 Cornerstone Report, the methodology used to calculate "simplified tiered damages"
     might overstate damages relative to case-specific analyses because of a number of simplifying assumptions applied.
28   *Id.*.  For example, among other things, the simplified tiered damages approach "does not examine the mix of
     information associated with the specific dates listed in the plan of allocation, but simply applies the stock price

Highlighting that point, courts regularly approve securities class action settlements with substantially lower percentage recoveries than the proposed Settlement provides here.  *See, e.g. In re Biolase, Inc. Sec. Litig.*, No. SAC 13-1300-JLS (FFMx), 2015 WL 12720318, at *4 (C.D. Cal. Oct. 13, 2015) (settlement at "8% of the maximum recoverable damages . . . equals or surpasses the recovery in many other securities class actions"); *McPhail v. First Command Fin. Planning, Inc.*, No. 05cv179-IEG-JMA, 2009 WL 839841, at *5 (S.D. Cal. Mar. 30, 2009) (settlement at "7% of the estimated damages . . . weigh[s] in favor of final approval"); *Int'l Bhd. of Elec. Workers Local 697 Pension Fund. v. Int'l Game Tech., Inc.*, No. 3:09-cv-00419-MMD-WGC, 2012 WL 5199742, at *3 (D. Nev. Oct. 19, 2012) (settlement at approximately "3.5% of the maximum damages . . . is within the median recovery in securities class actions settled in the last few years").

Further, in absolute terms, the proposed Settlement's $50 million recovery is more than four times larger than the median securities fraud class action settlement in 2018, which was $11.3 million.  2018 Cornerstone Report at 1.  Significantly, this impressive result was obtained notwithstanding the absence of factors associated with larger settlements in securities class action cases, such as accounting violations or a corresponding SEC or criminal action.  *Id.* at 9, 12, 15. The Settlement also compares favorably to settlements of securities class action cases resolved at a similar stage of litigation.  For securities class actions in which class certification was granted and a motion for summary judgment was filed, but not decided, in the five-year period from 2014 to 2018, the median recovery was $36.5 million, or 4.4% of "simplified tiered damages," notably lower than here.  *Id.* at 13.

Class Representatives and Class Counsel obtained this impressive amount offered in settlement by doing the hard work necessary to prepare this case for trial.  By the time the Settlement was reached, merits and expert discovery were complete, summary judgment and *Daubert* briefing was ongoing, and Class Representatives had retained, and were working with, jury and trial consultants in preparation for the scheduled May 28, 2019, trial date.  As described

movements on those dates to an estimate of the 'true value' of the stock during the alleged class period (or 'value line')."  *Id.* at 17.

immediately below, the substantial risks that the Class faced from continued litigation further demonstrate that the proposed Settlement provides an excellent recovery.

### b. The Strength of Class Representatives' Case Balanced Against the Substantial Risks of Continued Litigation

Courts "must balance the risks of continued litigation, including the strengths and weaknesses of plaintiff's case, against the benefits afforded to class members, including the immediacy and certainty of a recovery." *Knapp v Art.com, Inc.*, 283 F. Supp. 3d 823, 831 (N.D. Cal. 2017). Based on the evidence and expert reports reviewed in connection with summary judgment and preparing for trial, Class Representatives and Class Counsel believe in the merits of this Action. But they also recognize the substantial risks of continued litigation, with Defendants vigorously disputing all elements of the Class' claims. The most prominent risks to the Class securing a jury verdict and surviving appeals therefrom are set forth below.

The Risk of Establishing Material Misstatements and Omissions

As noted in the Court's opinion granting in part and denying in part Defendants' motion to dismiss the SAC (the "MTD Order"), the alleged false and misleading statements and omissions detailed in the SAC generally fell into two categories: (i) "a series of qualitative pronouncements about the strength of SanDisk's enterprise SSD portfolio"; and (ii) "a series of quantitative statements" that addressed the future prospects of the enterprise business, particularly Fusion-io. ECF No. 184 at 1.

Throughout the litigation, including in their motion for summary judgment, Defendants argued that the "qualitative" statements alleged to be false in the SAC (*e.g.*, that SanDisk had the "broadest" or "most comprehensive" enterprise SSD product line and its enterprise business had a "market leadership position," "momentum," "strong demand signals" from customers "in all key product categories," and was "firing on all cylinders") were general, optimistic statements (*i.e.*, puffery) and opinions that were not actionable as a matter of law. *See* ECF No. 258 at 10-12. While the Court had ruled that certain of the "qualitative" statements were not puffery, when considered "in context" (ECF No. 184 at 2), the MTD Order specifically addressed only a few of

the 47 statements alleged to be materially false and misleading and none that were made prior to January 21, 2015.

As a result, there was *some* risk that the Court might grant summary judgment with respect to qualitative statements notwithstanding its MTD Order.  Indeed, Defendants argued that summary judgment should be granted with respect to all such statements *before* January 21, 2015. That was because, prior to that date, the "relevant context" that the Court found "could reasonably have led investors to rely on [the] accuracy and completeness" of Defendants' qualitative statements touting enterprise – the loss a major customer (in a different part of SanDisk's business) – had not yet been discussed publicly.  *See* ECF No. 258 at 21-22.  Class Representatives believed that the "context" of the pre-January 21, 2015, qualitative statements touting enterprise – Defendants need to convince investors that they were successfully re-orienting SanDisk from older products that were experiencing slow growth to new, purportedly high-margin enterprise products – also "could reasonably have led investors to rely on [the] accuracy and completeness" of those statements.  ECF No. 184 at 2.  But this argument was untested and there was no assurance it would be successful.

As for Defendants "quantitative" statements, the Court had previously ruled that these statements, including that Fusion-io would earn $1 billion in 2015, were forward-looking statements protected by the PSLRA's "safe harbor."  *See* ECF No. 104 at 1, 4-6; ECF No. 184 at 1.  Although Class Representatives believed that an intervening Ninth Circuit decision – *In re Quality Sys., Inc. Sec. Litig.*, 865 F.3d 1130 (9th Cir. 2017) – demonstrated that all of the statements previously dismissed by this Court as forward-looking were, in fact, actionable "mixed" statements – *i.e.*, forward-looking statements accompanied by non-forward-looking statements not subject to the safe harbor – there was no assurance that the Court would revisit its earlier ruling or, if it did, rule in Class Representatives' favor with respect to this issue.

Defendants also argued that even if the alleged misstatements and omissions were not immaterial as a matter of law, they were not rendered false and misleading by Defendants' failure to disclose the allegedly concealed facts concerning the issues in SanDisk's enterprise business.

*See* ECF No. 258 at 14.  While Class Representatives argued that this position was inconsistent with well-settled law that once Defendants chose to tout positive information to the market, they could not mislead investors by withholding negative information cutting the other way, *see Schueneman v. Arena Pharms., Inc.*, 840 F.3d 698, 706 (9th Cir. 2016), as explained below (*infra* at 13-15).  A decision by the Court at the summary judgment stage that some or all of the statements alleged to be false and misleading were not actionable as a matter of law could have had implications with respect to the length of the Class Period, loss causation, and damages.

The Risk of Establishing Scienter

As Defendants' motion for summary judgment made plain, Defendants viewed the absence of any apparent personal financial motive on the part of the Individual Defendants (for example, significant insider selling) as an important factor weighing in their favor.  ECF No. 258 at 22-23.  In addition, the Individual Defendants adamantly asserted that they believed their statements were truthful when made.  *See* ECF Nos. 259-60.  In this regard, Defendants noted, among other things, that their scripted remarks during earnings conference calls were reviewed and revised by the Company's investor relations personnel and other members of SanDisk's senior management, including John Scaramuzzo, general manager of the enterprise business.  *See* ECF No. 259 ¶14.  Defendants also argued that Class Representatives' claim that Defendants intentionally or knowingly misled investors was implausible given that their optimistic statements, with respect to the financial prospects of the enterprise business unit, "would be put to the test in a matter of weeks" and risked destroying their credibility with the market.  *See* ECF No. 258 at 23.  Moreover, Defendants argued that there was no evidence of deliberate recklessness either since the financial projections they provided were supported by forecasts agreed to by the Company's senior management team.  *Id*. at 24-25.

While Class Representatives were confident that Defendants' claims of "no motive" would not carry the day on summary judgment, Class Counsel knew from experience that this fact did have the potential to sway a jury.  In addition, while Class Representatives believed that the record evidence demonstrated that Defendants (as well as SanDisk's senior management,

including John Scaramuzzo) possessed substantial information contradicting Defendants' positive statements concerning enterprise and its financial prospects (ECF No. 264 at 31-35), their arguments, in this regard, depended on voluminous, technical evidence that a jury could have found difficult to follow.   In short, Class Representatives and Class Counsel recognized that persuading a jury as to Defendants' scienter would be challenging.

The Risk of Establishing Loss Causation and Damages

Risks to establishing loss causation and damages were detailed in Defendants' motion seeking to exclude the opinion of Class Representatives' expert, Coffman, under *Daubert v. Merrell Dow Pharms. Inc.*, 509 U.S. 579 (1993), and in the rebuttal report of their expert, Fischel. *See* ECF No. 258 at 26-30; ECF No. 263-9.

To establish loss causation, Class Representatives would have to prove "a causal connection between the material misrepresentation and the loss[.]"  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 342 (2005).   Defendants argued that Coffman's methodology improperly "assumed" this causal connection because it assumed that Class Representatives would establish Defendants' liability for ***all*** of the alleged misstatements and omissions, including, in particular, the "quantitative" statements that the Court had previously concluded were protected by the PSLRA safe harbor for forward-looking statements.  *See* ECF No. 258 at 27.   In turn, Defendants argued that Coffman was required to, but did not, disaggregate the market impact of these protected statements from the impact of actionable statements.

Additionally, Defendants criticized Coffman's use of the "constant dollar" methodology to measure artificial inflation (under that methodology, the dollar amount of artificial inflation that dissipates with a corrective disclosure is the same as the dollar amount of artificial inflation caused by the corresponding misstatement).   They argued that certain of the issues and financial results that led enterprise to suffer losses did not occur until later in the Class Period, and that Defendants, therefore, could not have known of or disclosed those issues at the start of the Class Period, purportedly rendering it inappropriate to assign the same value to the artificial inflation of certain information at the start of the Class Period and the time of its disclosure.  *Id*. at 28-30.

1    While Class Representatives believed these criticisms were unfounded, and that Coffman

2    had applied widely accepted methodologies in securities class action cases, if Defendants

3    succeeded in excluding his opinions, Class Representatives' ability to prove loss causation and

4    damages would have been substantially impaired, if not extinguished.   Indeed, Defendants

5    insisted that, based on the foregoing arguments, Coffman's opinions were not reliable and should

6    be excluded by the Court under *Daubert*.  *Id.*

7    Also, though not a basis of their motion for summary judgment, Defendants, through

8    Fischel's rebuttal report, advanced several other arguments for limiting damages at trial.  First,

9    Fischel attacked Coffman's decision to use revenue attributable to the enterprise business as a

10    metric to disaggregate fraud-related declines in SanDisk's stock price on corrective disclosure

11    dates.  Fischel argued that Coffman should have used enterprise profits, instead of revenue, as a

12    disaggregation metric, and concluded that use of this alternate metric would have reduced

13    Coffman's maximum artificial inflation per share by 26%.  *See* ECF No. 263-9 ¶¶34-38.  Second,

14    Fischel attacked Coffman for identifying only two corrective disclosures, where Fischel found a

15    third purported corrective disclosure on July 22, 2015, a date three months after the end of the

16    Class Period.  *Id.* ¶¶39-45.  On this date, SanDisk announced better than expected results for its

17    enterprise business in 2Q2015 and its stock price rose nearly 18% after controlling for market and

18    industry factors.  *Id.* ¶¶41-42.  Finally, as noted, Defendants argued that the Class Period should

19    begin no earlier than January 21, 2015, effectively reducing it by half, because the alleged

20    misstatements and omissions prior to that date were inactionable as a matter of law, which would

21    have substantially reduced the amount of damages as well.  ECF No. 258 at 21-22.

22    While Class Representatives believed that Defendants' arguments with respect to loss

23    causation and damages lacked merit, the risk that the Court might shorten the Class Period and/or

24    that the jury would credit Fischel's positions on disaggregation and corrective disclosures over

25    Coffman's had considerable consequences in terms of the amount of the Class' potential recovery.

26    *See, e.g.*, *City of Providence v. Aeropostale, Inc.*, No. 11 Civ. 7132(CM)(GWG), 2014 WL

27    1883494, at *9 (S.D.N.Y. May 9, 2014) ("Undoubtedly, the Parties' competing expert testimony

28

on damages would inevitably reduce the trial of these issues to a risky battle of the experts and the jury's verdict with respect to damages would depend on its reaction to the complex testimony of experts, a reaction that is inherently uncertain and unpredictable."). Each of the arguments, if accepted by the jury, would individually reduce the potential recoverable Class-wide damages by approximately $100 million to $170 million and would collectively reduce damages by almost $300 million – that is from a maximum amount of $361.5 million to as little as $85.6 million. Coffman Decl. ¶33. Compared to the possibility of a recovery at those substantially lower levels, which would likely be further reduced by the post-trial claims process, the value the proposed Settlement increases even further.

* * *

As set forth in Class Representatives' opposition to Defendants' motion for summary judgment, Class Representatives believe that they adduced substantial evidence to support their claims and were prepared to proceed to trial. *See* ECF No. 264 at 4-35. They also understood, however, that success was not guaranteed. In particular, the outcome of a jury trial, especially in a case involving complex facts and claims, such as this one, can never be predicted with certainty. Moreover, as noted, this Action did not have many of the hallmarks of a successful securities fraud action – there was no restatement of financial results, SEC investigation, or criminal indictment. Simply put, for the reasons discussed above, there is no assurance that the Class would have recovered an amount equal to, let alone greater than, the proposed Settlement Amount.

### c.  The Complexity, Expense, and Likely Duration of Continued Litigation

Given the "notorious complexity" of securities class actions, in particular, settlement is often proper, as it "circumvents the difficulty and uncertainty inherent in long, costly trials." *In re AOL Time Warner, Inc. Sec. & "ERISA" Litig.*, No. MDL 1500, 2006 WL 903236, at *8, (S.D.N.Y. Apr. 6, 2006); *see Torrisi*, 8 F.3d at 1375-76 (finding settlement fair due to "the cost, complexity and time of fully litigating the case"); *In re LinkedIn User Privacy Litig.*, 309 F.R.D.

1  573, 587 (N.D. Cal. 2015) ("Generally, unless the settlement is clearly inadequate, its acceptance

2  and approval are preferable to lengthy and expensive litigation with uncertain results.").

3         If the Class survived summary judgment, the Action would have soon proceeded to trial,

4  which would have been extremely complex and expensive in and of itself, and, even if successful,

5  would have likely extended the length of the litigation by years due to the post-trial appeals and

6  claims process.   The complexity and expense of the trial would result from numerous factors,

7  including that: the Class would have to present its highly-technical case-in-chief entirely through

8  hostile witnesses; loss causation and damages would turn into a "battle of the experts" between

9  Coffman and Fischel; and the use of jury consultants to maximize the Class' presentation of all

10 of these issues.   "A trial of a complex, fact-intensive case like this could have taken weeks, and

11 the likely appeals of rulings on summary judgment and at trial could have added years to

12 litigation."   *In re Amgen, Inc. Sec. Litig.*, No. CV 7-2536 PSG (PLAx), 2016 WL 10571773, at

13 *3 (C.D. Cal. Oct. 25, 2016).   Indeed, in other securities fraud class actions that have gone to trial,

14 it has taken as long as seven years to proceed from verdict to final judgment, which would

15 enormously magnify the Class' expenses.   *See Jaffe Pension Plan v. Household Int'l., Inc.*, No.

16 1:02-cv-05893, Verdict Form (N.D. Ill. May 7, 2009) (ECF No. 1611) and Final Judgment and

17 Order of Dismissal with Prejudice (N.D. Ill. Nov. 10, 2016) (ECF No. 2267); *In re Vivendi

18 Universal, S.A. Sec. Litig.*, No. 1:02-cv-05571, Verdict Form (S.D.N.Y. Feb. 10, 2010) (ECF No.

19 998) and Final Judgment Approving Class Action Settlement of All Remaining Claims (S.D.N.Y.

20 May 9, 2017) (ECF No. 1317).   Moreover, assuming the Class won at trial and that verdict was

21 affirmed on appeal, Class Members would have likely faced a complex, lengthy, and contested

22 claims administration process to recover their individual awards.

23        But for the proposed Settlement, resolution of this Action would unquestionably entail

24 considerable time and expense, making the present value of a certain and substantial recovery far

25 preferable to the mere chance of a greater recovery in the distant future and the real possibility of

26 a smaller one.

27

28

1

2

### d.   Fact and Expert Discovery Are Complete and the Action Is at an Advanced Stage

3

"A settlement following sufficient discovery and genuine arms-length negotiation is

4

presumed fair" because, in those circumstances, the parties and their counsel had sufficient

5

information to make an informed decision about the merits of the case.  *Nat'l Rural Telecomms.*

6

*Coop. v. DIRECTV, Inc.*, 221 F.R.D. 523, 528 (C.D. Cal. 2004).  Discovery here is more than just

7

sufficient, as both fact and expert discovery are, in fact, complete.   Moreover, Class

8

Representatives and Class Counsel had a deep understanding of the evidence because they had

9

prepared extensive responses to Defendants' contention interrogatories, opposed Defendants'

10

motion for summary judgment, and were in the midst of preparing evidence for trial.  In short, a

11

careful and complete evaluation of the evidence led to the conclusion that entering into the

12

proposed Settlement would produce an excellent recovery for the Class.  *See Todd v. STAAR*

13

*Surgical Co.*, No. CV 14-5263 MMF (GJSx), 2017 WL 4877417, at *4 (C.D. Cal. Oct. 24, 2017)

14

("the parties had ample information with which to make informed settlement decisions" after,

15

among other things, having "engaged in substantial discovery").

16

### e.   The View of Experienced Counsel

17

Courts consider and place "weight" on the views of experienced counsel because parties

18

represented by such counsel are positioned to "produce a settlement that fairly reflects each

19

party's expected outcome in the litigation."  *See DIRECTV*, 221 F.R.D. at 528.  As detailed above,

20

through extensive discovery, litigation, and mediation, Class Counsel has a comprehensive

21

understanding of the merits and risks of the claims and of the proposed Settlement.  Given Class

22

Counsel's extensive experience with securities cases and class actions, its assessment that the

23

proposed Settlement is a very favorable outcome for Class Members merits substantial weight.

24

### f.   The Risk of Maintaining Class Action Status Through Trial

25

Following the class certification order, Defendants have raised no new issues or

26

subsequent arguments with regard to the maintenance of class certification that the Court did not

27

already address therein.  This factor does not favor or disfavor approval.  Nor does it affect the

28

overall evaluation of the proposed Settlement, as all of the other factors overwhelmingly favor approval. *General Electric*, 361 F.3d at 576 n.7.

* * *

To summarize, the *Hanlon* factors strongly support approving the proposed Settlement because: the amount offered is substantial; continued litigation would pose significant risks of non-recovery or lesser recovery, while imposing considerable delays and expense on the Class; and having completed fact and expert discovery, the Parties and their experienced counsel were well informed about the strengths and weaknesses of the Action.

### 4.    The Rule 23(e)(2) Factors Support Approval

The Rule 23(e)(2) factors largely overlap with the *Hanlon* factors and also strongly favor approving the proposed Settlement.

### a.    Class Representatives and Class Counsel Have Adequately Represented the Class

Class Representatives and Class Counsel respectfully submit that they have adequately represented the Class, including with respect to the proposed Settlement.  Within the Ninth Circuit, the adequacy inquiry is governed by two questions: "(1) whether the named plaintiffs and their counsel have any conflicts of interest with other class members, and (2) whether the named plaintiffs and their counsel [will] prosecute the action vigorously on behalf of the class." *Brown v. China Integrated Energy Inc.*, No. CV 11-02559 BRO (PLAx), 2015 WL 12720322, at *15 (C.D. Cal. Feb. 17, 2015) (quoting *Hanlon*, 150 F.3d at 1020).

Class Representatives' interests are directly aligned with those of absent Class Members because they all have an interest in obtaining the largest possible recovery from Defendants.  Class Representatives, along with all eligible Class Members, will share *pro rata* in the Class' recovery pursuant to the Plan of Allocation.  Moreover, Class Representatives have actively supervised the litigation and retained experienced counsel who have vigorously prosecuted the Action on behalf of the Class to within months of trial.

**b.**     **The Settlement Was Negotiated at Arm's-Length**

Not only is the Settlement a product of arm's-length negotiations, as required, but it also resulted from a lengthy mediation process overseen by Judge Phillips, a retired federal judge and experienced mediator.  *Supra* at §III.A.2.

**c.**     **The Relief Provided Is Adequate, Taking into Account the Costs, Risks, and Delay of Trial and Appeal, as Well as Other Factors**

The primary element of this factor – whether the relief, in this instance the amount offered, is adequate taking into account the costs, risks, and delay of trial and appeal – overlaps with several of the *Hanlon* factors.  As discussed, the $50 million payment to the Class is a substantial recovery, particularly when weighed against the potential negative consequences of ongoing litigation, and unquestionably adequate relief.  *Supra* at 7-17.

This factor also analyzes the adequacy of the relief relative to several other considerations, including the "effectiveness of any proposed method of distributing relief to the class, including the method of processing class-member claims[.]"  FRCP 23(e)(2)(C)(ii).  The proposed Plan of Allocation was developed by the Class' damages expert, Coffman.  It is based on the methodologies and calculations that he has submitted to date in this Action and would have presented at trial.  Coffman Decl. ¶34.  Thus, it provides for a claims process that distributes the Net Settlement Fund *pro rata* based on the approximate individual losses of eligible Class Members.  Schwartz Decl., Ex. 1-A-1 at 17-25 (Settlement Notice).  Courts regularly approve similar allocation plans in securities class actions.  *See In re Oracle Sec. Litig.*, No. C-90-0931-VRW, 1994 WL 502054, at *1 (N.D. Cal. June 18, 1994) ("A plan of allocation that reimburses class members based on the extent of their injuries is generally reasonable."); *see Heritage Bond*, 2005 WL 1594403, at *11 (allocation formula need only have a reasonable basis).[8]

---

[8]     If, after the first distribution, a sufficient amount of money remains unclaimed from the Net Settlement Fund, Epiq will make a second distribution, should it be economically efficient to do so.  After the distribution process is complete, Epiq will distribute any remainder in the Net Settlement Fund in equal amounts to the Consumer Federation of America and the Council of Institutional Investors (or such other non-profit organizations approved by the Court) – organizations that promote interests similar to the securities laws and with which Class Counsel has no relationships.

---

1    In addition, this factor takes into account "the terms of any proposed award of attorney's

2    fees[.]"  FRCP 23(e)(2)(C)(iii).  As the Settlement Notice explains, Class Counsel plan to seek

3    an award of attorneys' fees not to exceed 28% of the Settlement Fund.  A 28% fee award, if

4    requested, would be slightly greater the Ninth Circuit's 25% benchmark and within the "usual

5    range."  *Destefano v. Zynga, Inc.*, No. 12-cv-04007-JSC, 2016 WL 537946, at *16 (N.D. Cal.

6    Feb. 11, 2016).  It would also result in a negative multiplier of approximately 0.9 – that is it would

7    be less than Class Counsel's collective lodestar to date of over $15 million  Schwartz Decl. ¶6.

8    Given the substantial amount of effort necessary to bring the Action to summary judgment and

9    within three months of trial, and to achieve the excellent recovery described herein, Class Counsel

10   respectfully submit that an award of up to 28% would be appropriate, and courts have granted

11   such awards in similar circumstances.  *See, e.g.*, *Heritage Bon.*, 2005 WL 1594403, at *11 (factors

12   that support an award above the benchmark include "the hours devoted to the case" and awarding

13   33.3% fee of $27.8 million settlement); *In re CV Therapeutics, Inc., Sec. Litig.*, No. C 03-3709

14   SI, 2007 WL 1033478, at *1 (N.D. Cal. Apr. 4, 2007) (awarding 30% fee of $13.5 million

15   settlement).  Class Counsel will also seek reimbursement of reasonable litigation expenses,

16   including reimbursement of Class Representatives' costs and wages for work expended on the

17   Action, not to exceed $1 million.  Here too, in light of the substantial amount of expert and factual

18   development necessary to bring the Action to this stage and prepare for trial, Class Counsel

19   respectfully submits that such reimbursement is appropriate, and courts have granted such awards

20   in similar circumstances.

21       Finally, this factor takes into account "any agreement made in connection with the

22   propos[ed]" settlement.  FRCP 23(e)(2)(C)(iv) and (e)(3).  The only such agreement here,

23   assuming it falls within that rule, is the Parties' confidential Supplemental Agreement Regarding

24   Requests for Exclusion ("Supplemental Agreement").  It would permit Defendants to terminate

25   the Settlement if the number of Class Members who request exclusion in connection with the

26   Settlement reaches a certain threshold.  That is the entire substance of the Supplemental

27   Agreement.  Such agreements are standard provisions in securities class actions and ensure that

28

Defendants are receiving finality, without affecting Class Members' rights under, or altering the substance or fairness of, the Settlement.  Should the Court wish to review the Supplemental Agreement, the Parties are prepared to present it, and would respectfully request that they be permitted to do so under seal, as litigants and courts typically treat such agreements as confidential.

        **d.**      **The Settlement Treats Class Members Equitably Relative to Each Other**

The proposed Plan of Allocation treats all Class members equitably relative to each other. As discussed above (*supra* at 19-20), the proposed claims process will result in each Class Member, who submits an eligible claim, receiving a Recognized Claim amount, expressed in dollars, that approximates its losses based on the alleged artificial inflation in SanDisk common stock at the time it acquired and/or disposed of that stock.  Settlement proceeds will then be distributed *pro rata* among those Class Members, according to the relative size of their Recognized Claims.  This process treats Class Members equally by using the same objective criteria to determine their Recognized Claims and distributing Settlement proceeds in direct and consistent proportion to the amount of the Recognized Claims.  Class Representatives' claims will be handled in the same manner.[9]

* * *

Like the *Hanlon* factors, the Rule 23(e)(2) factors strongly support preliminary approval because the Settlement will provide a substantial recovery as a result of extensive litigation and arm's-length negotiation, avoid the potential negative outcomes of additional litigation, and disseminate the Settlement proceeds in an efficient and equitable manner.

    **B.**      **The Class Has Been Certified and the Settlement Specifically Applies to that Class**

The Class definition that the Court certified, and that the Settlement adopts, is the same. Specifically, in both instances, the Class covers: "all persons and entities who purchased or otherwise acquired SanDisk's publicly traded common stock during the period from October 16,

---

[9]    As noted, Class Representatives will also seek reimbursement of their reasonable costs, including lost wages, for work they performed in the Action.

2014 through April 15, 2015 (inclusive), and were damaged thereby."  ECF Nos. 209 at 9, 242 at 4; Stipulation ¶1(e).[10]  In turn, as discussed herein (*supra* at §II.C.2.), the Class Members' Released Claims under the Settlement are limited to claims with the same factual predicate as the claims at issue in the Action and already certified.  Thus, the certified Class perfectly overlaps with the Settlement and enables the Class-wide resolution of the Action through the Settlement.

### C.   The Court Previously Approved the Notice Plan for Class Certification and Should Approve the Similar Plan for Disseminating the Settlement Notice and the Form of Notice

The Federal Rules of Civil Procedure require the Court to direct the "best notice that is practicable under the circumstances, including individual notice to all [class] members who can be identified through reasonable effort" and "who would be bound by the propos[ed]" settlement.  FRCP 23(c)(2)(B) and (e)(1)(B) (notice must be given "in a reasonable manner").  The Court previously approved the Class Notice, informing Class Members of class certification, under this standard.   The Settlement Notice program builds on information already gained from the dissemination of the Class Notice and follows a similar dissemination plan.  Class Representatives propose to provide notice of the Settlement: (i) by first-class mailing (and email if provided) of the long-form Settlement Notice, addressed to all Class Members, who can reasonably be identified and located, including by using the mailing information gathered from the mailing of the Class Notice; and (ii) by publication of the Summary Settlement Notice in *Investor's Business Daily* and its transmission on the internet over *PR Newswire*.  The Settlement Notice will also be posted on the case website and Class Counsel's website.[11]  Courts regularly find that similar plans

---

[10]       The same is true for the exclusions from the Class.  The definition of the certified Class has the following exclusions: "[e]xcluded from the Class are Defendants and their immediate family members; the officers and directors of the Company during the Class Period and their immediate family members; any entity in which Defendants have or had a controlling interest; and the legal representatives, heirs, successors, assigns, or affiliates of any excluded person" (ECF No. 209 at 9) and "those who purchased or otherwise acquired SanDisk's publicly traded common stock during the class period but who sold their stock prior to the first corrective disclosure on March 26, 2015" (ECF No. 242 at 4).  The Class defined in the Stipulation for the proposed Settlement has the exact same exclusions. Stipulation ¶1(e) (also noting that any person or entity that properly seeks exclusion from the Class will be excluded).

[11]       Because of the availability of name and address data for Class Members from third-party banks, brokers, and nominees, and Epiq's ability to reach potential Class Members through individual mailed notice, Class Counsel and Epiq (which has its own department that specializes in media notice via multi-channel advertising) have conferred and determined that using social media or hiring an outside marketing specialist would not be appropriate here.

1  providing "notice by mail and publication [are] the best notice practicable under the

2  circumstances, as mandated by FRCP 23(c)(2)(B)."  *Portal Software*, 2007 WL 1991529, at *7;

3  *see also* ECF No. 255.  Just as it approved the Class Notice dissemination plan, the Court should

4  approve the similar Settlement Notice dissemination plan.

5      Relatedly, the Court appointed Epiq to disseminate the Class Notice (ECF No. 255 at 4),

6  and for the same reasons, as well as for efficiency concerns, should permit Epiq to disseminate

7  the Settlement Notices and serve as the claims administrator.  In selecting Epiq, on November 9,

8  2018, Class Counsel requested bids from five highly qualified claims administration firms for two

9  separate projects: (1) notice of pendency; and (2) settlement administration.  Class Counsel

10  selected Epiq because its estimates were the most competitive of the five submissions and

11  commensurate with the costs of other comparable administrations that Class Counsel has

12  overseen.  *See* Schwartz Decl., Ex. 3 (Declaration of Alexander Villanova of Epiq in Support of

13  Settlement Notice Plan ("Villanova Decl.")).   With respect to Notice and Administration

14  Expenses, Epiq estimates that its fees and expenses in connection with the Settlement notices and

15  claims process may be in the range of $430,000 to $480,000, which includes Epiq's fees and

16  expenses to date in connection with disseminating the Class Notice.  *Id.* ¶19.[12]  This estimate

17  assumes, among other things, that approximately 140,000 notice packets of roughly 20 pages will

18  be mailed and that 35,000 claim forms will be received.  *Id.*  In the event that actual experience

19  differs from these assumptions, the administrative fees and expenses may differ.  *Id.*  Within the

20  past two years, Class Counsel, serving as Lead Counsel, has engaged Epiq on three matters to

21  administer claims.  Schwartz Decl. ¶4 (providing further information regarding engagements with

22  Epiq).  Both Epiq and Class Counsel have effectively disseminated notice programs in similar

23  cases and expect a similar experience here.  *See* Villanova Decl. ¶17; Schwartz Decl. ¶5.

24      In terms of its form, notice is satisfactory if it generally describes the terms of the

25  settlement in sufficient detail to alert those with adverse viewpoints to investigate and to come

26  forward and be heard.  Several rules, statutes, and guidelines place additional requirements on the

27

28
_____

[12]      Epiq's fees and expenses in connection with the Class Notice, to date, total $87,150.33, and Epiq anticipates
incurring approximately $10,000 more to complete this stage.  *Id.* at 5 n.2.

form of notice.  The proposed Settlement Notice here (Schwartz Decl., Ex. 1-A-1) meets all of these requirements.  It is written in plain language and clearly sets forth all relevant information along with answers to commonly asked questions:

- As required by Rules 23(c)(2)(B) and (e)(1), the Settlement Notice objectively and neutrally apprises Class Members of the Action's nature, claims, and issues, Class definition, procedures and deadlines for any Class Members who so wish to exclude themselves from the Settlement or object, and binding effect of the judgment on Class Members;

- As required by the PSLRA, 15 U.S.C. §78u-4(a)(7), the Settlement Notice provides the amount of the Settlement on an absolute and per-share basis, a discussion of the issues on which the Parties disagree, the amount of attorneys' fees and litigation costs that Class Counsel will seek, the names and contact information of Class Counsel available to answer Class Members' questions, and a discussion of why the Parties are proposing the Settlement;

- As required by ¶3 of the Court's Procedural Guidance for Class Action Settlements ("N.D. Cal. Guide"), the Settlement Notice provides the web address for the case website and instructions on how to access the case docket; and

- The Settlement Notice informs Class Members of the date, time, and location of the Final Settlement Hearing, procedures and deadlines for submitting Claim Forms or objections, and Plan of Allocation, among other things.[13]

The Summary Settlement Notice (Schwartz Decl., Ex. 1-A-3) provides similar abbreviated information.  Accordingly, the Court should approve the form of Settlement Notice.

Class Members who wish to receive a recovery must respond by filing a Proof of Claim (Schwartz Decl., Ex. 1-A-2), which is appropriate because their potential damages and recovery under the Plan of Allocation are dependent on their transactions in SanDisk common stock, and neither Defendants nor Class Representatives possess that data.

**D.      The Proposed Schedule of Events**

The Parties respectfully propose that the Court should enter the schedule of events leading up to the Final Settlement Hearing (*see* Schwartz Decl., Ex. 4), which complies with *In re Mercury Interactive Corp. Sec. Litig.*, 618 F.3d 988 (9th Cir. 2010) (requiring that fee motion be made available to the class before the deadline for objecting to the fee), and the N.D. Cal. Guide.

---

[13]      In addition to the Settlement Notice discussed above, Defendants will serve the notice required by the Class Action Fairness Act, 28 U.S.C. §1715, *et seq.*, no later than 10 days after the filing of the Stipulation with the Court. Stipulation ¶52; N.D. Cal. Guide ¶10.

**IV.      CONCLUSION**

For the foregoing reasons, the Court should grant the Motion in full, preliminarily approve the Settlement, approve the Settlement Notice and notice plan, and enter the schedule set forth herein.

Dated:  May 6, 2019

**SCOTT+SCOTT ATTORNEYS AT LAW LLP**

By:  /s/ Max R. Schwartz
DEBORAH CLARK-WEINTRAUB (*pro hac vice*)
MAX R. SCHWARTZ (*pro hac vice*)
The Helmsley Building
230 Park Avenue, 17th Floor
New York, NY 10169
Telephone: (212) 223-6444
Facsimile:  (212) 223-6334
Email:  dweintraub@scott-scott.com
              mschwartz@scott-scott.com

JOHN T. JASNOCH (Bar No. 281605)
**SCOTT+SCOTT ATTORNEYS AT LAW LLP**
600 W. Broadway, Suite 3300
San Diego, CA 92101
Telephone: (619) 233-4565
Facsimile:  (619) 233-0508
Email:  jjasnoch@scott-scott.com

*Attorneys for Class Representatives and the Class*

JONATHAN GARDNER (*pro hac vice*)
CAROL C. VILLEGAS (*pro hac vice*)
ROSS M. KAMHI (*pro hac vice*)
**LABATON SUCHAROW LLP**
140 Broadway
New York, NY 10005
Telephone: (212) 907-0700
Facsimile:  (212) 818-0477
Email:  jgardner@labaton.com
              cvillegas@labaton.com
              rkamhi@labaton.com

STEVEN J. TOLL (*pro hac vice*)
ELIZABETH ANISKEVICH
**COHEN MILSTEIN SELLERS & TOLL PLLC**
1100 New York Avenue, NW, Suite 500
Washington, DC 20005
Telephone: (202) 408-4600
Facsimile: (202) 408-4699
Email:  stoll@cohenmilstein.com
              eaniskevich@cohenmilstein.com

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

CHRISTOPHER LOMETTI (*pro hac vice*)
**COHEN MILSTEIN SELLERS & TOLL PLLC**
88 Pine Street, 14th Floor
New York, NY 10005
Telephone: (212) 838-7797
Facsimile: (212) 838-7745
Email:   clometti@cohenmilstein.com

*Additional Plaintiffs' Counsel*

UNOPPOSED NOTICE OF MOTION & MOTION FOR PRELIMINARILY APPROVAL OF SETTLEMENT; MEMORANDUM IN SUPPORT
CASE NO. 3:15-CV-01455-VC

26

1

## <u>CERTIFICATE OF SERVICE</u>

2      I hereby certify that on May 6, 2019, I caused the foregoing to be electronically filed with

3  the Clerk of the Court using the CM/ECF system, which will send notification of such filing to

4  the email addresses denoted on the Electronic Mail Notice List.

5      Executed on May 6, 2019, at New York, New York.

6                                          /s/ Max R. Schwartz
                                         MAX R. SCHWARTZ (*pro hac vice*)
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28